**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE No. 18-cv-61991-BLOOM/Valle**

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

v.

1 GLOBAL CAPITAL LLC, and
CARL RUDERMAN,

       Defendants, and

1 WEST CAPITAL LLC,
BRIGHT SMILE FINANCING, LLC,
BRR BLOCK INC.,
DIGI SOUTH, LLC,
GANADOR ENTERPRISES, LLC,
MEDIA PAY LLC,
PAY NOW DIRECT LLC, and
RUDERMAN FAMILY TRUST,

       Relief Defendants.
_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant Carl Ruderman's Motion to Dismiss the Amended Complaint, ECF No. [103] (the "Motion"). The Court has carefully reviewed the record, the parties' briefs, and the applicable law. For the reasons that follow, the Motion is denied.

**I.    BACKGROUND**

Plaintiff Securities and Exchange Commission ("SEC") initiated this action on August 23, 2018 against Defendants Carl Ruderman ("Ruderman") and 1 Global Capital ("1 Global") for violations of the Securities Act and Exchange Act. Ruderman founded, served as chairman, and

functioned as Chief Executive Officer of 1 Global — a private, South Florida firm. ECF No. [79] at ¶¶ 1, 7.

According to SEC's Amended Complaint, from February 2014 until July 27, 2018, 1 Global fraudulently raised more than $287 million from more than 3,400 individuals in at least 25 states to fund its business of offering short-term loans, called merchant cash advances ("MCAs") to small and medium-sized businesses. *Id.* at ¶¶ 1-2. Pursuant to the MCAs, in exchange for a loan, a merchant assigned its future accounts receivable to 1 Global until the full amount owed by the merchant under the MCA was repaid. *Id.* at ¶ 30; ECF No. [103-1] at 2. 1 Global also obtained a lien over the entire business and its assets. ECF No [103-1] at 4.

1 Global funded its MCA business with money from individuals. ECF No. [79] at ¶ 37. 1 Global used an instrument called a Syndication Partner Agreement or Memorandum of Indebtedness ("MOI") as the note or contract between 1 Global and noteholders. *Id.* at ¶ 50. The MOIs specifically stated that they enabled 1 Global to "expand its current business activities" which "shall include, but shall not be limited to, providing innovative funding known as [MCAs]." ECF No. [103-3] at ¶ 7. Additionally, the MOIs stated that 1 Global had "sole discretion" over how to conduct its business activities. *Id.* The funds tendered by noteholders under the MOIs were used to fund numerous MCAs so that each noteholder obtained a small, fractionalized interest in up to hundreds of MCAs, and each MCA was funded by dozens or even hundreds of noteholders. *Id.* at ¶ 56.

1 Global used significant portions of noteholder funds for purposes other than making MCAs. *Id.* at ¶ 64. Specifically, 1 Global spent approximately $6.4 million more in noteholder funds on operating expenses than it told noteholders it would. *Id.* at ¶ 65. 1 Global also spent $50 million of noteholder money to purchase $60 million of bad credit card debt, which

represented 16% of all noteholder funds 1 Global raised through April 2018.  *Id.* at ¶ 66.  Additionally, 1 Global misappropriated at least $28 million in noteholder funds to pay Ruderman personally as well as several companies in which he or his family members had a direct interest.  *Id.* at ¶ 68.

1 Global offered and sold MOIs that had either a nine-month or one-year term.  *Id.* at ¶ 52.  The nine-month MOI automatically rolled over into a new nine-month term unless the investor expressly informed 1 Global in writing at least 30 days before the end of the nine months that he or she did not want to roll over.  *Id.*  It took 1 Global several months to fully pay out a noteholder's principal plus interest.  *Id.* at ¶ 55.  Often 1 Global would not generate enough money from the MCAs to fully pay redeeming noteholders, forcing 1 Global to use new noteholder funds to pay off redeeming noteholders.  *Id.* at ¶ 57.

Defendant Ruderman filed the instant Motion on September 4, 2018.  SEC's Response, and Ruderman's Reply, timely followed.  *See* ECF Nos. [20], [25].  Ruderman argues that SEC does not have enforcement authority to bring this suit because the MOIs are not securities given that they fall squarely inside the list of non-securities enumerated in the Supreme Court's decision of *Reves v. Ernst & Young,* 494 U.S. 56 (1990).  In the alternative, Ruderman argues that the MOIs fall under the express statutory exemption in the Exchange Act and the registration requirement of the Securities Act for notes not exceeding nine months in duration.  Lastly, Ruderman argues that SEC is not authorized to seek disgorgement as a remedy in this action.

In Response, SEC counters that the MOIs are securities because they do not fall within a category of notes that *Reves* identified as not being securities. Moreover, the MOIs are securities applying the "family resemblance" test set forth in *Reves*.  Additionally, the MOIs are not exempt from the Exchange Act or the registration requirements of the Securities Act because the

MOIs are not short term and because the MOIs are investments. SEC further argues that the MOIs are securities because they are investment contracts under the *Howey* test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Finally, SEC maintains that disgorgement is a proper remedy in SEC enforcement actions.

## II. LEGAL STANDARD

Rule 8 of the Federal Rules requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal

4

conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682). A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

## III. DISCUSSION

### a. Standard for Evaluating Subject Matter Jurisdiction

As an initial matter, SEC argues that Ruderman's Motion to Dismiss should be construed as a 12(b)(1) challenge to the Court's subject-matter jurisdiction, not under Rule 12(b)(6) for failure to state a claim. SEC contends that the distinction is critical because a court "may only find that it lacks subject matter jurisdiction 'if the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action*.'" *SEC v. LeCroy*, No. 09-cv-2238, 2010 WL 11565305, at *2 (N.D. Ala. Aug. 4, 2010) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (emphasis in original). SEC argues that the present question of whether an investment is a security implicates both whether the Court has subject matter jurisdiction and the

merits of the cause of action. Ruderman counters in his Reply that the motion to dismiss is properly brought under Rule 12(b)(6) because the Motion sets forth reasons why the SEC has not brought a claim on which relief can be granted — that the MOIs are not securities under the Securities and Exchange Acts and the MOIs are nine-month notes and thus are exempt from the Exchange Act and from the registration requirement of the Securities Act.

SEC relies on *SEC. v. Mut. Benefits Corp.*, in which the Eleventh Circuit affirmed the district court's denial of a motion to dismiss for lack of subject matter jurisdiction under 12(b)(1). 408 F.3d 737, 745 (11th Cir. 2005). In denying defendant's motion to dismiss, the district court concluded that the contracts at issue qualify as "investment contracts" within the meaning of the Securities Acts of 1933 and 1934. *Id.* at 738. The Eleventh Circuit noted that because the defendants' motion to dismiss directly challenged the merits of SEC's case, "such an attack is best resolved through a Rule 56 motion for summary judgment or a Rule 12(b)(6) motion to dismiss for failure to state a claim…" *Id.* at 742. Although brought as a 12(b)(1) motion, the Eleventh Circuit resolved the question of whether the contracts qualified as "investment contracts" based on the undisputed facts presented in the record. *Id.*

Here, Ruderman's Motion directly challenges the merits of SEC's case and the Motion expressly states that it is brought under Rule 12(b)(6). ECF No. [103] at 1 ("Defendant Carl Ruderman, pursuant to Fed. R. Civ. P. 12(b)(6), respectfully submits this motion to dismiss …"). Courts routinely consider motions to dismiss pursuant to Rule 12(b)(6) where a defendant argues a claim for a securities violation fails due to insufficient allegations that the instruments at issue are "securities" under the applicable securities laws. *See, e.g., SEC v. Olive*, 2013 WL 12091826, at *2 (S.D. Fla. July 17, 2013) (under Rule 12(b)(6), examining whether agreements were "investment contracts" under the securities laws and pursuant to *Howey* test); *Steinhardt*

*Group Inc. v. Citigroup*, 126 F.3d 144 (3rd Cir. 1997) (affirming order granting motion to dismiss under Rule 12(b)(6) where defendants argued that the transactions at issue were not investment contracts under *Howey* and, thus, not securities); *Bollinger v. Marco Bay Homes, LLC*, No. 2:08-CV-119-UA-DNF, 2008 WL 4844763, at *2 (M.D. Fla. Nov. 6, 2008) (examining, under Rule 12(b)(6), a motion to dismiss whether certain agreements were "investment contracts" under the securities laws); *SEC v. SG Ltd.*, 265 F.3d 42, 49-50 (1st Cir. 2001) (same); *SEC v. Schooler*, 2013 WL 3320364, at *2 (S.D. Cal. July 1, 2013) (same); *SEC v. Stanford Int'l Bank, Ltd.*, No. 2011 WL 13160374, at *2 (N.D. Tex. Nov. 30, 2011) (under Rule 12(b)(6), determining whether the SEC properly pled that certificate of deposits at issue were securities under *Reves*); *Peterson v. Wasem*, 1991 WL 119609, at *1 (N. D. Ill. June 28, 1991) (same); *Eagle Trim, Inc. v. Eagle-Picher Indus., Inc.*, 205 F. Supp. 2d 746, 753 (E.D. Mich. 2002) (examining whether notes were "securities" under *Reves* in Rule 12(b)(6) context); *Beber v. Kanarick*, 1992 WL 8716, at *2 (S.D.N.Y. Jan. 14, 1992). Accordingly, the Court construes Defendant's Motion as being brought under 12(b)(6).

The Court's review of a 12(b)(6) motion to dismiss is limited to "the complaint itself and any documents referred to in the complaint which are central to the claims." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *see also Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)). The MCA and MOI attached to the Motion, ECF No. [103-1] and [103-3], are central to SEC's claims and their authenticity is undisputed. The Court will consider the MCA and MOI for purposes of resolving this Motion.

### b. The MOIs are Securities Under *Reves*

Ruderman argues that SEC does not have enforcement authority to bring this suit because the MOIs are not securities.  Ruderman contends that the MOIs fall squarely within two categories of notes that the Supreme Court has declared are not securities — namely, short-term notes secured by a lien on a small business or some of its assets, and short-term notes secured by an assignment of accounts receivable.  Ruderman insists that the inquiry ends here and the Court need not engage in the four-factor "family resemblance" test set forth in *Reves.*  SEC counters that the MOIs were not loans to businesses, but rather investments in 1 Global's business, and therefore do not fall within the categories of notes that are not securities.  SEC also argues that Ruderman cited the wrong standard the Court must use to evaluate whether the MOIs were securities and that the Court must apply the "family-resemblance" test.

In *Reves,* the Supreme Court set forth the proper approach to ascertaining whether a "note" is a security under the Securities Acts.  494 U.S. 56, 64–65 (1990).  The Court adopted the "family resemblance" test, under which

> [a] note is *presumed* to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance ... to one of the ... categories of instrument [identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1137 (2d Cir.1976)].

*Reves*, 494 U.S. at 67 (emphasis added).  The categories of instruments enumerated by the Second Circuit which are *not* securities include

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] ... notes evidencing loans by commercial banks for current operations.

*Id.* at 65 (quoting *Exch. Nat. Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976) and *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir. 1984)).

The Supreme Court listed four factors to determine whether an instrument bears a strong resemblance to the instruments on the list: (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument. *Reves*, 494 U.S. at 66–67. The Court instructed that if application of *Reves*'s four factors "leads to the conclusion that an instrument is not sufficiently similar to an item on the list," the analyzing court must then decide "whether another category should be added ... by examining the same factors." *Id.* at 67. The Court in *Reves* conceived of this analysis as comprised of two separate steps, however, "both inquiries involve the application of the same four-factor test, and so the two essentially collapse into a single inquiry." *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 2002); *accord Resolution Tr. Corp. v. Stone*, 998 F.2d 1534,1538–39 (10th Cir. 1993) (treating the two steps as a single inquiry).

The Court agrees with Ruderman that the first inquiry for the Court is to determine whether the MOIs fall within a category of notes that the Supreme Court has declared are not securities. *See Lincoln v. Washington Mut. Bank, N.A.*, No. 07-60273-CIV, 2007 WL 9701069, at \*2 (S.D. Fla. Aug. 6, 2007) ("Since the note in contention is a mortgage note for a home there is no need to further discuss the family resemblance test. The note in question is on the judicially crafted list of exceptions and as such is not a security."). However, the Court does not agree that the MOIs fall within any of the categories on the list of notes that are not securities.

9

First, even if the MOIs were secured, they certainly were not secured by *a* lien on *a* small business or some of *its* assets, nor were they secured by *an* assignment of accounts receivable. Rather, funds tendered under MOIs were used to fund numerous MCAs so that each noteholder obtained a small, fractionalized interest in up to hundreds of MCAs.  Each MCA granted 1 Global a security interest in the business and its assets and assigned the business' future accounts receivable to 1 Global.   Thus, to the extent that the MOIs were secured, they were secured by *many* liens on *many* businesses or secured by *multiple* assignments of accounts receivable.

Second, at least a portion of the funds tendered under the MOIs were not secured. According to the MOI's terms, 1 Global was not limited to using noteholders funds to fund MCAs.  1 Global was permitted to use the funds to "expand its current business activities."  SEC has alleged that, in fact, 1 Global used significant portions of noteholder funds for purposes other than MCAs, including allocating $50 million to buy impaired, long-term credit card debt. Because the MOIs were not fully secured by a lien on a small business or some of its assets or by an assignment of accounts receivable, the MOIs do not fall within a category of notes that are not securities.

Ruderman argues that it is irrelevant whether 1 Global had discretion as to how to use the noteholder funds, relying on *Prochaska & Assocs., Inc. v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 798 F. Supp. 1427, 1429, 1431 (D. Neb. 1992).  There the court concluded that allegedly fraudulent promissory notes were not securities because they were short-term notes secured by a lien on a small business or its assets.  *Id.* at 1431.  The court evaluated the notes "on the basis of what [they] would have been but for the fraud, because the issue … is the status of the instruments as they were bought or sold, not their ultimate value."  798 F. Supp. 1427, 1430 n.2 (D. Neb. 1992) (internal quotations and citations omitted).  Thus, the Court finds *Prochaska* to

be inapposite. By the MOIs terms, the notes were not fully secured by a lien on a small business or some of its assets or by an assignment of accounts receivable. Upon reviewing the MOIs and drawing all reasonable inferences in favor of SEC, the Court concludes that the MOIs do not fit squarely into one of the enumerated categories of notes that expressly are not securities. Accordingly, the Court must apply the four-factor test to determine whether the MOIs bear a "family resemblance" to one or more of the exempt categories.

The Court first examines the motivations that would prompt a reasonable buyer and seller to enter into the transaction. *Reves,* 494 U.S. at 66. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id.* On the other hand, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, ... the note is less sensibly described as a 'security.'" *Id.*

Here, the buyers' primary motivation was likely the "high single digit" or "low double digit" rate of return that 1 Global offered. ECF No. [79] at ¶¶ 44-47. Indeed, the noteholders received no other benefit from purchasing an MOI. As to 1 Global's motivation, it offered the MOIs so 1 Global could expand its current business activities, which expressly included, but was not limited to, providing MCAs to businesses. Additionally, the MOIs stated that 1 Global had "sole discretion" over how to conduct its business activities. Accepting the allegations in the Complaint as true, it is apparent that 1 Global issued the MOIs to raise money for the general use of its business enterprise, including funding MCAs. Thus, the first factor weighsts in favor of the MOIs being securities.

The second factor requires that the court determine whether there was "common trading for speculation or investment" on the MOIs. *Reves,* 494 U.S. at 66. The offer and sale of the MOIs to a "broad segment of the public" is sufficient to establish this element. *Id.* at 68. "Importantly, an 'evident interest in widening the scope of distribution,' combined with the 'broad availability of the notes' can tip this factor 'strongly in favor' of classifying the note as a security." *SEC v. Thompson*, 732 F.3d 1151, 1164 (10th Cir. 2013) (quoting *Wallenbrock,* 313 F.3d at 539).

Here, 1 Global sold its notes to more than 3,400 investors in at least 25 states, who collectively invested at least $287 million. ECF No. [79] at ¶¶ 1-2. A network of external sales agents could solicit investments from the public, regardless of income, net worth, or sophistication. *Id.* at ¶¶ 40-41, 61. The MOIs were clearly "offered and sold to a broad segment of the public," and therefore the second factor weighs in favor of declaring the MOIs to be securities. *See, e.g.*, *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1128 (9th Cir. 1991) (notes sold to 148 investors in several states were offered to a broad segment of the investing public); *Wallenbrock*, 313 F.3d at 539 (notes were held by over 1,000 investors in at least 25 states); *Wright v. Downs*, 972 F.2d 350, 1992 WL 168104 at *3 (6th Cir. July 17, 1992) (notes sold to 200 investors constituted broad segment); *SEC v. Levin*, No. 12-cv-21917, 2014 WL 11878357, at *10 (S.D. Fla. Oct. 6, 2014) ("That the notes were sold to a number of investors in different states indicates that the notes are securities.").

Under the third factor, "we examine the reasonable expectations of the investing public," with the court considering "instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Reves,* 494

U.S. at 66.  Where the notes are characterized by the originator as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [originator] at its word."  *Id.* at 69.

1 Global advertised its investments as "an alternative to fixed income," "safe," and "[p]utting cash to work for merchants while earning high returns on your investment."  ECF No. [79] at ¶¶ 43-49.  Based on these characterizations, purchasers would reasonably view these notes as investments.  *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1336 (S.D. Fla. 2018) (third factor supports finding that the notes were securities because of advertised 5-8% annual return, paid on a monthly basis, and representations that the offerings were 'low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.'"); *Levin*, 2014 WL 11878357, at *10 (third factor supports finding that the notes were securities because they were advertised as a "low risk investment strategy," and investors were promised a high interest rate on their investment.).  The third factor also supports a finding the that MOIs are securities.

Under the final *Reves* factor, the Court considers whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."  *Reves,* 494 U.S. at 67.  If the note "would escape federal regulation entirely if the Acts were held not to apply," the fourth factor supports characterizing the instrument as a security.  *See id.* at 69 (recognizing as adequate risk-reducing factors (1) insurance provided by the Federal Deposit Insurance Corporation, and (2) comprehensive regulation under the Employee Retirement Income Security Act, because both ensure that an instrument would not "escape federal regulation entirely if the Acts were held not to apply").

Ruderman has not identified any risk-reducing factors or existing non-securities regulations that would reduce risks associated with the MOIs. Collateralization would help mitigate the risk of the MOIs. But here, as described above, only a portion of the funds tendered under the MOIs were secured. *Wallenbrock*, 313 F.3d 532, 539–40 (fourth factor weighed in favor of finding that the notes were securities because "the so-called collateralization appears to be a fiction"). Thus, the final factor supports a finding that the MOIs are securities.

The Court concludes that MOIs do not bear a family resemblance to the exempted notes because each of the factors weighs toward that conclusion. For the same reason, the Court declines to add an additional category to the list of exempted notes. Therefore, the MOIs are securities and subject to federal securities regulation.

### c. The MOIs are not Exempt Nine-Month Notes

Ruderman argues that the MOIs are exempt from the Exchange Act and the registration requirements of the Securities Act because they are nine-month notes that are commercial in nature.[1] SEC counters that 1 Global sold one-year notes as well as nine-month notes in one integrated offering,[2] the MOIs were not truly nine-month notes because of the automatic rollover provision, and the statutory exemption is not applicable to investment notes like the MOIs. The Court agrees with SEC that the MOIs are investments and not commercial in nature. They are therefore not exempt from the Exchange Act or the registration requirements of the Securities Act.

---

[1] Ruderman acknowledges that the antifraud provision of the Securities Act does not incorporate this exemption. ECF No. [119] at 8 n.2; *see* 15 U.S.C. § 77q(c). Accordingly, Ruderman seeks dismissal on this basis of the statutory exemption only as to Counts 1 and 5-10. *Id.*

[2] Ruderman's Reply clarifies that he seeks dismissal on the basis of the statutory exemption only as to the nine-month notes (not the 12-month notes).

Case No. 18-cv-61991-BLOOM/Valle

The Securities Act and the Exchange Act define the term "security" to exempt "any note … which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof …" 15 U.S.C. § 78c(a)(10); 15 U.S.C. § 77c(a)(3). The exemption applies only to notes that can be characterized as commercial in nature rather than as an investment. Ruderman contends that under *Bellah v. First Nat. Bank of Hereford, Tex.*, 495 F.2d 1109 (5th Cir. 1974),[3] the MOIs at issue are commercial in nature. In *Bellah*, the bank issued a promissory note of six-months maturity to the Bellahs to aid them in the development of a livestock business. *Id.* at 1110. The note was collateralized by a deed of trust in the farm. *Id.* The Bellahs failed to repay the note and the bank foreclosed. *Id.* at 1110-11. The Bellahs, in turn, brought claims against the bank under the federal securities laws. *Id.* at 1110. The Fifth Circuit concluded that because the duration of the note was less than nine months and was commercial in nature it was not a "security." *Id.* at 1113. In so holding, the Court reasoned:

> The record reveals that in extending the loans, the Bank merely intended to aid the Bellahs in the operation of their livestock business. It is bereft of any evidence indicating that the Bank sought to profit from the successful operation of this enterprise.

*Id.* at 1113.

Ruderman asserts that the critical distinction between a loan that is an investment and one that is commercial in nature is that with respect to the former, a lender seeks to profit from the success of the debtor apart from obtaining repayment of the note, whereas with respect to the latter, a lender seeks to profit by the mere repayment of the note. Ruderman argues that here, the holders of MOIs sought to profit from the collection of interest on their loan, like the bank in *Bellah*, and not from the success of the small businesses to which 1 Global lent money.

---

[3] Decisions of the former Fifth Circuit rendered prior to September 30, 1981, are binding decisions in the Eleventh Circuit pursuant to *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

But, as explained above, 1 Global was permitted to use noteholder funds to "expand its current business activities," which was not limited to funding MCAs. Unlike *Bellah*, MOI noteholders did not seek to profit solely from the repayment of a loan (or loans), but also from the success of the expansion of 1 Global's business activities. Because the MOI noteholders sought to profit from the success of 1 Global's business, not merely from the repayment of loans, the MOIs are investments, not loans that are commercial in nature Accordingly, the Court finds that the MOIs are not exempt nine-month notes.[4]

### d. Disgorgement is a Proper Remedy

SEC seeks disgorgement of all "ill-gotten gains" resulting from the acts alleged in the Amended Complaint. Ruderman argues that disgorgement is not an authorized remedy in SEC enforcement actions because it is not an equitable remedy – instead, it is a penalty based on the Supreme Court decision *Kokesh v. SEC.*, 137 S. Ct. 1635 (2017). SEC argues that *Kokesh* did not eliminate disgorgement as a remedy in SEC enforcement actions.

Under long-standing Eleventh Circuit case law, SEC has authority to seek disgorgement as an "equitable remedy intended to prevent unjust enrichment." *SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014). The Supreme Court has consistently held that equitable relief includes the specifically equitable remedies available in English Courts of Chancery in the eighteenth century. *See, e.g.*, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (in holding that district court had no authority to order a pre-judgment asset freeze the court considered "whether the relief respondents requested … was traditionally accorded by courts of equity"). Critically, "chancery courts possessed the power to order equitable disgorgement in the eighteenth century…" *SEC v. Cavanagh*, 445 F.3d 105, 120 (2d

---

[4] Because the Court finds that the MOIs are securities and are not exempt nine-month notes, it need not address SEC's arguments that the MOIs are longer in duration than nine months and that the MOIs are investment contracts under the *Howey* test.

Cir. 2006). Ruderman asserts that the Supreme Court's decision in *Kokesh* called into question the courts' authority to award disgorgement in SEC enforcement proceedings.

In *Kokesh*, the Supreme Court considered whether a claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued. *Id.* at 1367. Pursuant to 28 U.S.C. § 2462, "an action, suit or proceeding for the enforcement of any … penalty … shall not be entertained unless commenced within five years from the date when the claim first accrued…" The Supreme Court concluded that "[d]isgorgement in the securities enforcement context is a 'penalty' within the meaning of § 2462, and so disgorgement actions must be commenced within five years of the date the claim accrues." *Id.* at 1639. In reaching the conclusion, the Court reasoned that disgorgement is imposed by the courts as a consequence for violating public laws, disgorgement is imposed for punitive purposes, and SEC disgorgement is not compensatory in cases where some disgorged funds are paid to the United States Treasury rather than to victims. *Id.* at 1643-44. The Court expressly noted that

> [n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context. The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." *Id.* at 1642 n.3.

*Id.*

Post-*Kokesh*, no court has been persuaded that disgorgement is no longer an appropriate remedy in an SEC enforcement action. *See, e.g.*, *SEC v. Brooks*, No. 07-61526-CIV, 2017 WL 3315137, at *8 (S.D. Fla. Aug. 3, 2017) ("*Kokesh* is about statutes of limitations, and its holding is embedded in this context"); *SEC v. Revolutions Med. Corp.*, No. 12-cv-3298, 2018 WL 2057357, at *3 (N.D. Ga. Mar. 16, 2018) ("Because the Eleventh Circuit has expressly recognized disgorgement as a proper remedy in SEC enforcement actions, the Court declines to find that *Kokesh* has undermined that authority."); *SEC v. Arcturus Corp.*, No. 13-cv-4861, 2018

WL 1701998, at *2 (N.D. Tex. Jan. 10, 2018) ("Unless, and until, current binding authority changes, this Court understands its authority to order disgorgement in SEC proceedings"); *SEC v. Jammin Java Corp.*, No. 15-cv-08921, 2017 WL 4286180, at *3 (C.D. Cal. Sept. 14, 2017) ("*Kokesh* is best seen as a decision clarifying the statutory scope of § 2462, rather than one redefining the essential attributes of disgorgement"); *see also Fed. Trade Comm'n v. Dantuma*, No. 17-15600, 2018 WL 4178127, at *1 (9th Cir. Aug. 31, 2018) ("The *Kokesh* Court itself expressly restricted its ruling to whether the SEC's power to seek equitable disgorgement was subject to a five-year statute of limitations"); *Fed. Trade Comm'n v. J. William Enterprises, LLC*, 283 F. Supp. 3d 1259, 1262 (M.D. Fla. 2017) ("The Defendants argue that the footnote in *Kokesh* could be read as an expression of doubt as to whether courts had such authority in SEC proceedings, but the Supreme Court's deliberate avoidance of this different, if potentially analogous, issue provides no basis for this Court to disregard decades of precedent."). The Eleventh Circuit recently affirmed an award of disgorgement in an SEC enforcement action, reaffirming that "[t]he SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains…" *SEC v. Hall*, No. 17-13897, 2019 WL 103892, at *4 (11th Cir. Jan. 4, 2019) (internal quotation omitted).  Accordingly, the Court concludes that it retains its equitable power to order disgorgement

## IV.   CONCLUSION

For the reasons stated herein, it is **ORDERED AND ADJUDGED** that Defendant Carl Ruderman's Motion to Dismiss the Amended Complaint, **ECF No. [103]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 7th day of February, 2019.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record