# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:18-cv-61991-BB**

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

1 GLOBAL CAPITAL LLC, and
CARL RUDERMAN,

      Defendants, and

1 WEST CAPITAL LLC,
BRIGHT SMILE FINANCING, LLC,
BRR BLOCK INC.,
DIGI SOUTH LLC,
GANADOR ENTERPRISES, LLC,
MEDIA PAY LLC,
PAY NOW DIRECT LLC, and
RUDERMAN FAMILY TRUST,

      Relief Defendants.

---

## DECLARATION OF LORI EDWARDS IN SUPPORT OF WESTERN ALLIANCE BANK'S VERIFIED MOTION TO OFFSET CASH COLLATERAL TO RECOVER ITS ATTORNEYS' FEES AND COSTS AND INCORPORATED MEMORANDUM OF LAW

      I, Lori Edwards, declare the following under penalty of perjury:

      1.     I am employed by Western Alliance Bank, an Arizona banking corporation ("WAB" or the "Bank") in the capacity of Executive Vice President, Special Assets Group, at its office located in San Jose, California. I make this declaration in support of *Western Alliance Bank's Verified Motion to Offset Cash Collateral to Recover its Attorneys' Fees and Costs and Incorporated Memorandum of Law* ("Motion"). The facts stated in this declaration are true of my own personal knowledge, except as to any matters stated on information and belief, and as to those matters, I am informed and believe them to be true. If called as a witness in this matter, I could and would completely testify to the matters set forth below.

2.      Between January, 2018 and July, 2018, Bright Smile Financing, LLC ("Bright Smile") opened and maintained three accounts at WAB: (i) a Business Checking account ending in 1343, (ii) a Business Checking account ending in 3270, and (iii) a Business Money Market account ending in 5484.

3.      These accounts are governed by the terms and conditions set forth in, among other related agreements, (i) a certain written "Deposit Account Agreement and Disclosure," revised October 2016 (the "Deposit Account Agreement"), and (ii) a certain written "Treasury Management Services Agreement and Service Descriptions," revised October 2016 (the "Treasury Management Services Agreement," and collectively with the Deposit Account Agreement, the "Banking Agreements") by and between Bright Smile and the Bank.  A true and correct copy of the Deposit Account Agreement is attached hereto as **Exhibit A**.  A true and correct copy of the Treasury Management Services Agreement is attached hereto as **Exhibit B**.

4.      By maintaining the Accounts at WAB and availing itself of the Bank's deposit and automated clearing house ("ACH") processing services, Bright Smile agreed to the terms and conditions for the Bank's provision of such services as set forth in the Banking Agreements.

5.      For example, the Banking Agreements expressly provide that:

(a)      Each Account holder promises to pay, upon demand, any and all debit balances, fees and charges, **reasonable attorneys' fees and costs and expenses of collection**. (*See* Ex. A hereto, pp. 4-5, "Deposit Accounts");

(b)      **Bright Smile grants WAB a security interest in all Accounts** other than fiduciary accounts maintained for the benefit of others **to secure the repayment of any overdraft or obligation that Bright Smile incurs under the Banking** Agreements (*See* Ex. B hereto, p. 5, §10, "Security Interest");

(c)      Subject to applicable law, **the Bank may exercise its right of setoff or security interest against any and all of Bright Smile's Accounts held at WAB** (except IRA, Keogh and certain fiduciary accounts) **without notice, for any liability or debt of Bright Smile, whether direct or contingent.** (*See* Ex. A hereto, p. 15, "Right of Setoff");

(d)      Bright Smile agreed to be liable to Bank, to the extent permitted by law, for any loss, costs, or expenses (including attorneys' fees) that WAB may incur as a result of any dispute or legal proceeding involving Bright Smile's Accounts. In fact, **Bright Smile "authorize[d] [WAB] to deduct any such loss, costs, or expenses from [the] Account[s] without prior notice" to**

**Bright Smile**.  (*See* Ex. A hereto, p. 20, "Miscellaneous Provisions") (Emphasis supplied); and, significantly,

(e) **No party's delay in exercising any right or remedy under the Banking Agreements will operate as a waiver of such right or remedy**, or preclude the exercise of any right upon a party's prior, current, or subsequent breach. (*See* Ex. B, p. 9, § 26, "Waiver").

6.      WAB's ACH collateral funds are currently being held in Bright Smile account ending in 5484.  Further to the Freeze Order in place, WAB confirms that it has taken no action to setoff or otherwise assert control over these funds of the Receivership Estate.

7.      WAB enlisted the assistance of three law firms in this matter:  its long-time counsel in San Jose, Hopkins & Carley; the Tabas & Soloff firm with whom the Bank and Hopkins & Carley had worked with on other matters; and the White & Case law firm, whom was brought in after Tabas & Soloff determined it could no longer assist the Bank in this matter.  Each respective firm bills WAB for the time spent by its attorneys and legal professionals at specified hourly rates. Pursuant to the Bank's agreements with each firm, the firms all submit monthly invoices to the Bank.  In each case, those invoices are due upon receipt.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on April 4, 2019, at San Jose, California.

*Lori Edwards*

Lori Edwards

# EXHIBIT A



Alliance Association Bank | Alliance Bank of Arizona | Bank of Nevada | Bridge Bank | First Independent Bank | Torrey Pines Bank

Divisions of Western Alliance Bank. Member FDIC.

# TREASURY MANAGEMENT
# SERVICES AGREEMENT AND SERVICE DESCRIPTIONS

Revised October 2016
TM-700

WAB000181

## Table of Contents

GENERAL TERMS ............................................................................................................................. 3

BUSINESS ONLINE BANKING SERVICE DESCRIPTION ........................................................ 11

AUTOMATED CLEARING HOUSE ("ACH") SERVICE DESCRIPTION................................. 14

ACH FILTERING/BLOCKING SERVICE DESCRIPTION ........................................................ 17

FUNDS TRANSFER SERVICE DESCRIPTION.......................................................................... 18

POSITIVE PAY SERVICE DESCRIPTION ................................................................................. 19

REMOTE DEPOSIT CAPTURE SERVICE DESCRIPTION ...................................................... 20

LOCKBOX SERVICE DESCRIPTION......................................................................................... 24

AUTOMATED SWEEP SERVICE DESCRIPTION..................................................................... 26

CASH VAULT AND DEPOSIT SERVICES SERVICE DESCRIPTION .................................... 28

GLOSSARY .................................................................................................................................... 30

## GENERAL TERMS

1. _Definitions._ Unless otherwise defined herein, all capitalized terms shall have the meaning provided in the Glossary.

2. _Agreement; Service Descriptions._
   a. _Reference to Agreement._ Any reference to the Agreement shall be deemed to include this Treasury Management Services Agreement, the Setup Form, the respective Service Descriptions, and the Supporting Documents, unless otherwise stated. The Agreement applies between the Company and Bank.
   b. _Services._ Company has engaged Bank to perform the Services more specifically described in the following, as updated from time to time: (i) the Agreement, (ii) the Service Descriptions and (iii) Supporting Documents. This Agreement and each Service Description may include exhibits, appendices, schedules or similar materials, which form a part of the Agreement and Service Description, respectively. This Agreement applies to and governs: (i) any Service Company may use, whether or not the specific Service was selected on the Setup Form or written service request; and (ii) any and all Company accounts with Bank that use any cash management services described in the Agreement, whether or not Company has formally designated the accounts on the Setup Form.
   c. _Acceptance._ Unless otherwise agreed, this Agreement including the Service Descriptions and Supporting Documents will be deemed accepted by Company upon provision by Bank of a Service. The terms and conditions of the Agreement will apply to the Services and the Accounts which access the Services, in addition to the account deposit terms and conditions otherwise applicable to Company's accounts with Bank, including but not limited to the Deposit Account Agreement and Disclosure.
   d. _Order of Precedence._ Unless otherwise provided, to the extent any provision of this Agreement conflicts with a Service Description, the Service Description will control. To the extent any term or provision of this Agreement conflicts directly with any term or provision of Company's deposit account terms and conditions or the Supporting Documents, the provision of this Agreement (including any Service Description) will control.
   e. _Deposit Account Agreement and Disclosure and Transfers._ All transfers to and from an Account will be subject to the terms and conditions applicable to the Account as set forth in the Deposit Account Agreement and Disclosure governing the Account, including but not limited to transfer limitations, as amended by the Agreement.
   f. _Service Change Requests._ Any addition, deletion or change to the Setup Form for any Service requested by the Company must be submitted in a form acceptable to the Bank, and no such requested addition, deletion or change will become operative or effective until the Bank confirms to Company that such addition, deletion or change has been implemented.
   g. _Service Descriptions._ The terms and conditions of individual Service Descriptions apply only to the extent Company utilizes the Services contemplated in that particular Service Description.

3. _Company Rights._ Subject to the terms of this Agreement and each applicable Service Description, Bank hereby grants Company a non-exclusive, non-transferable right to access and use the Services in connection with Company's own business operations in accordance with the Supporting Documents.

Without limiting the generality of the foregoing, Company agrees not to (a) make the Services available or allow use of the Services in a computer bureau service business, or on a timesharing basis, or (b) otherwise disclose or allow use of the Services by or for the benefit of any third party.

4. _Security Procedures; Communications._
   a. Company and Bank may agree to Security Devices designed to verify the authenticity (but not errors in transmission or content, including discrepancies between Account names and numbers) of Communications. In this regard, application of the procedures and Security Devices to authenticate a Communication will be collectively referred to as the "**Security Procedures**" in the Agreement. If Bank takes any action not provided in the Security Procedures in connection with any Communication, such additional action shall not be deemed to become part of the procedures.
   b. Before using a Service and/or before sending a Communication to Bank, Company will review the Security Procedures and determine whether they will provide a commercially reasonable method for verifying whether a Communication is that of Company. As part of the review, Company will consider the size, type and frequency of Communications Company will make or anticipates making, along with such other factors as Company may deem relevant or appropriate.
      i. _Commercially Reasonable Procedures._ If the size, type or frequency of Communications made by Company changes such that the Security Procedure in use by Company no longer provide a commercially reasonable method of providing security against unauthorized Communications, Company shall promptly notify Bank. Company agrees that Bank will use the Security Procedures to verify the authenticity of Communications, but that the Security Procedures are not designed to and are not used for the purpose of detecting errors.
      ii. _Supplemental Security Devices._ Bank may offer to Company or require Company to use additional authentication tools or methods from time to time (for example, challenge questions and phrases for employees). If Company chooses not to implement supplemental authentication tools, Company's access to some or all of the Services may be limited. Company's continued use of any modified Security Procedures will evidence Company's agreement that the modified Security Procedures are commercially reasonable for Company.
      iii. _Company Responsible for Verified Communications, Even if Unauthorized._ If Bank acts on a Communication in compliance with the Security Procedures, then Company will be obligated on the Communication and it will be treated as Company's Communication, whether or not authorized by Company.
      iv. _Company Also Responsible for Communications Actually Authorized._ If a Communication is received by Bank and was authorized by Company, Company will be obligated to pay the amount of the Communication whether or not Bank complied with such Security Procedures with respect to that Communication and whether that Communication was erroneous in any respect

WAB000183

or that error would have been detected if Bank had complied with the Security Procedures.

c. Each time Company makes a transfer or payment for a Service, Company agrees and warrants that the security procedures established in accordance with this Agreement are commercially reasonable.

d. Company will use and safeguard the Services, Security Devices, Security Procedures, Supporting Documents, and the Software (if applicable) in accordance with the Agreement. In connection with Company's safeguarding obligations, Company will implement and maintain physical, technical, and administrative controls and procedures sufficient to prevent impermissible or unauthorized access to or use of any Service, Supporting Document, Security Device or procedure.

e. Company assumes all risks associated with disclosure of any Security Device to its employees. Company agrees to limit disclosures of Security Devices to those employees or agents it will authorize to access the Services on Company's behalf, or who have a specific need to know. Company agrees to follow all requirements and guidance that may be outlined in the Supporting Documents, including but not limited to password change policies and practices. Without limiting the foregoing, Company further agrees to require Authorized Representatives to create new passwords at reasonably frequent periods, based on Company's assessment of the security requirements appropriate for the Services utilized by Company. Company agrees to promptly change security codes and level of authority, as applicable, in the event of any change in personnel or when reasonably prudent to do so.

f. The Service Description and/or Supporting Documents for each Service shall describe the various means by which the Company may communicate with Bank in connection with such Service. Those means may include, without limitation, the use of computer software ("**Software**") licensed or sublicensed by Bank to Company ("**License**") or the use of an Internet connection. To the extent any of the Services involve the Bank having granted Company Software License usage rights, such grant shall be a non-exclusive, non-transferable right to access and use the Service in connection with Company's own business operations in accordance with the Supporting Documents. Without limiting the generality of the foregoing, Company agrees not to (a) make the Service available or allow use of the Service in a computer bureau service business, or on a timesharing basis, or (b) otherwise disclose or allow use of the Service by or for the benefit of any third party. If applicable, Company shall select on the Setup Form for a particular Service a means of communicating with Bank in connection with that Service (each a "**Communication Link**"). Multiple Communication Links may be selected for certain Services, as more specifically described in the Service Description and/or Supporting Documents. Information and instructions may be sent and received by Company through those Communication Links.

g. Bank may act on a Communication by reference to the Account number only, even if the name on the Account is also provided. Furthermore, any Communication received by Bank will be treated as Company's, and will bind Company, notwithstanding Bank did not verify the authenticity of the Communication, if the Communication is delivered to Bank directly or indirectly by any Authorized Representative, or if Company would otherwise be legally bound by the Communication, regardless of whether any loss to Company would have been prevented had Bank verified the authenticity of the Communication.

h. Bank is not obliged to act on a Communication that is not transmitted in accordance with the Security Procedures. Bank may act, at its sole discretion, on an incomplete Communication, including but not limited to if in Bank's reasonable opinion, it contains sufficient information. Bank has no duty to discover, and shall not be liable for, errors or omissions made by the Company or the duplication of any Communication by the Company.

i. Bank may delay or refuse to process any requested Service. Bank may do so for any reason or for no reason. Bank may provide notice to Company, but is not obligated to do so. Bank may delay or refuse processing, for example, if: (i) processing would or may exceed the available funds in Company's affected Account; (ii) the Communication is not authenticated to Bank's satisfaction or Bank believes it may not have been authorized by Company; (iii) the Communication contains incorrect, inconsistent, ambiguous, or missing information; (iv) processing would or may involve funds which are subject to lien, security interest, claim, hold, dispute, or legal process prohibiting withdrawal; (v) processing would or may cause a violation of any laws or rules applicable to Company or to Bank; or (vi) for any other reason under this Agreement. In addition, Bank shall be excused from failing to transmit or delay in a requested Service if such transmittal would result in Bank's having exceeded any limitation upon Bank's intra-day net funds position established pursuant to present or future Federal Reserve guidelines or in Bank's reasonable judgment otherwise violating any provision of any present or future risk control program of the Federal Reserve or any rule or regulation of any other U.S. governmental regulatory authority. Company agrees that Bank will have no liability to Company or to any other person for any loss, damage or other harm caused by or arising out of any such delay or refusal.

j. If the Company informs Bank that it wishes to recall, cancel or amend a Communication after it has been received by Bank, Bank may, but will not be required to, use its reasonable efforts to assist the Company to do so, but shall not be liable for any loss, cost or expense suffered by the Company if Bank does not, or is unable to, amend, cancel or recall that Communication. The Company hereby agrees to indemnify Bank against any loss, liability, claim or expense (including legal fees) it may incur in connection with assisting the Company to recall, cancel or amend a Communication.

k. Company assumes the sole responsibility for providing Bank with accurate transaction information in the form and format that Bank requires. Bank is not responsible for confirming such information, or for failing to detect and reject duplicate Communications. If Company provides Bank with a Communication that is incorrect in any way, Company agrees that Bank may charge Accounts for the transaction whether or not the error could have been detected by Bank. Bank is not obligated to detect errors in Company's transfer or payment instructions.

l. Any person identified by Company in the Supporting Documents or so designated by any subsequent written notice delivered to Bank may receive information, communications and notices regarding the Services, and is authorized to transact all business, make all agreements and sign and deliver all documents in connection with the Services. If the identity of such a person changes, Company will promptly notify Bank in writing. Bank will have a reasonable time after receipt of a notice or other communication to act on it.

TM-700 (10.2016)

WAB000184

5. <u>Equipment and Software.</u>  Unless otherwise provided in the Agreement, Company is responsible for providing and maintaining any equipment that is necessary for the Services, such as telephones, terminals, modems and computers. Company agrees to use equipment that is compatible with Bank's programs, systems and equipment, which Bank may change from time to time.  Bank assumes no responsibility for the defects or incompatibility of any computers or software that Company uses in connection with the Services, even if Bank has previously approved their use.   BANK MAKES NO WARRANTY, EXPRESS OR IMPLIED, IN LAW OR IN FACT, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY, WITH RESPECT TO THE SERVICES OR EQUIPMENT. Company agrees to notify Bank promptly if any Bank-provided Equipment becomes defective. Bank's sole responsibility (if any) in such instances will be to use best efforts to repair or replace the defective Equipment. Company agrees to comply with the terms of any Software License(s) provided to Company in connection with the Services.  Company may not transfer, distribute copy, reverse compile, modify or alter such Software.  Unless otherwise agreed by Bank in writing, the computer programs, Service guides, Security Procedures, equipment, Software and systems provided to Company in connection with the Services represent Bank's proprietary property and must be returned to Bank upon request.  Bank and/or its suppliers retain all right, title and interest in and to the intellectual property rights associated with the Services, and Equipment provided.  Company's license to use the Equipment will end with the termination of this Agreement or upon Bank's prior notice. Company may not use or move the Equipment outside the United States without Bank's written consent.  Further, Company may not use the Equipment in a service bureau, time-sharing or outsourcing capacity.

6. <u>Company Representations.</u> Company represents and warrants to Bank that:
   a. It is duly organized and validly existing, and is in good standing in every jurisdiction where required;
   b. It has the authority to execute and deliver the Setup Form;
   c. The officers executing and delivering the Agreement and the Setup Form for and on behalf of Company, are duly authorized to do so;
   d. Any consent, authorization or instruction required in connection with the Agreement and each Service Description has been provided by any relevant third party; Bank may rely upon the authority of each Authorized Representative for all purposes until Bank has received written notice acceptable to it of any change from an Authorized Representative and Bank has had a reasonable time to act thereon (after which time it shall rely upon the changed version);
   e. Any act required by any relevant governmental or other authority in connection with the Agreement has been or will be done (and will be renewed if necessary);
   f. It fully complies with Regulation GG and is not engaged in any activities that Regulation GG defines as "unlawful Internet gambling" nor does it accept payments in connection with the participation of another person in unlawful Internet gambling;
   g. Its performance of the Agreement and use of the Services will not violate any applicable law, regulation or other requirement;
   h. The Agreement is a legal, valid and binding obligation; Bank, in accepting the Agreement, is acting and relying upon the foregoing representations and warranties; and

   i. Unless otherwise agreed to in writing by Bank, the Accounts established by Company with Bank and the Services Company establishes or uses in connection with the Accounts will only be used for business purposes and not for personal, family or household purposes.

7. <u>Compliance with Law.</u>  Company shall comply with all laws, rules, and regulations applicable to Company, to Company's business and operations, and to the Services, including without limitation, Regulation CC, the Uniform Commercial Code, as adopted by the State of Arizona and any rules established by an applicable network, and the prohibitions applicable to illegal Internet gambling.  Company shall have the responsibility to fulfill any compliance requirements or obligations that Bank and/or Company may have with respect to the Services under all applicable U.S. federal and state laws, regulations, rulings, including sanction  laws administered by the Office of Foreign Assets Control, and other requirements relating to anti-money laundering, including but not limited to, the federal Bank Secrecy Act, the USA PATRIOT Act and any regulations of the U.S. Treasury Department to implement such Acts, as amended from time to time.

8. <u>Delayed Processing.</u>  In addition to any allowances provided to Bank in any other agreement Bank has with Company, Company agrees that Bank may delay posting of an inbound credit to Account(s), or delay the processing of an outbound transaction, when the delay is due to a suspicion that the transaction may be in violation of applicable law, or the transaction is otherwise under review by Bank.

9. <u>Account Designations.</u> For certain Services, Company may be required to designate one or more Accounts to facilitate the particular Service.  If one or more Accounts must be designated, they will be reflected in the Supporting Documents.  However, Company understands that this Agreement will govern any and all Account for which Company uses any of the Services, whether or not the Account(s) have been formally designated as linked in the Agreement.

10. <u>Security Interest.</u>  Company grants Bank a security interest in Accounts (other than fiduciary accounts maintained for the benefit of others) to secure the repayment of any overdraft or obligation that Company incurs under the Agreement.  The security interest provided under the Agreement is in addition to any other security interest Bank may have in Accounts or other assets.

11. <u>Reserve Account.</u>  Company agrees that it will, if requested by Bank at any time, establish one or more reserve accounts to be maintained with Bank in type (including time deposits) and amount satisfactory to Bank, to serve as collateral for and to secure Company's obligations to Bank under the Agreement. Bank may restrict or prohibit Company's access to any reserve account(s) and the funds on deposit in them, and may hold such accounts following termination of the Agreement for a period of time sufficient to protect us against loss (including loss due to returned items or Entries).  Bank may increase or decrease the required reserve account amount from time to time, upon notice to Company.  Company agrees to provide immediately available funds to cover a reserve amount requested by Bank.  In addition, Bank may transfer funds from another account of Company, or use funds payable to Company or owed by Company to Company under the Agreement or due to a Service, and credit such funds to a reserve account if a deficiency exists between the available

TM-700 (10.2016)

WAB000185

funds in Company's reserve account(s) and the amounts specified by Bank as the required reserve amount.

12. <u>Sufficient Funds.</u>   Company agrees to maintain sufficient available funds (as determined under Bank's funds availability policy) in Accounts to cover all transactions requested through the Service and applicable fees, or such higher amounts as Bank may specify from time to time.   Company acknowledges that Bank does not control intermediary banks, including intermediary banks chosen by Bank, and that Bank does not control whether intermediary banks deduct fees as part of the processing of transfer requests.   Company agrees that Company's funds may be held by Bank for a period of time during the term of a Service Description and following termination of the Services, to protect Bank against any possible losses relating to the use by Company of the Services.   If Bank does hold funds, Bank may treat the held funds as not available for other purposes, and reject other transactions (for example, checks or other transfer instructions) in any order Bank chooses. Bank may, at its sole discretion, allow overdrafts/overlimits or negative balances, but Bank also may discontinue the practice at any time with or without prior notice to Company. Bank may prevent or reverse any payments or other service in any order that Bank chooses as a means of preventing or recovering any overdrafts or other exposures. If Company does not have sufficient or available funds or credit in an Account for which a particular transaction was requested, Bank may charge any account of Company held at Bank to cover the cost of the transaction as well as any corresponding fees. Alternatively, and at Bank's sole discretion, Bank may overdraw Company's accounts and Company may be charged an overdraft or other fee (such as fees for returned checks or other electronic items). Accordingly, Company agrees to immediately pay Bank such overdraft or other fees. Company's obligation to pay Bank remains immediately due and payable whether or not the rejected, returned or adjustment entry was processed in accordance with any requirement of any applicable laws or rules applicable to any party other than Bank and notwithstanding Bank or Company may have a claim against another third party for breach of the applicable laws or rules. Nothing in the Agreement shall be construed as Bank's commitment or obligation to lend Company money.

13. <u>Transaction Limits and Safeguards.</u>   Company agrees not to exceed the transaction limits we establish from time to time for any Account or Service.   Company will not allow anyone to initiate transactions on its behalf without proper supervision and adequate safeguards.   Company agrees to review pending instructions prior to their submission to ensure they are complete, accurate and properly authorized.

14. <u>Fees.</u>   Company agrees to pay Bank the fees prescribed in Bank's current Fee Schedule.   Unless other arrangements are made for payment of the fees, Bank will automatically debit any account maintained by Company with Bank in the amount thereof.   Even in the event that the amount owing bears a rate of interest, Company continues to be immediately obligated to Bank to repay the amount in full.   Bank does not in any way extend credit to Company under this Agreement.   Bank may amend the Service pricing from time to time.   Certain prices are subject to change without prior notice (see applicable Fee Schedule for details).   Special or additional Services performed at Company's request may be subject to additional terms and fees.   If Accounts are analyzed, Company may be able to use available earnings credit to offset certain Service charges.   If analyzed Accounts contain funds belonging to third parties, Company represents that use of any related earnings credit is not

limited by law, regulation or agreement with such third parties, and that Company has the requisite authorization from such third parties for such use.   In addition to the Service fees, Company agrees to pay all taxes, tariffs and assessments levied or imposed by any government agency in connection with the Services, the Agreement, and/or the Software or equipment made available to Company (excluding any income tax payable by Bank).   Company is also responsible for the costs of any communication lines and any data processing charges payable to third parties.   If Company is required by the laws of any relevant jurisdiction to make any deduction or withholding from any fees, interest or other amounts, on account of tax or other charges, the Company shall withhold the same and pay it to the relevant authority, and shall pay Bank such additional amount as may be necessary to ensure Bank receives an amount equal to the amount it would have received had no such deduction been made.

15. <u>Notices.</u>
a. *General Requirements.*   Except as otherwise provided in the Agreement, all notices and other communications by Company to Bank shall be in writing and, addressed to:

> Western Alliance Bank
> Attn: Treasury Management Client Support
> One East Washington Street, Suite 2500
> Phoenix, AZ 85004

or at such other address as Bank may specify in writing. Notices to Company may be mailed or sent to Company electronically at the statement, email or mailing address shown for Company in Bank's deposit or Service records. Any notice or communication to Bank will be effective when Bank has actually received, and has had a reasonable time to act on it. Any notice or communication to Company will be effective when sent by Bank, or as otherwise stated in the notice or communication. Company further acknowledges and agrees that certain notices and communications may be provided to Company by telephone, facsimile or electronic transmission at the telephone number, facsimile number or other location or number as shown on Bank's records.

b. *Reliance.* Bank may rely on all notices, instructions and other communications sent to Bank via facsimile or electronic transmission as though they are originals. Without limiting the foregoing, Bank is entitled to rely on any notice, communication or instruction believed by it in good faith to be genuine or to have been signed or authorized by an Authorized Representative of Company.

c. *Errors; Unauthorized Transactions; Other Notices.* Company will inspect all information provided by Bank in connection with the Services. Company agrees to promptly, by telephone and in writing, notify Bank of (i) any errors in such information or any discrepancies between its records and the information, statements or confirmations of transactions provided by Bank or otherwise made available to Company. If Company fails to notify Bank of any such error or discrepancy within fifteen (15) days of the date on which such information is received by or otherwise made available to Company, then Company agrees that Bank will not be liable for any losses resulting from Company's failure to give such notice or any resulting loss of interest relating to any funds transfers. If Company fails to notify Bank of any such error or discrepancy within one (1) year of the date on which such information is received by or otherwise made available to Company, then Company shall be precluded from asserting such error or discrepancy

WAB000186

against the Bank. Notwithstanding the foregoing, Bank reserves the right to, in its sole discretion, adjust transaction records for good cause after the expiration of said one (1) year period.

d. *Change in Business.* Company agrees to provide Bank with at least thirty (30) days' advance notice of: (i) any material (twenty percent (20%) or greater) change in Company's ownership; (ii) any material change in the type, scope or nature of Company's business; or (iii) any anticipated increase (twenty percent (20%) or greater) in the amount or volume of Company's ACH transactions over the preceding calendar quarter (if applicable).

16. Limitation on Liability; Indemnification.

a. Bank's duties and responsibilities shall be limited to those set forth in this Agreement. In no event shall Bank be liable for: (i) any punitive, indirect, consequential or special damages or lost profits, even if Bank has been advised of the possibility of such damages; (ii) the acts or omissions of a contractor, vendor, processor, third party servicer or vendor used by Company or Bank, or any loss, cost, damage or expense incurred by any person or entity in connection therewith; (iii) Company negligence or breach of any agreement with Bank; (iv) any loss, cost, expense, or damage to Company in connection with any Communication Link, Software, or any technical computer service, including Software installation or de-installation performed by Bank, or Company's or Bank's use thereof; (v) any ambiguity, inaccuracy or omission in any instruction or information provided to Bank; (vi) the application of any government or funds-transfer system rule, guideline, policy or regulation; (vii) the lack of available funds in an Account to complete a transaction; (viii) Bank's inability to confirm to its' satisfaction the authority of any person to act on Company's behalf; (ix) Company's failure to follow any applicable software manufacturer's recommendations or Bank's Service instructions; or (x) any Internet sites related to the Services or maintained or operated by Bank or the use thereof or the inability to use such sites by any party, or in connection with any failure or performance, error, omission, interruption, defect, delaying in operation or transmission, computer virus or line or system failure, even if Bank, or representatives thereof, are advised or the possibility of such damages, losses or expenses. There may be other exceptions to Bank's liability, as stated in Company's account or other service agreements with Bank. Bank will not be responsible for determining the compatibility of any installed Software with other system components or for any failure of any technical servicing or Software installation to provide access to the particular cash management service which servicing or Software installation was intended to make available.

b. Bank's liability and Company's remedy for actual costs and losses resulting from Bank's failure to transmit funds in the correct amount or to the correct beneficiary listed in your payment orders shall not exceed the direct money damages that you incur as a result of the failure (e.g., the amount of a wire transfer that is sent to the wrong party, or the amount by which a transfer exceeds the amount you authorized, plus interest as permitted by law. In all other cases, Bank's actions and/or omissions, whether the claim is in contract or tort, will not exceed the lesser of (i) six times the average monthly charge for the Service(s) in question for the three months immediately preceding the cost or loss, or (ii) $25,000.

c. Any claim, action or proceeding by Company to enforce the terms of the Agreement or to recover for any Service-related loss must be commenced within one (1) year from the date that the event giving rise to the claim, action or proceeding first occurs.

d. Company agrees to cooperate with Bank in any loss recovery efforts Bank undertakes to reduce any loss or liability that arises in connection with the Services. Company acknowledges that Service fees have been established in contemplation of: (a) these limitations on Bank's liability, (b) Company's agreement to review statements, confirmations, and notices promptly and to notify Bank immediately of any discrepancies or problems; and (c) Company's agreement to assist Bank in any loss recovery effort.

e. Company agrees to indemnify and hold the Indemnified Parties harmless from and against any and all Loss and Liabilities arising directly or indirectly out of: (i) the acts or omissions of Company, or any person acting on Company's behalf in connection with Company's use of the Services, including without limitation (a) the breach by Company of any provision, representation or warranty of the Agreement, (b) the negligence or willful misconduct (whether by act or omission) of Company, its clients or any third party acting on behalf of Company, (c) any misuse of the Services by Company, or any third party within the control or on behalf of Company, (d) the failure by Company to comply with applicable state and federal laws and regulations, or (e) any fine, penalty or sanction imposed on Bank by, any clearing house, or any governmental entity, arising out of or connected with the Service; (ii) any act or omission of Bank that is in accordance with the Agreement or instructions from Company; (iii) actions by third parties, such as the introduction of a virus that delay, alter or corrupt the transmission of an image or communication to Bank; (iv) any loss or corruption of data in transit from Company to Bank; (v) any claim by any third party corresponding, that such third party incurred loss due to the Service; or (vi) any claims, loss or damage resulting from Company's breach of, or failure to perform in accordance with, the terms of the Agreement. This indemnity will survive the termination of the Agreement.

f. Company agrees that it will not assert any claims against Bank based on theories of negligence, gross negligence, strict liability, misrepresentation, or fraud based on or relating to any Communication Link, Software or Company's possession or use thereof or any technical computer service including, but not limited to, Software installation or de-installation performed by Bank.

g. EXCLUSION OF WARRANTIES. COMPANY ACKNOWLEDGES THAT THE SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. BANK IS NOT RESPONSIBLE FOR ANY ERRORS OR OMISSIONS IN OR TO ANY INFORMATION RESULTING FROM COMPANY'S USE OF THE SERVICES. BANK MAKES NO AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING COMPANY'S USE OF THE SERVICE AND THE EQUIPMENT, INCLUDING THE WARRANTY OF TITLE AND THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BANK DISCLAIMS ANY WARRANTIES REGARDING ANY SOFTWARE, ANY COMMUNICATION LINK, THE

TM-700 (10.2016)

WAB000187

OPERATION, PERFORMANCE OR FUNCTIONALITY OF THE SERVICE AND THE EQUIPMENT, INCLUDING ANY WARRANTY THAT THE SERVICE AND THE EQUIPMENT WILL OPERATE WITHOUT INTERRUPTION OR BE ERROR FREE. COMPANY ACKNOWLEDGES THAT THERE ARE CERTAIN SECURITY, TRANSMISSION ERROR, AND ACCESS AVAILABILITY RISKS ASSOCIATED WITH USING THE SERVICE AND ASSUMES ALL RISKS RELATING TO THE FOREGOING.

17. Force Majeure.  Notwithstanding any other provisions of the Agreement, Bank shall not have any responsibility or liability for any failure, error, malfunction or any delay in carrying out any of its obligations under the Agreement if such failure, error, malfunction or delay results from events due to any cause beyond its reasonable control, including, without limitation, unavailability of any communications system, sabotage, fire, flood, explosion, acts of God, civil commotion, strikes, stoppages of labor or industrial action of any kind, riots, insurrection, war or acts of government, power or equipment failure (including that of any common carrier, transmission line or software), emergency conditions, adverse weather conditions or any other factor, medium, instrumentality, condition or cause. Bank will not be liable or responsible for the acts or omissions of any other financial institution or any third party or for any inaccuracy or omission in a notice or communication received by Bank from Company, another financial institution, or any other third party.  In addition, Bank shall be excused from failing to transmit, or delaying the transmission of, any transaction, if such transmittal would result in Bank's having exceeded any limitation upon its intra-day net funds position established pursuant to present or future Federal Reserve guidelines or in Bank's otherwise violating any provision of any present or future risk control program of the Federal Reserve or any rule or regulation of any other U.S. governmental regulatory authority. Bank shall not be liable for any failure to perform any of its obligations under the Agreement if such performance would result in it being in breach of any law, regulation, requirement or provision of any government, government agency, banking or taxation authority in accordance with which it is required to act, as it shall determine.

18. Confidentiality.  Bank, its contractors or vendors, or Bank's agent (as applicable) will remain the sole owner of all such Confidential Information, and Company will not acquire any interest in or rights to such Confidential Information as a result of Company's use of any Service except as set forth in the Service Description. Company will maintain the confidentiality of the Confidential Information and will not disclose (or permit its employees or agents to disclose), copy, transfer, sublicense or otherwise make any of it available to any person or entity, other than its employees who have a need to use the Confidential Information in connection with the applicable Service. Company shall notify Bank immediately if it knows or suspects that there has been any Unauthorized Use, and if it is responsible for the Unauthorized Use, it will, at its expense, promptly take all actions, including without limitation initiating court proceedings to recover possession or prevent further Unauthorized Use and obtain redress for any injury caused to Bank as a result of such Unauthorized Use. In addition, except as permitted by applicable law, Company may not decompile, reverse engineer, disassemble, modify, or create derivative works of any computer program provided pursuant to this Agreement.

To the extent not prohibited by applicable law, Company authorizes the transfer of any information relating to Company to and between the branches, subsidiaries, representative offices, affiliates, contractors, vendors and agents of Bank and third parties selected by any of them, wherever situated, for confidential use in connection with the provision of products or Services to the Company (including for data processing purposes), and further acknowledges that any such branch, subsidiary, representative office, affiliate, contractor, vendor or agent or shall be entitled to transfer any such information as required by any law, court, regulator or legal process.

19. Audit and Inspection.  Bank reserves the right, with prior notice to Company, to enter upon Company's premises from time to time during regular business hours to verify that Company's operations and procedures are in compliance with the terms of the Agreement.

   a. In connection with any such audit, Company agrees to furnish Bank with any documentation or information as is reasonably necessary to establish Company's compliance with the terms of the Agreement.  If it is determined by Bank that additional procedures or controls need to be implemented by Company, Company agrees to implement such procedures or controls within a reasonable period of time to be agreed upon by the parties.

   b. In connection with Bank's entry on the premises of Company for the purpose of conducting an on-site audit or inspection, or in connection with providing support to Company, Bank shall not be liable or responsible to Company or any third party for any loss, bodily harm, property damage, claims of the introduction of a virus or other malicious code into Company's system, including any which allegedly delay, alter or corrupt the data of Company, whether related to the transmission of check images or other data to Bank or whether caused by the equipment, Software, Bank Internet service providers, Internet browsers, or other parties providing communication services to or from Bank to Company.

20. Term and Termination.
   a. The term of the Agreement will commence upon full execution of the Agreement and will continue in full force and effect thereafter until terminated as follows:
      i. Company may terminate some or all of the Services under the Agreement, with or without cause, upon thirty (30) days prior written notice to Bank; and
      ii. Bank may terminate, suspend or restrict some or all of Company's access to the Services under the Agreement, with or without cause, at any time immediately upon notice to Company.

   b. Any termination will not affect any obligations arising prior to termination.  Upon termination, Bank may terminate Company's access to the Services, and Company will terminate its access to and use of the Services, except to the extent necessary to process transactions that were in process prior to the termination date.

   c. Within thirty (30) days after termination of the Agreement, Company will, at its expense, promptly uninstall and remove all Software provided for the Service from its computers and return to Bank any Software, hardware and equipment provided by Bank for the Service, including the Supporting Documents, procedures, documentation and any materials relating to the Service in its possession or under its control, destroy all copies of the Supporting Documents and materials relating to the Supporting Documents that cannot be returned, and upon request from Bank certify in

TM-700 (10.2016)

WAB000188

writing to Bank that all copies have been returned or destroyed. Company will be responsible and liable to Bank for the replacement cost of all lost, stolen or damaged equipment that was provided by Bank to Company in connection with the Service.

d.   Upon termination of the Agreement, all Services and any Licenses shall automatically terminate.

21.   Company's Records.  The Agreement and the Services are not intended to relieve Company of any obligation imposed by law or contract regarding the maintenance of records or from employing adequate audit, accounting and review practices as are customarily followed by similar businesses.  Except as otherwise stated in the Agreement, Company agrees to retain and provide to Bank, upon request, all information necessary to remake or reconstruct any deposit, transmission, file or entry until ten (10) business days following receipt by Bank of the deposit, file, entry, transmission, or other order affecting an Account.

22.   Business Days; Cutoff Hours.    For the purpose of the Agreement, Bank's business days are Monday through Friday, excluding Saturdays, Sundays, bank holidays, and any other day that Bank chooses to be closed.  Some of the Services are subject to processing cutoff hours.  Information on cutoff hours can be found in Supporting Documents, applicable Service Descriptions and Service schedules.  Instructions received after the applicable cutoff hour or on a non-business day may be deemed received as of the next business day.

23.   Assignment.  Bank may assign its rights and delegate its duties under the Agreement to an affiliated company or a third party with or without notice to Company and without Company's consent. Company may not assign any right or delegate any obligation under the Agreement without Bank's prior written consent.

24.   Third Parties.  Company acknowledges and agrees that Bank may arrange to provide Software, if required, and/or may arrange for the Services covered by the Agreement to be performed or provided by third parties, including its affiliates. Company further agrees that any such party is a third party beneficiary of the Agreement and as such is entitled to rely on, and avail itself of, the provisions of the Agreement as if it was Bank, including, without limitation, the limitations on liability and the indemnities described in the Agreement. Bank's ability to provide certain Services may be dependent upon Bank's ability to obtain or provide access to third party vendors and networks. In the event such third party network is unavailable or Bank determines in its sole discretion, that Bank cannot continue providing any third party network access, Bank may discontinue the related Service or may provide the Service through a different party. In such situations, Bank will have no liability for the delay or unavailability of access.

To the extent Company authorizes a third party to access the Services on Company's behalf, Company will be solely responsible and liable for all actions and inactions of said third party.  Company expressly assumes the risks associated with providing Service access rights to its agents or third party vendors, including but not limited to the risk of unauthorized or erroneous transactions.  Bank will not be responsible, nor have any liability whatsoever for any services Company receives from Company's agents, or third party vendors. Bank reserves the right to require Company to agree to additional terms and conditions as a condition precedent to Company's use of any

agent or third party vendor in connection with Company's access to the Services.

25.   Credit Criteria; Financial Statements.  Bank may, in its sole discretion, perform credit reviews of Company in accordance with Bank's credit criteria. Company shall, upon Bank's request, provide Bank with any credit-related information and assistance as the Bank may require to perform such review.  Company agrees to provide Bank with a financial statement or information on Company's financial condition upon Bank's request.

26.   Waiver.  No party's failure or delay in exercising any right or remedy under the Agreement will operate as a waiver of such right or remedy, and no single or partial exercise of any right or remedy under the Agreement will preclude any additional or further exercise of such right or remedy or the exercise of any other right.  No waiver by either party of any breach of the Agreement will operate as a waiver of any prior, current or subsequent breach. No waiver, breach, right or remedy will be effective unless made in writing.

27.   Electronic Recordings.  The Bank is authorized (but is not obligated) to record electronically and retain telephone conversations between the Company (including its purported Authorized Representatives) and the Bank.    Accordingly, Company agrees on behalf of itself, its employees and agents that Bank may monitor and record Company's telephone and electronic communications in connection with the Services at any time, without further notice.  Bank and Company hereby agree that Bank may produce the telephonic or electronic recordings or computer records as evidence in any proceedings brought in connection with the Agreement and the Company hereby acknowledges the validity and enforceability of such telephonic or electronic recordings.

28.   Final Agreement; Amendments.
a.   *Final Agreement.*  The Agreement constitutes the final and complete agreement between Bank and Company with respect to the Services and any required Software, and supersedes all other oral or written agreements, understandings and representations.    This Agreement incorporates, supplements, and supersedes where inconsistent the terms of your account agreement with Bank.    This Agreement does not change any other agreements entered into with Bank for non-cash management services, including the Deposit Account Agreement and Disclosure.

b.   *Amendments.*  Bank may amend (add, delete or change) the terms of the Agreement, including but not limited to the terms of any Service Description, Supporting Documents or applicable fees.  Bank may make such amendments, additions, changes or deletions, at any time and at Bank's sole discretion. If Bank deems it reasonably practicable to do so and if the change adversely affects Company's usage of the Service, Bank may notify Company of the change in advance.  Otherwise, Bank will notify Company of the change as soon as reasonably practicable after it is implemented, which notice may be given electronically. Company's continued use of the Services after the effective date of the applicable modification will evidence Company's consent to any amendments, including additions, changes or deletions.

29.   Availability.  Bank may cause a Service to be temporarily unavailable to Company, either with or without prior notice, for site maintenance, security or other reasons, and Company acknowledges that factors beyond Bank's reasonable control,

TM-700 (10.2016)

WAB000189

such as telecommunications failure or equipment failure, may also cause the Service to be unavailable to Company.  In such event, Company must make alternative arrangements for scheduled transactions and Company will be responsible for maintaining procedures and facilities to enable Company to do so if any of the Services are unavailable to Company. Upon notice from Bank of a failure of any software, hardware or other equipment necessary for Bank to perform in accordance with a Service Description, Company will as soon as reasonably possible deliver to Bank all data in Company's possession or under its control which Bank reasonably requests in order for Bank to continue to provide the Service.

30.  <u>Headings.</u>  Headings are for reference only and are not part of the Agreement.

31.  <u>Successors and Assigns.</u>  The Agreement is binding upon and shall inure to the benefit of Bank and Company and their respective successors and assigns.

32.  <u>Applicable Law; Severability.</u>    The Agreement shall be construed and interpreted in accordance with all applicable federal law and regulations, and to the extent such law and regulations do not apply, with the laws of the state of Arizona, without regard to its conflict of law provisions.  Even if a provision of the Agreement is held to be invalid, illegal or unenforceable, the validity, legality, or enforceability of the other provisions of the Agreement will not be affected or impaired by such holding.

TM-700 (10.2016)

**WAB000190**

## BUSINESS ONLINE BANKING SERVICE DESCRIPTION

1. <u>Business Online Banking.</u> Company desires to use Business Online Banking to access its Accounts and to facilitate certain Services as identified in and subject to this Service Description. Bank reserves the right, with prior written notice to Company, to place, from time to time, limits on Company's right to use the Business Online Banking.

   Subject to Bank's prior approval, Company's may use Business Online Banking to: (i) View balances on Linked Accounts; (ii) View Account history for all Linked Accounts; (iii) Transfer funds between Linked Accounts; (iv) Request check stop payments; (v) Send secure email messages to the Bank; (vi) initiate Funds Transfers; (vii) ACH origination services; and (viii) initiate bill payments. Additional Business Online Banking Services may be added to or removed by the Bank from time to time as reflected in the Supporting Documents.

2. <u>Related Service Descriptions for Entries, Funds Transfers, Positive Pay and ACH Filtering/Blocking.</u> Certain Business Online Banking Services are subject to separate Service Descriptions, in addition to this Service Description. If Company is permitted to originate Entries through the Business Online Banking Services, all requests relating to entries through the ACH must be processed by Company consistent with a separate ACH Origination Service Description. All Funds Transfers subject to the Code must be processed by Company consistent with a separate Funds Transfer Service Description. Positive Pay Services and ACH Filtering/Blocking Services must also be facilitated by Company consistent with a separate Positive Pay Service Description and/or a separate ACH Filtering/Blocking Service Description, respectively. The foregoing is not an exhaustive list of separate Service Descriptions that may apply to your Business Online Banking Services and Bank reserves the right to require Company to agree to additional Service Descriptions not specifically identified here.

3. <u>Primary Account Designation.</u> Company agrees to designate one of its Accounts as the Primary Account. Company authorizes Bank to debit the Primary Account or any other account maintained by Company at Bank, in the event insufficient funds are available in the Primary Account, for any fees or other amounts due to Bank in connection with the Services. If the Primary Account is closed for any reason, Bank will charge one of Company's other Accounts for any fees or other amounts due to Bank in connection with the Services. If Company closes its Primary Account and has no other Accounts, Company's Services will be stopped along with any unprocessed Services transfers. To reinstate its Services, Company must open a new Primary Account.

4. <u>Administrator and User(s) and Account Designations.</u> To utilize Business Online Banking, Company must appoint at least one individual to act as an Administrator with the authority to determine who will be authorized to use the Business Online Banking Services on Company's behalf. The Administrator will be able to, among other things, designate Users, establish User rights and/or limits, and remove existing Users. The Administrator will also determine what Business Online Banking Services will be available to particular Users, when to change passwords, and any limitations on the use of the Services by individual Users. Bank will not control or oversee the Administrator function. Company agrees to all action taken by the Administrator or any User designated or authorized by the Administrator, and all such persons are Company's agents for purposes of use of Business Online Banking Services, each authorized to act individually or in concert. The fact that Bank is, or may be made aware of, or could have discovered, any limitation on access to Business Online Banking does not make Bank obligated to enforce or attempt to enforce any limitation. Company understands that the Administrator and each User may utilize Business Online Banking (including inquiries, transfers and account verification) without regard to any restrictions otherwise applicable to an Account. For example, the Administrator and each User will be able to utilize Business Online Banking regardless of whether they are also authorized signers on the applicable Account's signature card.

5. <u>Computer Equipment and Software to Access the Business Online Banking Services.</u> To use the Business Online Banking Services, Company must have a sufficiently powerful computer hardware and appropriate software as described in the Supporting Documents. Some Business Online Banking Services may require Company to download Software from Bank's website; in some cases, Bank may place Software on Company's computer as part of Bank's security and/or User verification tools.

6. <u>Access to Account Data.</u> Company can obtain balance and other Account information through Business Online Banking. Since certain information and transactions are not processed by Bank until after the close of Bank's business day, some transactions may not be reflected on Business Online Banking until the next banking day. Posted items may be reversed due to insufficient funds, stop payment orders, legal process, and other reasons. Certain balances also may not be subject to immediate withdrawal. Bank assumes no responsibility for any loss arising from incomplete information or for any temporary interruption in Bank's information system. If Company is unable to access Business Online Banking for any reason, Company may contact Bank at (888) 995-2265 for support.

7. <u>Account Transfer Limitations.</u> All transfers to and from an Account will be subject to the terms and conditions applicable to the Account as set forth in the Deposit Account Agreement and Disclosure, including but not limited to transfer limitations. For example, federal regulations limit certain types of transactions/transfers from a money market or savings account. If Company exceeds these limits, Bank may impose a fee, close or convert Company's Account, limit Company's use of the Business Online Banking Services, or any combination of the foregoing. In addition, there may be other transfer limits addressed in the Supporting Documents.

8. <u>Bill Payment Service.</u>

   *Bill Payment Account Designation; Payment Details.* When using Bill Payment Service, Company must designate at least one Bill Payment Account. Company will also have the ability to identify other Accounts Company wishes to use to make Bill Payments. For each Bill Payment, Company will also be required to provide the complete name of the Payee, the account number and the Payee's remittance address (as exactly as shown on the billing statement or invoice), the amount of the Bill Payment and the Payment Processing Date. If the Payment Processing Date is not a business day, then Company's Bill Payment will be processed the next business day.

   *Setting Up Payees.* To initiate Bill Payments through the Bill Payment Service, Company must establish Company's list of

TM-700 (10.2016)

WAB000191

Payees. Bank reserves the right to reject any Payee at any time, at its discretion. Bank is not responsible if a Bill Payment is not made to a Payee because Company provided Bank with incomplete, incorrect or outdated information regarding the Payee or Company attempted to make a Bill Payment to a Payee that is not on Company's established list of Payees. Also, Bank reserves the right to refuse to prohibit payment to a Payee via the Bill Payment Service.

*One-Time Payment.* Company can use the Bill Payment Service to make a one-time Bill Payment. A one-time Bill Payment will be processed on the Payment Processing Date; provided that the Payment Processing Date selected by Company is a business day and Company submits Company's one time Bill Payment prior to the Bill Payment cutoff hour for that date. If Company selects a Payment Processing Date that is not a business day or submits Company's Bill Payment after the Bill Payment cutoff hour for that date, then the Payment Processing Date will be the next business day. For cutoff hours for Bill Payments, see the Supporting Documents.

*Recurring Payments.* Company can use the Bill Payment Service to make recurring Bill Payments. The Bill Payment Service allows Company to schedule a Bill Payment to be processed on Company's selected frequency on an ongoing basis. However, if the future Payment Processing Date is on a non-business day, then the new future Payment Processing Date will be the next business day.

*Available Funds.* For same-day Bill Payments, Company will need to have sufficient available funds in Company's designated Bill Payment Account to cover the amount of all Bill Payments scheduled on the same business day Company logged onto the Service, even if Bank does not debit Company's Bill Payment Account on that same business day. For future one-time or recurring Bill Payments, Company will need to have sufficient available funds in the designated Bill Payment Account on the Payment Processing Date. Company can initiate Bill Payments up to the available funds in Company's Bill Payment Account, plus any linked credit or other overdraft facility. If Company exceeds these limits, then Bank may prevent (or reverse) payments in any order and in any amount that Bank chooses, even if the result is to reduce Company's transactions to a level below the amounts needed to pay Company's Bill Payments.

*Non-Recommended Payees.* Bank does not recommend that Company use this Service to pay Company's federal, state or local taxes, courts or other governmental entities. Bank will not be liable for penalties, interest or other damages of any kind if Company tries to use the Bill Payment Service to remit or pay money for taxes, or to courts or governmental agencies.

*Scheduling Bill Payment.* Bill Payments should be scheduled sufficiently in advance of the Due Date to allow a Payee to receive it by the Due Date set by Company's Payee and without taking into account any grace period that may be offered by Company's Payee. Some companies paid through the Bill Payment Service are not set up for electronic payment and therefore will receive a paper draft on Company's behalf. These paper draft Bill Payments can take up to six (6) business days to process before the Payee receives the Bill Payment. Longer exception periods may be required for Bill Payments to the U.S. Territories of Guam, Puerto Rico, U.S. Virgin Islands, and payments to international military bases. Company is responsible for ensuring that Company initiates a Bill Payment in time for the payment to reach the Payee before its Due Date (without taking into account any grace period). Company must

allow at least six (6) business days (or longer for the exceptions noted above), prior to the Due Date, for each Bill Payment to reach the applicable Payee. Bank is not responsible for any damages Company may suffer if Company does not allow sufficient time between the Payment Process Date and the Due Date of Company's bill or obligation, without counting any grace period offered by the Payee.

*Cutoff Hour.* Bill Payments received by Bank after the cutoff hour provided in the Supporting Documents or on a day that is not a business day of Bank (or of any Bill Payment vendor or intermediary that Bank may use) may be treated by Bank as received on the next business day, potentially delaying Bill Payment.

*Payment Methods.* Bank reserves the right to select the method in which to remit funds on Company's behalf to Company's Payees. These payment methods may include, but may not be limited to, an electronic payment, or a demand draft payment (where a negotiable instrument is created and drawn off of Company's Bill Payment Account).

*Payment Changes and Cancellation.* Company may change or cancel a Bill Payment via the Service as long as Company logs onto the Service prior to the Payment Processing Date for the Bill Payment and Company follows the Bill Payment provided by the Bill Payment Service for changes and cancellations.

*Accurate Information on Payees.* If the Bill Payment Service provides Company with a series of options regarding Payee address or location, Company is responsible for correcting that information if such information does not agree with Company's records or with Company's particular bill. Bank and the others that handle Company's Bill Payment (including the Payee's bank) are entitled to rely on information Company supplies, such as the Payee's account number or the routing number of the Payee's bank, even if the name Company gives to Bank and the number Company gives to Bank identify different persons. Electronic payments that are made through the ACH are subject to the rules of the ACH, and Company agrees to be bound by the Rules, including the rule making payment to the Payee provisional until receipt by the Payee's bank of final settlement of the credit transaction. If final settlement is not received, Company will not be deemed to have paid the Payee the amount of the electronic Bill Payment.

*Entries.* If a bill payment is processed electronically through ACH, the Entries and the transaction will also be subject to the terms and conditions of a separate Automated Clearing House Service Description, to the extent applicable.

9. <u>Check Stop Payment Service.</u> Company may stop payment on a check by providing Bank with timely, complete and accurate information on: the number of the Account in question; the date of the item; the item number; the Payee information and the EXACT amount of the item (dollars and cents). If any information is incomplete or incorrect, Bank will not be responsible for failing to stop payment on the item. Requests become effective when Bank has had a reasonable opportunity to confirm their receipt and have verified that the item has not been paid. Company may use Business Online Banking to stop payment on checks that Company has written against Company's Accounts. If Company wishes to cancel or amend any other Business Online Banking Service transaction (for example, Funds Transfer or Entries), Company should use that Business Online Banking Service and Company will be subject to any limitations or inability to stop applicable to that Business

TM-700 (10.2016)

WAB000192

Online Banking Service. If Company contacts Bank, Bank may at its sole discretion attempt to assist Company, but will not be liable for any failure to successfully stop payment on transactions.

Company may not use this check stop payment service to stop payment on any ACH/EFT transaction, point-of-sale ACH/EFT transfer; any cashier's check, certified check or other official institution check have purchased from Bank or any check which Bank has guaranteed. Company understands that its stop payment request is conditional and subject to Bank's verification that the check has not already been paid, or any Business Online Banking Service not already performed, or that stopping payment may subject Bank to risk of loss or damages under any law or regulation (including clearing house or other processor rules).

All Stop Payment orders, renewals and revocations of stop orders will be subject to Bank's current policy on stop payment orders. From time-to- time, Business Online Banking may be inoperable. If that occurs, Company's request can be communicated to Bank by telephone. A check stop payment order is effective for six (6) months only and will expire automatically, at which time Company is responsible for any renewal desired by Company for another six (6) month term. There will be a fee assessed for each stop payment request processed.

10. <u>Email Messages; Encrypted Transmissions.</u>   While access to Bank through the secure email function of the Services is "online," messages sent to Bank through email are not reviewed by Bank personnel immediately after they are sent.   If immediate attention is required, Company must contact Bank by telephone or in person or through some other procedure not using Business Online Banking.

Encryption of data transmissions does not guarantee privacy. Data transferred via Business Online Banking is encrypted in an effort to provide transmission security. Notwithstanding Bank's efforts to insure that Business Online Banking is secure, Company acknowledges that the Internet is inherently insecure and that all data transfers (including transfer requests and electronic mail) occur openly on the Internet. This means that the data transfers potentially can be monitored and read by others. Bank cannot and does not warrant that all data transfers utilizing Business Online Banking will not be monitored or read by others. Company's email messages may be acted upon by Bank if received in a manner and in a time providing Bank a reasonable opportunity to act. Nevertheless, unless otherwise provided herein, email messages will not serve as a substitute for any requirement imposed on Company to provide Bank with "written" notice.

11. <u>Availability.</u>   Bank may cause Business Online Banking to be temporarily unavailable to Company, either with or without prior notice, for site maintenance, security or other reasons, and Company acknowledges that factors beyond Bank's reasonable control, such as telecommunications failure or equipment failure, may also cause Business Online Banking to be unavailable to Company. In such event, Company must make alternative arrangements for scheduled transactions and Company will be responsible for maintaining procedures and facilities to enable Company to do so if Business Online Banking is unavailable to Company.

TM-700 (10.2016)

WAB000193

## AUTOMATED CLEARING HOUSE ("ACH") SERVICE DESCRIPTION

1.  **ACH Service.**  In conjunction with the Services, Company may initiate credit and/or debit Entries by means of the ACH Network and agrees to be bound by the terms of this Service Description and the Rules.  Bank will act as an ODFI with respect to such Entries. Company is responsible for all Entries to the fullest extent provided by law and as set forth in this Service Description.  For the purposes of this Service Description, unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Rules.

2.  **Related Service Descriptions for Entries.**  Company's Entries using Business Online Banking must be consistent with the separate Business Online Banking Service Description. Additional terms and conditions may apply to the ACH Service to the extent Company transmits Entries outside Business Online Banking Services.  Company may not submit Entries outside Business Online Banking Services without Bank's prior written consent.

3.  **The Rules.**  A copy of the Corporate Edition of the Rules can be purchased from NACHA at www.NACHA.org.  Company agrees to obtain a copy, to understand and be familiar with the Rules, and to be responsible for keeping up to date with changes in the Rules, including applicable timeframes and deadlines. Company agrees that information or advice received by Company from Bank as to the Rules or the operation of the Rules is not legal advice and is not a substitute for Company's obligation independently to understand and comply with the Rules.

4.  **Processing Entries.**
    a.  Company shall only transmit PPD (Prearranged Payments and Deposits) or CCD (Corporate Credit or Debit) credit or debit Entries to Bank to the location(s) and in compliance with the formatting and other requirements set forth in the Supporting Documents.  The ACH Service will start on a date agreeable to Company and to Bank after all set up requirements have been completed.  Company agrees that its ability to originate Entries under this Agreement is subject to exposure limits in accordance with the Rules and as set forth in the Supporting Documents.
    b.  Company will not submit individual or total monthly Entries in excess of the maximum limits established by Bank and reflected in the Supporting Documents, as amended from time to time.  The parameters and variations of the limits shall be set at Bank's discretion, including but not limited to limits based on dollar amounts and/or Entry Standard Entry Class Code types.  Company will not divide a transaction into more than one Entry in order to avoid these limitations. The Bank may adjust these limitations from time to time by providing notice to Company. The Bank processing of Entries in an amount greater than the established limit(s) shall not be deemed a waiver of this provision; the Bank may cease processing Entries in a greater amount at any time without prior notice.
    c.  Company may not originate Entries using Standard Entry Class Codes other than CCD, CTX or PPD without prior notice to and written approval by Bank.  Bank may require Company to submit an application in form and content acceptable to Bank, and execution by Company of such supplemental schedules, agreements and other documents as Bank may require, as a condition precedent to Company's use of other Standard Entry Class Codes.  By

way of example, the foregoing restrictions and requirements may apply to Company's use of ARC, RCK, BOC, POP, WEB, IAT or TEL Standard Entry Class Codes, or if Company is engaging in cross-border (International) transactions. If Company has been approved by Bank to originate Entries using Standard Entry Class Codes in addition to CCD, CTX and PPD, the additionally approved Standard Entry Class Codes will be identified in the Setup Form, and Company agrees to be bound by the Rules applicable to those additional Standard Entry Class Codes.  Bank may block unapproved use of a Standard Entry Class Code or an unapproved cross-border transaction.

    d.  Except as provided below for On-Us Entries, Bank shall: (i) process Entries received from Company in accordance with the file specifications set forth in Rules; (ii) transmit such Entries as an ODFI to a Federal Reserve Bank acting as an ACH Operator; and (iii) settle for such Entries as provided in the Rules. All Entries shall be received by Bank prior to Delivery Date Deadline.
    e.  Bank shall transmit or complete the necessary authorizations for Entries by the Delivery Date Deadline, provided: (i) such Entries are received by Bank's related cutoff time and Delivery Date Deadline on a business day, and (ii) the ACH Operator is open for business on such business day.  Entries shall be deemed received by Bank at the location set forth in the Supporting Documents, and in the case of transmittal by electronic transmission, when the transmission (and compliance with any related Security Procedure provided for herein) is completed as provided in the Supporting Documents.  If any of the requirements of this Section are not met, Bank may use reasonable efforts to transmit such Entries to the ACH Operator by the next Delivery Date Deadline which is a business day and a day on which the ACH Operator is open for business.

5.  **Compliance with Security Procedures.**
    a.  If an Entry (or a request for cancellation or amendment of an Entry) received by Bank purports to have been transmitted or authorized by Company, it will be deemed effective as Company's Entry (or cancellation request) and Company shall be obligated to pay Bank the amount of such Entry even though the Entry (or cancellation request) was not authorized by Company, provided the Bank accepted the Entry in good faith and acted in compliance with the Security Procedures contemplated herein.
    b.  If an Entry (or a request for cancellation or amendment of an Entry) received by Bank was transmitted or authorized by Company, Company shall pay Bank the amount of the Entry, whether or not Bank complied with the Security Procedures and whether or not that Entry was erroneous in any respect or that error would have been detected if Bank had complied with such procedures.

6.  **Rejection of Entries.**  Bank may reject any Entry which does not comply with the requirements of Section 4 (Processing Entries), Section 5 (Compliance with Security Procedures), or which contains an Effective Entry Date more than one (1) day after such Entry is received by Bank.  Bank may reject an On-Us Entry for any reason for which an Entry may be returned under the Rules.  Bank may reject any Entry if Company has failed to comply with its account balance obligations under Section 14 (Account).  Although Bank is under no obligation to do so, Bank may reject any Entry if Company does not adhere to Security Procedures contemplated herein.  Bank shall notify Company either by phone or electronic transmission, including email, or as otherwise agreed to by Bank and Company of such rejection no

TM-700 (10.2016)

WAB000194

later than the business day such Entry would otherwise have been transmitted by Bank to the ACH Operator or, in the case of an On-Us Entry, its Effective Entry Date.  Notices of rejection shall be effective when given.  Bank shall have no liability to Company by reason of the rejection of any such Entry or the fact that such notice is not given at an earlier time than that provided for herein.

7. <u>On-Us Entries.</u>  Except as provided in Section 6 (Rejection of Entries), in the case of an On-Us Entry, Bank shall credit or debit the Receiver's account in the amount of such Entry on the Effective Entry Date contained in such Entry, provided the requirements set forth in Section 4 (Processing Entries) are met.  If said requirements are not met, Bank may use reasonable efforts to credit or debit the Receiver's account in the amount of such Entry no later than the next business day following such Effective Entry Date.

8. <u>Notice of Returned Entries.</u>  Bank shall notify Company by phone or electronic transmission, including email, of the receipt of a returned Entry from the ACH Operator no later than one (1) business day after the business day of receipt of the returned Entry.  Except for an Entry retransmitted by Company in accordance with the requirements of Section 4 (Processing Entries), Bank shall have no obligation to retransmit a returned Entry to the ACH Operator if Bank complied with the terms of this Service Description with respect to the original Entry.

9. <u>Notifications of Change.</u>  Bank shall notify Company of all Notifications Of Changes ("**NOC**") or Corrected NOC received by Bank relating to Entries transmitted by Company by mutually agreeable means, including email, within two (2) Banking Days. Company must make the changes specified in an NOC or corrected NOC (a) within six (6) Banking Days of receipt or prior to initiating another Entry to the Receiver's account, whichever is later, or (b) as otherwise required in the Rules, if the Rules specify a different time for correction.

10. <u>Prefunding.</u>   Bank may designate Company as "**ACH Prefunding,**" and Bank may change Company's designation to or from ACH Prefunding at any time, with or without cause and at Bank's sole discretion. Bank will inform Company of its designation as an ACH Prefunding company, and of any change in the designation.  Company will pay Bank, in immediately available funds, an amount equal to the sum of all credit Entries or debit Reversing Entries related to Entry data delivered to Bank at such time as Bank may from time to time designate or, if not otherwise designated (a) if Company is not an ACH Prefunding company, no later than the opening of business on the Settlement Date, and (b) if Company is an ACH Prefunding company, no later than the date of transmittal of the related Entry data to Bank or at such earlier time as Bank may have established for Company.

11. <u>Inconsistencies.</u>  If a beneficiary of a Request is identified by both name and account number, payment may be made by Bank and by any other financial institution based on the account number even if the name and the account number are not consistent or identify different parties.  If an intermediary bank or a beneficiary's bank is identified on a payment order by both name and account number, Bank and other financial institutions may rely on the account number even if the name and the account number are not consistent or identify different parties.

12. <u>Cancelation or Amendment.</u>  Company has no right to cancel or amend any Entry after its receipt by Bank.  However, if such request complies with the Security Procedures for the cancellation of an Entry, Bank may use reasonable efforts to act on a request by Company for cancellation of an Entry prior to transmitting it to the ACH Operator or, in the case of an On-Us Entry, prior to crediting a Receiver's account, but shall have no liability if such cancellation is not affected.  Company shall reimburse Bank for any expenses, losses, or damages Bank may incur in affecting or attempting to affect Company's request for the reversal of an Entry.

13. <u>Provisional Credit.</u>  Company agrees that any payment by Bank to Company for any debit Entry, returned credit Entry or credit Reversing Entry is provisional until Bank has received final settlement for such Entry.  Bank may delay availability of provisional funds at its discretion.  If final settlement is not received, Bank is entitled to and Company agrees to pay a refund of the amount credited; Bank may charge Company's account for the amount due.  Bank may refuse to permit the use of any amount credited for a debit Entry or credit Reversing Entry if it believes that there may not be sufficient funds in Company account to cover chargeback or return of such Entry or Reversing Entry.

14. <u>Account.</u>  Bank may, without prior notice or demand, obtain payment of any amount due and payable to it under this Service Description by debiting the Account(s) of Company identified on the Setup Form as completed by Company, and shall credit the Account(s) for any amount received by reason of the return of an Entry transmitted by Company for which Bank has previously received payment from Company.  Such credit shall be made as of the day of such receipt by Bank.  Company shall at all times maintain a balance of available funds in the Account(s) sufficient to cover its payment obligations under the Service Description.  In the event there are not sufficient available funds in the Account(s) to cover Company's obligations under this Service Description, Company agrees that Bank may set off against Company Account any amounts Company owes to Bank or Bank may collect funds from any other account owned by Company and held with Bank (in accordance with the Deposit Account Agreement and Disclosure provided to Company at time of account opening) in order to obtain payment of Company's obligations under this Service Description.

15. <u>Account Reconciliation.</u>  Credit and debit Entries processed by Bank will be reflected on Company's periodic statement issued by Bank with respect to the Account(s) pursuant to the Deposit Account Agreement and Disclosure between Bank and Company.  Company agrees to promptly notify Bank of any discrepancy between Company's records and the information shown on any periodic statement.  Such notification time frame shall be in accordance with the Rules.  Company agrees that Bank shall not be liable for Company's failure to comply with the Rules, under any theory for any other losses resulting from Company's failure to give such notice or any loss of interest or any interest equivalent with respect to Entry shown on such periodic statement, and Company shall be precluded from asserting such discrepancy against Bank.

16. <u>Cutoff Hours.</u>  The cutoff hour applicable to Requests is reflected in the Supporting Documents.  A Request is considered executed when Bank executes it.  If a Request is received after the cutoff hour or on a day that is not a business day, Bank will process the Request on the following business day.  Companies who submit Requests via an automated transfer (for example, Business Online Banking) need not re-submit the Request and

TM-700 (10.2016)

WAB000195

the Request will be processed the next business day, provided the Request has a "scheduled" or similar status.

17. <u>Company Representations and Warranties.</u> With respect to each and every Entry initiated by Company, Company represents and warrants to Bank and agrees that:

a. Company shall obtain all consents and authorizations required under the Rules and shall retain such consents and authorizations two (2) years after they expire and other documents related to Entries for a period of six (6) years. Without limiting the foregoing, each person as the Receiver of an Entry received by Bank from Company has authorized the initiation of such Entry, and the crediting or debiting of its account in the amount and on the Effective Entry Date shown on such Entry. Company will provide the Receiver with a copy of such authorization whenever required to do so. Further, Company agrees to provide the original, copy or other accurate record of the Receiver's authorization to Bank in such time and manner as to enable the Bank to deliver the authorization to a requesting RDFI within ten (10) banking days of the RDFI's written request.

b. Such authorization is operative at the time of transmittal or crediting / debiting by Bank as provided herein;

c. Entries transmitted to Bank by Company are limited to those types of credit or debit Entries selected by Company on the Setup Form or set forth in this Service Description;

d. If the amount of a debit Entry to a Receiver's account varies in amount from the previous debit Entry relating to the same authorization or preauthorized amount, Company will, at least ten (10) days before the Effective Date of such debit Entry, send the Receiver written notice of the amount of such debit Entry and its Effective Entry Date, unless the Receiver has previously been notified of Receiver's right to receive such notice and Receiver has elected to receive such notice only when the debit Entry does not fall within a specified range of amounts or varies from the most recent debit Entry by an agreed amount;

e. If any change is made by Company in the scheduled Effective Entry Date of one or more debit Entries, Company will, at least seven (7) days before the Effective Entry Date of the first such debit Entry to be affected by such change, send the Receiver a written notice of the new Effective Entry Date(s) of such Entry or Entries;

f. Company shall be bound by and comply with the Rules as in effect from time to time, including, without limitation, the treatment of a payment of an Entry by the RDFI to the Receiver as provisional until receipt by the RDFI of final settlement for such Entry; and

g. Company specifically acknowledges that it has received notice of the Rule regarding provisional payment and of the fact that, if such settlement is not received, the RDFI shall be entitled to a refund from the Receiver of the amount credited and Company shall not be deemed to have paid the Receiver the amount of the Entry. Company shall indemnify Bank against any loss, liability or expense (including attorney's fees and expenses) resulting from or arising out of any breach of any of the foregoing representations or agreements.

h. Company will not use the ACH Service to collect payments for any prohibited business categories or types as developed by Bank, in its sole discretion. Neither Company nor any service provider may initiate corrections to files that have already been transmitted to an ACH Operator.

i. Company must agree to establish data security policies, procedures and systems as required by the Rules. This must include controls that comply with applicable regulatory

guidance on access to all systems used by Company to initiate, process and store Entries. This requires Originators to:

i. Protect the confidentiality and integrity of Protected Information;

ii. Protect against anticipated threats or hazards to the security or integrity of Protected Information until its destruction; and

iii. Protect against unauthorized use of Protected Information that could result in substantial harm to a natural person.

18. <u>Compliance Audits.</u> Bank may, upon providing five (5) days written notice, audit Company for the purpose of ensuring Company's compliance with the terms and conditions of this Service Description and the Security Procedures. Bank may conduct the audit or, in its sole discretion, choose a third party auditor. If the audit indicates there is a breach in Company's compliance with this Service Description: (i) Bank may immediately terminate the Agreement and pursue its legal remedies, and (ii) Company will pay the cost of such audit. If Company does not cooperate with Bank's request to audit for compliance, Company shall be deemed to have constructively admitted to a material breach in its compliance.

TM-700 (10.2016)

WAB000196

## ACH FILTERING/BLOCKING SERVICE
## DESCRIPTION

1. <u>ACH Filtering/Blocking Service.</u>  If Company choses to use the ACH Filtering/Blocking Service through Business Online Banking as provided by Bank, Company agrees to be bound by the terms of this Service Description.  ACH Filtering allows Company to review and confirm debit Entries prior to posting to the specified Accounts listed on the Setup Form.  ACH Blocking is a service, when selected by Company, automatically returns all incoming debit Entries attempting to post to the specified Account.

2. <u>Related Service Description for Business Online Banking.</u> Company's use the ACH Filtering/Blocking services are facilitated through Business Online Banking and is subject to the separate Business Online Banking Service Description.

3. <u>General Terms.</u>
   a. Company using the ACH Filtering Service shall establish (and update from time to time) Filtering Rules, as specified further in the Supporting Documents.  Alternatively, if Company chooses the ACH Blocking Service for specified Accounts, all incoming debit Entries will auto return before posting to the Account. Company is not required to establish Filtering Rules for ACH Blocking.
   b. For ACH Filtering, Company shall review exceptions it receives from Bank through email notifications made through Business Online Banking, and determine if the exceptions will be treated as authorized or unauthorized debit Entries. If an exception item is a valid debit Entry, Company may establish a rule after authorizing to pay the item so that future items will be paid automatically.
   c. Company shall make its exception decisions online through Business Online Banking on each business day by the deadline specified in the Supporting Documents.
   d. Company acknowledges that the ACH Filtering/Blocking Services do not cover debit Entries which Bank has already paid or finalized or which Bank is already committed to pay or honor under applicable laws, regulations or the Rules.
   e. Bank shall compare incoming debit Entries against Company's Filtering Rules and accept those transactions which are authorized under Company's Filtering Rules.
   f. Bank shall submit to Company as exceptions any debit Entries which do not meet Company's Filtering Rules (unless the Company has chosen the Blocking Service, in which case all ACH transactions will be returned).
   g. Bank shall make reasonable efforts to make exceptions available to Company on each business day by the deadline specified in the Supporting Documents.
   h. ACH Exceptions will not reflect in the Company Account records if they are returned.
   i. If Company has not submitted a decision on the same Bank business day by the deadline specified in the Supporting Documents, Bank will apply the default decision as selected by Company in the Supporting Documents.

4. <u>Limitation on Liability.</u>  In addition to any other limitation on liability in the Agreement, Company agrees that if Bank pays or rejects for Entries in accordance with this Service Description, Company releases Bank and holds it harmless from any claim that the checks or items were not properly payable, or for wrongful dishonor (as applicable).

TM-700 (10.2016)

WAB000197

# FUNDS TRANSFER SERVICE DESCRIPTION

1. <u>Funds Transfer Service.</u>  If Company chooses to utilize Bank's Funds Transfer Service, Company agrees to be bound by the terms and conditions of this Service Description.  Company may submit Requests to Bank in accordance with the terms and conditions of this Service Description.   Subject to the terms of this Service Description, Bank may execute a Request received in the name of the Company, whether such Requests are written, oral, telephonic, or electronic, unless otherwise specifically agreed in writing.  Company is responsible for all Requests to the fullest extent provided by law and as set forth in this Service Description. Bank may choose the funds transfer mechanism, including but not limited to FedWire, correspondent bank transfer, or internal transfer, to be used when acting on upon Company's Request.

2. <u>Related Service Descriptions for Funds Transfers.</u>  If Company will communicate Requests using the Bank's Business Online Banking, all requests must be consistent with the separate Business Online Banking Description.

3. <u>Account Transfer Limitations.</u>   All transfers to and from an Account will be subject to the terms and conditions applicable to the Account as set forth in the deposit terms and conditions governing the Account, including but not limited to transfer limitations.  For example, federal regulations limit certain types of transactions/transfers from a money market or savings account.  If Company exceeds these limits, Bank may impose a fee, close or convert Company's account, limit Company's use of the Funds Transfer Services, or any combination of the foregoing.  In addition, there may be other transfer limits addressed in the Supporting Documents.

4. <u>Inconsistencies.</u>  If a beneficiary of a Request is identified by both name and account number, payment may be made by Bank and by any other financial institution based on the account number even if the name and the account number are not consistent or identify different parties.  If an intermediary bank or a beneficiary's bank is identified on a payment order by both name and account number, Bank and other financial institutions may rely on the account number even if the name and the account number are not consistent or identify different parties.

5. <u>Provisional Credit.</u> When Bank gives Company credit for an incoming payment order, it is provisional until Bank receives final settlement for the payment order.  If Bank does not receive final settlement, Company must return the funds previously credited to the Account to Bank, and the person who sent the payment order will not be treated as having paid Company.

6. <u>Confirmation; Duty to Review and Report.</u>  Bank shall provide confirmation of advice based on the request of the Company (fax or email) and in any case shall include the Funds Transfer as part of the periodic Account statements provided by Bank to Company.  Bank reserves the right to charge Company for confirmations.  Company agrees to examine the confirmations and monthly Account statements promptly upon receipt or availability, whichever occurs first.  Company shall notify Bank immediately and in no event later than fourteen (14) days after receipt or availability, whichever occurs first, of the advice or statement of the existence of any errors, unauthorized transactions or irregularities reflected on the advice or Account statement.  Failure to notify Bank within fourteen (14) days shall relieve Bank of responsibility for errors, unauthorized transactions or irregularities that may arise after the 14th day.

Failure to notify Bank within one (1) year shall preclude Company asserting the errors, unauthorized transactions or irregularities against Bank.

7. <u>Foreign Currency Transactions.</u>  If a Company requests a Funds Transfer in United States dollars or in a currency other than United States dollars to a foreign country, Bank may transfer the payment in the currency of the beneficiary bank's country at any exchange rate chosen by Bank.  If a funds transfer is returned, Company agrees that the exchange rate for conversion of the foreign currency into United States dollars may differ from that used by Bank to process the initial funds transfer.

8. <u>Cutoff Hours.</u>   The cutoff hour applicable to Requests is reflected in the Supporting Documents.  A Request is considered executed when Bank executes it.  If a Request is received after the cutoff hour or on a day that is not a business day, the Request will be processed the next business day.  If Company submits requests via an automated transfer (for example, the Business Online Banking) after the cutoff hour, Company does not need not re-submit the Request as the Request will be processed the next business day, provided the Request has a "scheduled" status.

9. <u>Availability.</u>  Bank may cause the Funds Transfer Service to be temporarily unavailable to Company, either with or without prior notice, for site maintenance, security or other reasons, and Company acknowledges that factors beyond Bank's reasonable control, such as telecommunications failure or equipment failure, may also cause the Funds Transfer Service to be unavailable to Company. In such event, Company must make alternative arrangements for scheduled transactions and Company will be responsible for maintaining procedures and facilities to enable Company to do so if the Funds Transfer Service is unavailable to Company.

10. <u>Subject Rules and Regulations.</u> Company acknowledges that any Request executed by Bank will be subject to rules and regulations applicable to payment orders, including recordkeeping and information transmittal requirements under federal Bank Secrecy Act and its implementing regulations. Company acknowledges and agrees that Bank may capture and transmit information regarding a Request (including but not limited to, beneficiary's name, address, and beneficiary's account number) as part of the processing of a payment order. Company agrees to assist Bank in connection with any requirements imposed by Bank fulfilling Bank's obligations in this regard.

11. <u>Liability of Company.</u>  Notwithstanding any other allocation of liability is the Agreement, Company shall be liable for any loss or damage resulting from Company's breach of the Agreement or this Service Description or to Company's negligence contributed, or which resulted from unauthorized, fraudulent, or dishonest acts by Company's current and/or former Authorized Representatives or Administrator(s).

TM-700 (10.2016)

WAB000198

## POSITIVE PAY SERVICE DESCRIPTION

1. <u>Positive Pay Service.</u>  If Company choses to use Positive Pay through Business Online Banking as provided by Bank, Company agrees to be bound by the terms of this Service Description.

2.

3. <u>Related Service Description for Business Online Banking.</u> Company's use of Positive Pay is facilitated through Business Online Banking and is subject to the separate Business Online Banking Service Description.

4. <u>General Terms.</u>
    a. Company's lists of checks recently issued will be compared through Positive Pay against the amounts and serial numbers of the checks that actually clear against the specified Company account(s) activated for Positive Pay and listed on the Supporting Documents.
    b. Company must submit a Positive Pay File to Bank prior to the cutoff time provided in the Supporting Documents, on the day of issuance of any checks against accounts that are subject to Positive Pay.  The Positive Pay File must be in the format and contain the information specified by Bank in the Supporting Documents. Company must inspect each Exception and submit a "pay" or "return" decision for each Exception to Bank on the same Bank business day by the deadline specified in the Supporting Documents.  Any item below the optional Exception threshold specified on the Supporting Documents will not be presented to Company as an Exception and will be automatically paid.
    c. Company may research Exceptions in Business Online Banking by viewing the check images.
    d. Company grants Bank full authority to honor all checks that match the serial numbers and amounts corresponding to the issue records maintained at Bank.
    e. All Exceptions for which Bank does not receive a timely "return" or "pay" decision will be handled according to the default procedure reflected in the Supporting Documents. If no default decision is selected by Company, Bank shall default to a "pay" decision for any Exception for which Company has not submitted a decision on the same Bank business day by the deadline specified in the Supporting Documentation.
    f. Bank is not obligated to verify signatures on any checks that match the information Company provides or that Company fails to return nor is it required to physically examine matching checks to confirm they are properly signed, completed and encoded.
    g. If Company orders or prints checks from any check-printing vendor other than Bank, Company agrees to meet the Bank's MICR encoding specifications.
    h. Positive Pay applies to checks that are presented for payment to Bank through normal interbank automated clearings.  Company acknowledges that Positive Pay does not cover checks which are: (i) presented over-the-counter, (ii) presented by mail for collection, (iii) miscoded or duplicate items, (iv) items which Bank has already cashed, negotiated or paid or which Bank is already committed to honor or pay under applicable laws, regulations or the Rules.
    i. Subject to funds being available pursuant to Bank's funds availability policy, Bank shall honor all checks that either match the serial numbers and amounts corresponding to the Positive Pay File that is provided in conformance with this Service Description, or that fall under the optional

Exception threshold established by Company in the Supporting Documentation.

5. <u>Security Procedures.</u>  Company agrees to implement reasonable internal security procedures in connection with Positive Pay. Bank recommends imposing a dual control environment in connection with the transmission of Positive Pay Files and related instructions.

6. <u>Limitation on Liability.</u>  In addition to any other limitation on liability in this Agreement, Company agrees that if Bank pays or rejects for payment checks or items in accordance with this Service Description, Company releases Bank and holds it harmless from any claim that the checks or items were not properly payable, or for wrongful dishonor (as applicable).

TM-700 (10.2016)

**WAB000199**

# REMOTE DEPOSIT CAPTURE SERVICE DESCRIPTION

1.  <u>Remote Deposit Capture Service.</u>  If selected by Company on the Setup Form, Bank will provide to Company RDC to enable Company to transmit images of Checks to Bank for deposit. RDC enables Company to use Equipment, consistent with the Bank's requirements set forth in the Supporting Documents, to create Electronic Images and to transmit an Electronic File to Bank for deposit to the specified Account. After Bank receives Company's Electronic File, Bank, at its sole option, uses the Electronic File either (a) to create Substitute Check(s), that Bank presents to the bank on which the check is either (i) drawn or (ii) payable at or through (each, "**Paying Bank**"); or (b) to generate one or more electronic files (from the original Electronic File) for presentment directly or indirectly to Paying Bank.

2.  <u>Related Service Description for Business Online Banking.</u>  If Company chooses to facilitate any part of RDC using Bank's Business Online Banking, all such use must be consistent with the separate Business Online Banking Service Description.

3.  <u>Conditions to Provision of RDC.</u>  In connection with RDC, Company shall comply with the following:
    a.  Company shall maintain one or more Accounts at Bank for the receipt of deposits of Checks.
    b.  Company shall be responsible for training its own employees in the use of RDC.
    c.  Company shall maintain satisfactory internal business controls, including the following:
        i.   Established and documented procedures related to the recording of receipts, preparation of and reconciliation of deposits;
        ii.  Segregation of duties in the recording and processing of deposited Checks; and
        iii. Timely reconciliation of Bank statements.
        At Bank's request, Company shall provide evidence of the foregoing controls and copies of the relevant portions of audit reports testing such controls.
    d.  Company shall use Equipment consistent with the Bank's requirements in the Supporting Documents and shall not take any actions to deploy or incorporate the Equipment in any way not intended for it without Bank's prior written approval. Company will ensure that the Equipment for RDC is clean and operating properly.
    e.  Company will only submit Checks for processing to Bank that meet the definition of "check" in Regulation CC.
    f.  Unless prior approval by Bank in writing, Company will not attempt to scan and transmit to Bank any Check which is drawn on a deposit account of Company at Bank or any other financial institution, or a deposit account of any business entity of which Company is a principal, officer or authorized signer. Company will only use RDC for its own purposes and in accordance with this Service Description. Company with a business need may request to have multiple entities established as a single Company within the RDC system. The multiple entities shall have a common ownership. If such is provided, Company understands and agrees to accept the increased business risk associated with such provision and warrants that Checks will be deposited into the correct account. For example, a Check made payable to an entity must be deposited into that entity's account.
    g.  Company will not scan and transmit for processing any Checks payable to third parties or in any way not payable solely to Company, demand drafts or remotely created

Checks as defined by the Code and Regulation CC, respectively, Checks that are stale dated by six (6) months or more or post-dated, savings bonds, Substitute Checks, Checks that do not meet the definition of a Check (facsimile, scanned, or any other reproduction of the original check does not meet the definition) under Regulation CC or the Code , images of Checks that do not meet the ANSI X9.37 standards for image quality as required by Regulation CC or other standards established or required by Bank or applicable law, Checks that have been returned unpaid for any reason or any Check that exceeds Company's transaction limitations as may be established by Bank from time to time.
    h.  Company will not attempt to scan and transmit to Bank any previously truncated and reconverted Substitute Check and shall not submit any duplicate Electronic Images to Bank. Company shall not deposit to Company's Account or otherwise negotiate any original Check from which Company has previously created and submitted to Bank as an Electronic File, unless Bank has notified Company that the Electronic Image is an Exception Check as defined in Section 5 (Exception Checks). Any previously truncated Check and Substituted Check must be physically deposited with the Bank. Notwithstanding the foregoing, Bank may redeposit any returned Substitute Check or Electronic Image consistent with the terms of the Deposit Account Agreement and Disclosure.
    i.  Company will (i) ensure that Checks are restrictively endorsed or otherwise processed to permit only financial institutions to acquire rights of a holder in due course in the collection process of Checks, (ii) handle, process, maintain and destroy original Checks as set forth in Section 3(n) and in the Supporting Documents, and (iii) ensure that no financial institution (depositary, collecting or payor), drawee, drawer or endorser receives presentment or return of, or otherwise is charged for an Check more than once in any form.
    j.  Company will use RDC, including the entering, processing and transmittal of Electronic Images, in accordance with the Supporting Documents.  In addition, Company will provide, at its own expense, a broadband Internet connection, such as via a digital subscriber line ("**DSL**") or other connectivity having equivalent or greater bandwidth and all other computer hardware, software, including but not limited to a compatible Web browser, and other equipment and supplies required to use RDC, all of which must satisfy any minimum requirements set forth in the Supporting Documents or as otherwise may be acceptable to Bank. Company will provide, or obtain from another party selected by Company at Company's expense, support and maintenance of such Internet connection and all other computer hardware, software, and equipment required to use RDC, including without limitation troubleshooting Internet connectivity issues with Company's internet service provider, and Bank will not be responsible therefore.
    k.  Company shall be responsible for verifying Bank's receipt of Company's transmission(s) by verifying that deposits have been posted to the appropriate Accounts, in addition to cooperating in any investigation and resolving any unsuccessful or lost transmission with the Bank.
    l.  Company shall be responsible for installing and implementing any changes and upgrades to RDC as required by the Bank within five (5) days to ensure compliance with regulatory changes or developments, or to protect the integrity and security of RDC.

Page 20 of 31

WAB000200

m.  Company shall exercise due care in preserving the confidentiality of any user identification, password, test key, or other code or authentication method provided by the Bank or otherwise required for use of RDC and shall further prevent the use of RDC by unauthorized persons. Company assumes full responsibility for the consequences of any missing or unauthorized use of or access to RDC or disclosure of any confidential information or instructions by Company, its employees and agents.

n.  Company will retain each original Check in accordance with the Supporting Documents. If not directed otherwise by the Bank, Company will store original Checks in a safe and secure environment for such time as Company deems necessary and advisable for a period of minimum of ten (10) days and a maximum of sixty (60) days after such Check has been digitized and processed. Company shall take appropriate security measures to ensure that: (a) only authorized personnel shall have access to original Checks, and (b) that the information contained on such original Checks or on any corresponding Electronic Images are not disclosed to third parties. Company will promptly (but in any event within five (5) business days) provide any retained original Check (or, if the original Check is no longer in existence, a sufficient copy of the front and back of the original Check) to Bank as requested to aid in the clearing and collection process to resolve claims by third parties with respect to any Check or as Bank otherwise deems necessary. Company will use a commercially reasonable method, or as otherwise directed by Bank to destroy original Checks and Electronic Files after Company's retention period has expired.

o.  Company understands and agrees that a Check that is not paid by a payor financial institution, or is otherwise returned for any reason, will be returned to Company and Company's Account charged for the amount of the Check plus any associated fee as disclosed in Bank's Supporting Documents, which may be changed from time to time in Bank's discretion. Bank's right to charge the Account of Company will apply without regard to whether the Check is timely returned to Bank or whether there is any other claim or defense that the Check has been improperly returned to Bank.

4.  Third Party Items.

a.  Company represents and warrants that:

i.  It has the legal authority to deposit and negotiate all Third Party Items, regardless of the name of the payee shown on the check;

ii.  It has obtained written authorization from each third party payee for Bank to endorse such Third Party Items as payable to Company and to deposit such items into Company's Account;

iii.  Such third party payee authorization includes an assignment to Company of the third party payee's right, title and interest in and to each of such Third Party Item;

iv.  Company will retain a copy of each such third party payee authorization for at least seven (7) years after the termination of the Agreement and will provide a copy of any such authorization to Bank upon request; and

v.  Each such third party payee authorization shall be in effect and fully operative at all times that Bank provides RDC under the Agreement with respect to such Third Party Items.

b.  Company agrees to indemnify Indemnified Parties against, and hold the Indemnified Parties harmless from Losses and Liabilities suffered or incurred by any of the Indemnified Parties as a result of, or in connection with, Bank's acceptance of such Third Party Items in accordance with this Service Description and the Agreement. The indemnification set forth in this Section shall be in addition to, and not in lieu of, indemnification and other rights of Bank under the Agreement.

c.  Company will also be liable for repayment of any overdrafts and/or fees related to the return of any Third Party Items, regardless of the balance in Company's Account at the time the check was deposited or returned.

d.  Bank reserves the right to reject any check for deposit and discontinue the acceptance of Third Party Items at its discretion, without liability to Company.

5.  Processing Company's Electronic File. If Company transmits Company's Electronic File to Bank before the RDC cutoff time Bank separately disclosed to Company on any business day, Bank will process Company's Electronic File on that business day. If Company transmits Company's Electronic File to Bank after the Cutoff Time on any business day, Bank will process Company's Electronic File on the next business day.

a.  Electronic Images processed for deposit through RDC will be deemed to have been received by Bank for deposit at the time the Electronic Files are actually received and accepted at the location where Bank or its designated agent posts the credit to the Account. A deposit of Electronic Images will be deemed to have been received and accepted by Bank for deposit when all of the following have occurred: (i) Bank has preliminarily verified that the image quality of the Electronic Images is acceptable to Bank in its discretion, all Check information is complete and the deposit totals are balanced to the Check information provided for the deposit; and (ii) Bank has successfully performed all further validation routines with respect to the deposit. Notwithstanding the foregoing, Electronic Files received by Bank for deposit may be rejected by Bank in Bank's sole discretion.

b.  Checks will be processed and ready for presentment by Bank after Bank receives all good digitized images and associated data for any given transmission from Company. Company agrees to view the images of each scanned Check that is sent to Bank. If Check information received by Bank is not complete or cannot be processed by Bank for any reason, Bank may reject the Electronic Image, notwithstanding any transmission confirmation and charge the amount back against any provisional credit to Company's Account. Company will be responsible for verifying Bank's receipt of Company's transmissions by verifying that deposits have been posted to Company's Account. Bank will use commercially reasonable efforts to ensure Checks are presented for payment to the applicable payor financial institution within a reasonable period of time following such receipt.

c.  If under Sections 4(a) or 4(b) above an Electronic Image is not accepted for deposit, Company may then submit the original Check to Bank for processing or contact the maker to reissue the Check. If Company submits the original Check for processing, Bank reserves the right to refuse to process the Check for deposit and presentment to the payor financial institution and may instead require Company to have the maker reissue the Check.

d.  It is Company's responsibility to understand and build into its transmission schedules the appropriate deadlines necessary to meet the availability schedules of Bank as set forth in the Deposit Account Agreement and Disclosure or as otherwise established by Bank. Company is further

TM-700 (10.2016)

WAB000201

responsible for understanding and building into its transmission schedule the changes in transmission windows required by time changes associated with Daylight Savings Time.

6.  <u>Exception Checks.</u>   When Bank reviews and processes Company's Electronic File, Bank shall reject any Electronic File, or any portion thereof, that Bank in its sole discretion determines to be ineligible for RDC (each, an "**Exception Check**") including, without limitation, Electronic Images of Checks drawn on financial institutions located outside the United States, Electronic Images that are illegible, Electronic Images of checks previously converted to substitute checks, and Electronic Images with unreadable MICR information.   The Bank will not be liable for delays in the deposit of and funds availability for Exception Checks, even if such delays result from errors or other problems in the operation of the Equipment. Each business day on which Bank reviews and processes Company's Electronic File, Bank will notify Company of all Exception Checks through a communication channel designated by Bank.  Company agrees that if it wishes to attempt to deposit any Exception Check to Company's Account, it shall do so only by depositing the original Check on which the Exception Check is based.  Company acknowledges and agrees that even if Bank does not initially identify an Electronic Image as an Exception Check, the Substitute Check created by Bank therefrom may nevertheless be returned to Bank because, among other reasons, the Electronic Image is deemed illegible by Paying Bank. Bank's failure to identify an Exception Check shall not preclude or limit the obligations of Company to Bank under Section 4.

7.  <u>Security Procedures.</u>
    a.  Company will be solely responsible for establishing, maintaining and following such security protocols as deemed necessary to ensure that output files transmitted directly to Bank are intact, secure and confidential until received by Bank.
    b.  Company agrees to implement security procedures that Bank may offer to verify the authenticity of any Electronic Files transmitted to Bank in the name of Company. Regardless of the security procedures implemented by Company, Company agrees that Bank may rely on and Company will be obligated on the Electronic File, whether or not the Electronic File was authorized by Company. Also, if an Electronic File was authorized by Company, Company will be obligated on the Electronic File even if Bank did not verify its authenticity using the security procedures and even if the security procedures would have prevented error.   Company agrees that the security procedures are intended to verify authenticity and not to detect error.
    c.  Company may appoint an individual to various security roles within RDC.  Security roles may include the authority to add other users, to reset passwords, to determine who will be authorized to use RDC on Company's behalf and to assign security roles to them, and to both process and approve Checks deposited through RDC.  RDC may refer to such role by various names such as, but not limited to, administrator, manager or supervisor (referred to herein as "**RDC Administrator**").  If such authority is provided by Company to an RDC Administrator, Company understands and agrees to accept any increased business risk associated with such RDC Administrator's access and use of RDC on Company's behalf.  For example, an RDC Administrator could process and approve a fraudulent Check for deposit, and should that same RDC Administrator have access to the Company's payment system or checks, draw on those

funds before the fraudulent Check is discovered. Company assumes full responsibility for the actions of the RDC Administrator, the authority the RDC Administrator gives others to act on Company's behalf, and the actions of any persons designated by the RDC Administrator to access and use RDC.
    d.  Company agrees to change its password(s) periodically and when circumstances require (e.g., a User's employment with Company has ended).
    e.  Bank may elect, at Bank's discretion, to verify the authenticity or content of any transmission by placing a call to any authorized signer on Company's Account or any other person designated by Company for that purpose. Bank may deny access to RDC without prior notice if unable to confirm any person's authority to the access RDC or if Bank believes such action is necessary for security reasons.
    f.  Company warrants each time Electronic Files are transmitted using RDC that Bank's security procedures are commercially reasonable (based on the normal size, type, and frequency of transmissions). Company agrees to be responsible for any transmission Bank receives through RDC, even if it is not authorized by Company, provided it includes a password or is otherwise processed by Bank in accordance with this security procedure.

8.  <u>Services Software.</u>   At any time during the term of this Service Description, Bank may require in its sole discretion the use of Software in connection with RDC.  If Software is required, Bank will provide to Company a copy of the Software or instructions on how to obtain the necessary Software.
    a.  To the extent the Bank requires the use of Software in connection with RDC, Company will implement and use the Software, as set forth in the Supporting Documents and any applicable materials relating to the Supporting Documents to transmit output files to Bank.
    b.  Company acknowledges that (i) its license to any Software that may be required for RDC is directly from the Software provider, pursuant to the license agreement that appears when any such Software is electronically accessed by Company or otherwise provided to Company, (ii) Bank may provide certain "first level" support to Company with respect to the Software, but that Bank will have no responsibility, for maintenance, support, infringement protection, or otherwise, to Company with respect to the Software, and (iii) Company will look strictly to the Software provider, or its successors, with respect to any issues concerning the Software that cannot be satisfactorily resolved with Bank's assistance.
    c.  Company will use the Software solely for the purpose of transmitting Electronic Files to Bank consistent with this Service Description and not for communications with any other party. Company will not allow access to the Software or the use of RDC by any person other than Company, and will only process Checks arising from a transaction or obligation between Company and its direct payor.
    d.  Company will promptly return all copies of the Software and Supporting Documents, including materials related to the Supporting Documents, to Bank upon termination of the Service Description.
    e.  Company will not reproduce the Software or other functionality or content included or used for RDC or on which RDC is based. Additionally, Company will not decompile, reverse engineer or disassemble the Software or otherwise attempt to derive computer source code from the Software functionality of RDC.

Page 22 of 31

WAB000202

f. Bank may, from time to time, require and change the Software required for this purpose, provided such change does not result in any additional license or maintenance fees payable by Company. Company will be responsible to install and implement and changes to the Software within 5 days following notice of such change.

9. Bank Rights and Responsibilities.

a. For all Electronic Images processed by Company pursuant to this Service Description, either (i) digitized images will be converted to Substitute Checks and presented for payment to established endpoints, or (ii) the Electronic Image will be presented for payment through image exchange networks. Bank may in its sole discretion determine the manner of processing. All such processing and presentment shall be done in accordance with timeframes and deadlines set forth in the Supporting Documents and as otherwise established by the Bank from time to time.

b. Unless otherwise agreed by Company and Bank, Bank will process any returned Checks in accordance with applicable law and the Deposit Account Agreement and Disclosure.

c. Bank may at its sole option, with or without cause, at any time and from time to time, refuse to process any Electronic Images. Bank may from time to time establish exposure limitations and assign them to Company.

d. In addition to any other rights Bank may have as regards the Accounts of Company as well as rights otherwise provided to Bank under this Service Description, Bank may hold and use funds in any Account following termination of this Service Description for such time as Bank reasonably determines that any Check processed by Bank prior to termination may be returned, charged back or otherwise a cause for any loss, liability, cost, exposure or other action for which Bank may be responsible. Without limitation, Company recognizes that under the UCC, Regulation CC and the rules of any image exchange network Bank's representations and warranties as regards Electronic Images and Substitute Checks may expose Bank to claims for several years following processing of the Electronic Image or Substitute Check.

e. In the event RDC becomes unavailable, Company may deposit original Checks and other checks to any deposit Account at Bank in person or in any other manner permitted by agreement between Company and Bank, and Company will be responsible for maintaining procedures and facilities to enable Company to do so if RDC is unavailable to Company.

10. Funds Availability. Bank shall make funds from accepted Electronic Files available according to Bank's Funds Availability Schedule. Bank's Funds Availability Schedule will be provided to Company upon request and may be amended by Bank from time to time.

11. Company's Agreement to Indemnify Bank. In addition to any rights or obligations provided for in the Agreement, Company shall indemnify, defend, and save harmless Indemnified Parties from and against Losses and Liabilities incurred by Indemnified Parties arising directly or indirectly from or related to the following (except for Losses and Liabilities arising directly or indirectly from or related to Bank's own gross negligence or willful misconduct):

a. Bank acting as a "reconverting bank" under the Check 21 Act through the creation of Substitute Checks or purported Substitute Checks using an Electronic Image or Electronic File or an illegible Electronic Image;

b. Bank presenting to Paying Bank an Electronic File for payment;

c. Company's failure to exercise adequate security controls or dispose of original Checks in accordance with Sections 3(c) and 3(n) above, or failure to securely dispose of such original Checks, in which event such Losses and Liabilities shall include, without limitation, consequential damages; and

d. Company's failure to exercise due care in handling and operating the Equipment. This Section 10 shall survive the termination of this Service Description.

12. Bank Liability. In addition to any limitations on liability provided for in the Agreement, Bank will not be liable to Company for any refusal of a Payor Bank to pay an Electronic Image or Substitute Check for any reason (other than the breach of contract, gross negligence or willful misconduct of Bank), including without limitation, that the original Check, Electronic Image or Substitute Check was allegedly unauthorized, was a counterfeit, had been altered, or had a forged signature. Furthermore, Bank's liability for errors or omissions with respect to the data transmitted or printed by Bank in connection with this Service Description will be limited to correcting the errors or omissions. Correction will be limited to reprocessing, reprinting and/or representing the Electronic Images or Substitute Checks to the Payor Bank.

13. Disaster Recovery. Bank shall maintain a disaster recovery plan for RDC in the event of delays or unavailability of RDC, which such plan Bank may determine in its sole discretion. Company acknowledges that Bank's disaster recovery plan may require Company to deposit Checks in an alternative manner, such as through deposit of paper Checks at a Bank branch.

TM-700 (10.2016)

WAB000203

## LOCKBOX SERVICE DESCRIPTION

1. <u>Lockbox Service.</u> If Company uses Bank's Lockbox Service, Company agrees to be bound by the terms of this Service Description. Company shall direct its customers to mail their payments in the form of Checks to Company to the Lockbox. Bank will have unrestricted and exclusive access to the mail directed to the Lockbox.

   Company acknowledges that this Service Description covers the Lockbox Service to be provided by Bank and, except as specifically provided in this Service Description, does not cover the handling of the Company's Account(s) or the processing of Checks drawn on the Account(s). As a result, the Account will be subject to, and Bank's operation of the Account(s) will be in accordance with, the terms and provisions of Bank's Deposit Account Agreement and Disclosure, a copy of which Company acknowledges having received.

2. <u>Commencement of Lockbox Service.</u> The Lockbox Service covered by this Service Description will start on the date separately agreed to by the Bank and the Company if the following events have occurred prior to such date:
   a. Bank has established a Lockbox with the number and at the address specified by Bank to Company.
   b. Company maintains one or more Accounts in good standing with Bank.
   c. Company has designated to the Bank in writing the names of Acceptable Payees.
   d. Company has completed all Supporting Documents applicable to the Lockbox Service, including but not limited to the procedures for handling returned Checks and restrictive notations on Checks, and the processing options selected by Company for the Lockbox Service; and
   e. Company has provided to Bank such other information and documents as Bank requests to enable Bank to commence and operate the Lockbox for Company and to enable Bank to comply with its other obligations under this Service Description.

3. <u>Lockbox Processing.</u>
   a. On each business day, Bank will pick up at and transport from the Lockbox to the processing site or sites the Checks or any other mail addressed to the Lockbox. The following Lockbox Services will be performed by Bank:
      i. Open the envelopes picked up from the Lockbox and remove the contents.
      ii. Inspect all Checks received for acceptability based on the Supporting Documents.
      iii. Prepare all acceptable Checks and their associated paperwork for further processing.
      iv. Capture an image of each Check with its Remittance Materials before it is deposited and make available a secured web site for displaying the images.
      v. Prepare deposit tickets and process deposits daily.
      vi. Prepare and mail to Company any unacceptable Checks, as this term is defined in the Supporting Documents ("**Unacceptable Checks**").
      vii. Shred or return all Remittance Materials as described in the Supporting Documents.
   b. If Bank receives any mail containing Company's lockbox number at Bank's operations locations (instead of the Lockbox), Bank may in its sole discretion handle the mail as if it had been received at the Lockbox. Bank will

process a Check only if it is made payable to an Acceptable Payee and if the Check is otherwise processable as provided in the Supporting Documents.
   c. Bank may treat as an Acceptable Payee any variation of any Acceptable Payee's name that Bank deems to be reasonable. Bank shall provide Company prior notice of any proposed change in the location or address of the Lockbox. If any payee on the list of Acceptable Payees delivered to Bank pursuant to the Supporting Documents is a legal entity other than Company, Company represents and warrants to Bank that Company has the proper authorization from such payee (a) to have such Check indorsed for deposit, and deposited, into the applicable account, and (b) for Bank to perform the Lockbox Service under this Service Description for such Acceptable Payee.

4. <u>Third Party Items.</u>
   a. Company represents and warrants that:
      i. It has the legal authority to deposit and negotiate all Third Party Items, regardless of the name of the payee shown on the check;
      ii. It has obtained written authorization from each third party payee, including but not limited to those provided as Acceptable Payees, for Bank to endorse such Third Party Items as payable to Company and to deposit such items into Company's Lockbox Account;
      iii. Such third party payee authorization includes an assignment to Company of the third party payee's right, title and interest in and to each of such Third Party Item;
      iv. Company will retain a copy of each such third party payee authorization for at least seven (7) years after the termination of the Agreement and will provide a copy of any such authorization to Bank upon request; and
      v. Each such third party payee authorization shall be in effect and fully operative at all times that Bank provides Lockbox Service under the Agreement with respect to such Third Party Items.
   b. Company agrees to indemnify Indemnified Parties against, and hold the Indemnified Parties harmless from Losses and Liabilities suffered or incurred by any of the Indemnified Parties as a result of, or in connection with, Bank's acceptance of Third Party Items in accordance with this Service Description and the Agreement. The indemnification set forth in this Section shall be in addition to, and not in lieu of, indemnification and other rights of Bank under the Agreement.
   c. Company will also be liable for repayment of any overdrafts and/or fees related to the return of any Third Party Items, regardless of the balance in Company's Account at the time the check was deposited or returned.
   d. Bank reserves the right to reject any check for deposit and discontinue the acceptance of Third Party Items at its discretion, without liability to Company.

5. <u>Returned Checks.</u> If any of the Checks (or image of the same) are returned unpaid for any reason, Bank may charge any one of Company's Accounts for the amount of the returned Checks plus applicable handling fees, without regard to whether the institution on which the Checks were drawn effected a timely return before its midnight deadline. If any of the Checks are returned for indorsement missing, Bank may, but will not be obligated to, supply an indorsement (utilizing Bank's indorsement stamp) and the Checks will be represented to the depository bank.

TM-700 (10.2016)

WAB000204

6. <u>Deposits.</u>  Company authorizes Bank to indorse Checks received at the Lockbox, and to deposit them into Company's Lockbox Account.  Bank will credit the Lockbox Account with funds no later than the next business day, subject to Bank's funds availability policy.  Lockbox deposits credited to Company's Lockbox Account maintained with Bank will be reflected on Company's periodic statement issued by Bank with respect to the Lockbox Account pursuant to the Deposit Account Agreement and Disclosure.  If cash is sent to the Lockbox with any Remittance Materials, the cash will be processed as a deposit.  Notwithstanding the foregoing, Company expressly acknowledges that the Lockbox may not be used to facilitate cash deposits and Company assumes all risk of loss associated with cash deposits.

7. <u>Company Responsibilities.</u>  Company's responsibilities under this Service Description include, but are not limited to each of the following:
   a. Company agrees to encode remittance documents to meet Bank or Processors requirements if Company requires electronic data capture of information on remittance documents.
   b. Company agrees to duly complete the Supporting Documents and all special instructions, and provide the same to Bank before start of the Lockbox Services.
   c. Company authorizes Bank to create ledger suspense entries, deposit corrections, or other such entries to balance transactions as may be necessary for the efficient processing of the Checks.
   d. Company will notify Bank in writing of any modification, addition or deletion to the list of Acceptable Payees for the Checks being received in the Lockbox.  Bank will not be obligated to implement any changes until Bank has actually received the change and had a reasonable opportunity to act upon the change.  All changes are subject to Bank's rights to reject any addition, deletion or modification to the list of Acceptable Payees.

8. <u>Funds Availability.</u>  Funds deposited in connection with this Service Description are subject to Bank's funds availability policy as disclosed in the Bank's funds availability policy.  For the purpose of application of Bank's funds availability policy and Regulation CC, funds deposited to the Lockbox are considered deposited on the day on which the deposit is removed from the Lockbox and is available for processing by Bank.  If Bank uses a correspondent financial institution to process payments, deposits to an account: (a) may be delayed by one banking day; (b) may be affected by local bank holidays; and (c) the availability may depend on the availability of the correspondent institution and any required third party service provider or funds transfer system.

9. <u>Collections.</u>  Unless otherwise agreed, while Company receives Lockbox Services, all funds held in the Lockbox Account shall be deemed to be Company's funds for all purposes, including adjustment, attachment, set-off, security interests, execution, garnishment and other forms of legal process.  The crediting and collection of Checks will be handled under the same agreement as applied to other commercial deposits.  Remittance Materials shall be provided to Company as agreed to by Bank.

10. <u>Reconcilement.</u>  Except as otherwise specified in the Supporting Documents, Bank will not reconcile the Checks, cash or other Remittances in the envelopes to invoices, to remittance statements, or to any other documents or papers in the envelopes elsewhere.

11. <u>Protected Health Information.</u>  Except with prior notice to and written approval by Bank, Company shall ensure that protected health information is not provided to Bank and that the provision of Lockbox Services does not result in Bank being deemed a "business associate" or otherwise subject to HIPAA, or otherwise under medical privacy and securities laws, rules or regulations. Company shall provide to Bank such assistance as Bank may request should Bank's provision of the Lockbox Service subject Bank to any compliance obligations under HIPPA or otherwise under medical privacy and security laws, rules or regulations.

12. <u>Statement; Notice of Discrepancy.</u>  Company agrees to notify Bank:  (a) no later than ten (10) calendar days after Company receives or is provided access to an advice of deposit, or electronic image summary, if there is any error in such advice, and (b) no later than fifteen (15) calendar days after Company receives, or is provided access to, a periodic statement on the Account if such statement contains an error or fails to show a deposit that should have been made during the time period covered by such statement.  If Company fails so to do, then Company shall be precluded from asserting such error or failure, and the advice or statement shall be deemed to be accurate as to any claims by Company (but shall not preclude later adjustment by Bank).

13. <u>Termination.</u>  Company has the right to terminate the Lockbox Service, with or without cause, upon sixty (60) days written notice provided to Bank. Should Company terminate this Service Description without prior notice, Company will owe Bank two (2) times the minimum monthly fees as reflected in Bank's then current Lockbox schedule.  Upon termination of the Lockbox Service, (a) Bank will close the Lockbox; and (b) Bank will dispose of the mail addressed to the Lockbox according to written instructions provided by the Company for a period of three (3) months after the termination date, unless arranged otherwise between Company and Bank.  Lockbox Service fees with respect to such disposition will be based on Bank's estimate and prepaid directly to Bank at the time of such termination by a check made payable to Bank.

TM-700 (10.2016)

WAB000205

# AUTOMATED SWEEP SERVICE DESCRIPTION

1. <u>Automated Sweep Service.</u>  If Company chooses to utilize the Automated Sweep Services offered by Bank, Company agrees to be bound by the terms and conditions of this Service Description. Company is responsible for all transfers to the fullest extent provided by law and as set forth in this Service Description.

2. <u>Sweep Notice.</u>  YOUR LOAN ACCOUNT IS NOT A "DEPOSIT," AS DEFINED IN THE FEDERAL DEPOSIT INSURANCE ACT (12 U.S.C.A. §1811, et seq.). FUNDS DRAWN FROM YOUR LOAN ACCOUNT BECOME A DEPOSIT WHEN THE DRAW AMOUNT IS ACTUALLY PROCESSED BY THE BANK.  FUNDS TRANSFERRED FROM YOUR DEPOSIT ACCOUNT TO MAKE A PAYMENT ON YOUR LOAN ACCOUNT CEASE TO BE A DEPOSIT WHEN THE PAYMENT IS ACTUALLY PROCESSED BY THE BANK.  ALTHOUGH THE PAYMENT IS NOT A DEPOSIT, IT REDUCES THE AMOUNT YOU OWE THE BANK ON YOUR LOAN ACCOUNT, PURSUANT TO YOUR LOAN AGREEMENT WITH THE BANK.

3. <u>Deposit Account/Loan Information.</u> Bank reserves the right to determine which Deposit Accounts are eligible for Company's sweep service.  In any event, due to regulatory transfer restrictions, money market and savings account types will not be eligible for Automated Sweep Services involving a transfer out of such account types. Each Deposit Account, including the Loan Payment Source Account and the Loan Account, must have identical ownership to be eligible for the Automated Sweep Service.

4. <u>Automatic   Sweep/Payment   Authorizations.</u>   Sweep authorizations options are detailed below and specifically selected in the Supporting Documents.

   *Automatic Target Balance Sweep.*  Company authorizes the Bank to automatically transfer the Account Balance in excess of the Target Balance for each Deposit Sub-Account to the Master Deposit Account. To the extent the Account Balance in any Deposit Sub-Account would fall below the Target Balance on any business day, Company hereby authorizes the Bank to automatically transfer funds from the Master Deposit Account to the Deposit Sub-Accounts, as needed, to maintain the Target Balance in each Deposit Sub-Account. If at any time there is a ledger balance in the Master Deposit Account to transfer to some, but not all Deposit Sub-Accounts, as needed to maintain the Deposit Sub-Account Target Balances, funds will be transferred to the Deposit Sub-Account in the descending order from A to C, as applicable.

   *Automatic Loan Advance to Maintain Master Deposit Account Target Balance.*  Company authorizes the Bank to automatically advance funds from the Loan Account to maintain the Target Balance in the Master Deposit Account. This advance will only occur to the extent there are sufficient available funds on the line of credit, as determined by the terms and conditions of the applicable loan documents and agreements, including, but not limited to, the promissory note, governing the Loan Account. Further, Company agrees that this Automated Sweep Service allows partial draws against the Loan Account in order to make a deposit to the Master Deposit Account. This means that there will still be a draw against the Loan Account even if the entire amount needed to maintain the Target Balance is not available

on the Loan Account. The amount drawn on the Loan Account in such instance will only be the amount available on the Loan Account. Notwithstanding the foregoing, nothing in this Service Description will require the Bank to honor items or other debit transactions against the Master Deposit Account when there are insufficient funds to cover the full amount of such transactions (including but not limited to insufficient available funds from the Loan Account).

   *Automatic Loan Payment Sweep.*  To the extent there is an Account Balance in excess of the Target Balance available, Company authorizes the Bank to automatically transfer funds from the Loan Payment Source Account to pay the Loan Account in the amount as identified in the Supporting Documents.

5. <u>Account Transfer Limitations.</u>   All transfers to and from an Account will be subject to the terms and conditions applicable to the Account as set forth in the deposit agreement governing the account, including but not limited to transfer limitations. In addition, there may be other transfer limits addressed in the Supporting Documents.

6. <u>Application of Swept Funds to Loan Account.</u>  This paragraph is applicable if Company has selected the "Automatic Loan Payment Sweep" option. Funds swept from the designated Loan Payment Source Account to reduce the outstanding balance on the Loan Account will be applied as unscheduled reductions of principal and as such will not satisfy the installment obligations under the payment schedule for the Loan Account or pay accrued interest.

7. <u>Noncompliance with Borrowing Base.</u>  This paragraph is applicable if the promissory note or other loan document for Company's Loan Account provides that the Loan Account is tied to a borrowing base of eligible receivables.  At any time that Company is not in compliance with the borrowing- base requirement, the Bank may reverse any sweep transaction that constitutes an advance on the Loan Account.

8. <u>Insufficient Funds.</u> The Automated Sweep Service sweeps funds from an Account only when there is an available Account Balance. Availability of funds for purposes of the Automated Sweep Service will be determined in accordance with the Bank's then funds availability and float policies.  If a hold is placed on funds in an Account they may not be swept from that Account.

9. <u>Processing Sweeps.</u>  Company agrees and acknowledges that the sweeps pursuant to this Service Description are not done on a real-time basis.  The Bank will look at the end of day Account Balance in the Deposit Accounts to determine whether either a sweep will occur, for example, from the Master Deposit Account to a Deposit Sub-Account, or the Loan Payment Source Account to the Loan Account under this Service Description. Further Company agrees and acknowledges that although the sweeps will be completed with the Bank's normal processing procedures, the processing may occur after the Bank is closed.

10. <u>Reversals.</u>  At any time, or from time to time, the Bank may reverse any transfer or credit made to or from a Deposit Account or the Loan Account, for any reason or for no reason.  The Bank may provide notice to Company, but is not obligated to do so. The Bank may reverse any transfer or credit, for example, if the Bank determines in its sole discretion that to do may assist the Bank in the avoidance of any loss, liability, or to correct any error, or to cover any overdraft that might arise in an Account.

TM-700 (10.2016)

WAB000206

11. <u>Inapplicable Restrictions.</u>  Company understands that transfers provided under this Service Description will occur without regard to any withdrawal or access restrictions otherwise applicable to the Deposit Accounts or the Loan Account. Company agrees that any arrangements with the Bank to restrict access to the Deposit Accounts or the Loan Account do not impact the Bank's ability to sweep funds or make payments as provided in this Automated Sweep Service Description.

TM-700 (10.2016)

**WAB000207**

## CASH VAULT AND DEPOSIT SERVICES
## SERVICE DESCRIPTION

1. <u>Cash Vault and Deposit Services.</u>  Bank hereby offers and, to the extent selected by Company on the Setup Form, Company hereby agrees to all terms and conditions applicable to Cash Vault Services. In certain circumstances, Company may be required to contract directly with Carrier to facilitate some or all of the Cash Vault Services as described herein. Cash Vault Services may be facilitated using Concentration Accounts. As a result, credits, debits and adjustments to Company's Account(s) may be delayed one business day. The Bank and not Company will have direct access to funds in Concentration Accounts.

2. <u>Cash Vault.</u>  The Cash Vault Services allow Company to place orders for Cash. Before utilizing the cash vault feature, Company agrees to identify the name(s) and location(s) of the persons authorized by Company to receive the service security credentials, in accordance with the Supporting Documents. Company's duty to safeguard the security credentials under this Service Description shall at least equal the duty as it applies to Security Procedures under the Agreement.

   Company authorizes the Bank to debit its designated Account for the amount of any Cash order under this Service Description as early as the day the Cash order is placed by Company. If Company fails to designate one of its Accounts for this purpose, Company authorizes the Bank to debit any of Company's Accounts for the amount of the Cash orders.

   To facilitate the Cash Vault Services, Company will be responsible for contracting with a Carrier for transportation services to and from the Bank. The Bank shall not be a party to the contract between Company and Carrier. Carrier shall for all purposes be considered the agent of Company and Company acknowledges and agrees that Carrier is not an agent, employee or other representative of Bank. Neither the Bank nor its employees or agents shall supervise, direct or control Carrier's performance under the Service Description or under Carrier's agreement with Company.

   Each time Company uses the Cash Vault Service to order Cash, Company agrees that it will have sufficiently available funds in its account to cover the amount of the Cash order and any applicable fees.

3. <u>Deposits.</u>  The deposit feature of the Cash Vault Services allows Company to present items and Cash for deposit to Company's Accounts, using Bank-designated depository facilities. Deposits of Cash may be subject to a daily or transaction based limitations. All deposits made must be entered by Company on deposit tickets. The deposit tickets must be locked, sealed in the Containers and placed with the Carrier by Company or Authorized Representative, or personally delivered to the Bank-designated depository facility. Items delivered to the Bank pursuant to this Service Description, including any instructions provided in the Supporting Documents, and must be payable to Company and be properly indorsed by Company.

   The Bank may, in its discretion, redeposit and reclear any items deposited pursuant to this Service Description that have been returned for: (i) non-sufficient funds; (ii) refer to maker, or similar indication; or (iii) uncollected funds. If the Bank is unable to successfully reclear or deposit the returned items, the item will be charged back against Company's account at Bank.

Upon delivery of the deposit to the Bank by the Carrier, the Bank is authorized to open the Container and verify the contents, and to credit the contents thereof for the benefit of the designated Account of Company. If no Account is designated, the Bank may credit for the benefit of any Account of Company's. If the contents of the Container do not conform to the deposit ticket, the Bank will credit only those contents as are found therein that are in compliance with this Service Description and the Supporting Documents. If the aggregate amount of the contents of any Container, as counted by the Bank, is less than that reported on the deposit slip covering that Container, the Bank will debit the Company's account by such difference and report the difference to Company. Company agrees that the Bank's records as to the contents of the Container opened by the Bank, including the amount of any Cash contained therein, shall be conclusive evidence of the contents of the Container. Neither the Bank will be deemed a bailee, the risk of damage, loss or shortage is expressly assumed by Company, and the Bank shall have no liability for any such damage, loss or shortage.

A notice of any discrepancy between the contents of the Container and the deposit ticket will be delivered or otherwise made available to Company. The Bank reserves the right to return any nonconforming items to Company and Company agrees that the Bank may charge Company's Account for the return costs. Alternatively, and at the Bank's discretion, the Bank may require Company to arrange to pick-up nonconforming items. Company agrees to hold the Bank harmless for any loss or shortage, including that the contents of the Carrier fail to conform to the accompanying deposit slip.

Company agrees to maintain a complete record of all contents placed in the Containers and in the case of loss, to promptly, diligently, and completely cooperate with the Bank in the identification or replacement of the items so lost. Such cooperation shall include, without limitation, requests by Company to makers of missing items to issue duplicates, and in the event the makers thereof refuse to do so, then to assert all its legal and equitable rights against said makers or, if applicable, to subrogate such rights to the Bank or its assigns. The provisions of this paragraph are not intended to alter or modify the responsibility for any loss, shortage or discrepancy set forth in the Service Description.

Company recognizes that in following the instructions of Company, the Bank may come into possession of items to which parties other than the Bank may claim an interest. In that regard, Company hereby agrees at all times to indemnify and hold the Bank harmless from and against any and all claims, actions, whether groundless or otherwise, as well as from and against, any and all liabilities, losses, damages, judgments, costs, charges, attorneys' fees, and any other expenses of every nature and character in any way related to the claims by any party or parties other than Company, whether by action or non-action, with respect to any item of any nature whatsoever, alleged or claimed to have been delivered to the Bank by Company.

Containers delivered by the Carrier on a business day after applicable cutoff hours, or to the Bank on a day when the Bank, respectfully, is not regularly open for business, need not be opened, verified or credited by the Bank until the following business day.

The Bank may make Night Deposit available to Company. Night Deposits must be facilitated by Company using Containers and only be placed in the designated Night Depository Facilities. For the purposes of Night Deposits only, Containers may only be used for the deposit of items and

WAB000208

currency, but no coin. Cutoff hours for Night Depository Facilities may vary. All other terms and conditions applicable to Containers under the Cash Vault Services shall also apply to Night Deposits.

4.   <u>Containers.</u> Deposits shall be made in locked, sealed Containers and in accordance with instructions received from the Bank, if any, including the use of any special deposit bags or deposit slips. No other Containers will be accepted by the Bank. The Containers shall include no property other than: (a) negotiable instruments payable to Company; (b) Cash; and (c) deposit slip(s) indicating the total dollar amount of such negotiable instruments, Cash and the account or accounts of Company in which such items are to be deposited. Company agrees to purchase from the Bank any and all additional Containers that Company may need from time to time.

The Bank may accept Containers from any person the Bank believes in good faith to be the Carrier. The Bank shall not assume responsibility for collection or be considered to have received a Container until it is actually delivered by the Carrier to the Bank and Carrier receives from the Bank written acknowledgment of receipt of such delivery, and the contents have been verified by the Bank. Similarly, any Container contents returned or sent to Company by or on behalf of the Bank shall be deemed received by Company when delivered by the Bank to the Carrier.

5.   <u>Company Insurance.</u> Company acknowledges that, at all times during the term of the Service Description, it shall be Company's sole responsibility to purchase and maintain insurance against loss or damage to the contents of Company's Containers, including Cash, while being handled by the Carrier and/or the Bank, its officers or employees, under this Service Description. The Bank is not and shall not be considered an insurer of any of the deposits or contents placed with the Carrier.

TM-700 (10.2016)

WAB000209

# GLOSSARY

"**ACH**" means automated clearing house.

"**ACH Exception**" means an Entry that does not match the Filtering Rules.

"**Acceptable Payee(s)**" means Company's name and any other third party payee name provided to Bank by Company as an acceptable payee for Checks to be processed under the Lockbox.

"**Account**" means the account or accounts to be accessed using BOB or one of the Services as designated by Company on the Setup Form.

"**Account Balance**" means current Account balance including Float (i.e., ledger balance), or the collected balance, as reflected in the Supporting Documents.

"**Administrator**" means the individual authorized by Company, that shall be: (i) the primary contact with the Bank for Company's use of services, and as designated on the Setup Form, to have full User access to BOB, and any accounts identified on the Setup Form; (ii) establish and direct Service features and options to be used by Company to establish Users and their access rights; and (iii) to conduct selected transactions and Services on behalf of Company.

"**Agreement**" means this Treasury Management Services Agreement, including any applicable Service Descriptions or Supporting Documents, as amended from time to time.

"**Authorized Representatives**" means those individuals authorized to act on the behalf of and bind the Company for purposes of the Services including but not limited to authorized signers.

"**Automated Sweep Service(s)**" means a service that automatically transfers amounts that exceed, or fall short of, a certain level from Account to another Account at set intervals, generally daily.

"**Bank**" means Western Alliance Bank and its divisions, Alliance Bank of Arizona, Bank of Nevada, Bridge Bank, First Independent Bank of Nevada, and Torrey Pines Bank.

"**Banking Days**" shall have the meaning set forth in the Rules.

"**Bill Payment**" means instructions from Company to pay third party bills.

"**Bill Payment Account**" means the Account selected by Company through Business Online Banking from which bill payments are to be made.

"**Bill Payment Service**" means the ability to initiate bill payments to third party payees through Business Online Banking.

"**Business Online Banking**" or "**BOB**" means the Internet-based cash management system offered by Bank that enables Company to access its Accounts and to certain electronic services online.

"**Carrier**" means an armored transport carrier or car service acceptable to the Bank.

"**Cash**" means coin and currency.

"**Cash Vault Services**" means those cash vault and deposit services described in the Cash Vault Service Description.

"**Checks**" means negotiable instruments as defined in the Code and Regulation CC.

"**Code**" means the Uniform Commercial Code as adopted by the State of Arizona, as may be amended from time to time.

"**Communication(s)**" means information, instructions, orders, Requests, Entries and other communications.

"**Communication Link**" shall have the meaning prescribed in Section 4 of the General Terms.

"**Concentration Accounts**" means one or more concentration Accounts maintained by the Bank at third party financial providers on behalf of multiple customers of Bank.

"**Confidential Information**" means, unless otherwise provided in a Service Description, all Supporting Documents and Software provided pursuant to this Agreement constitute Bank's, its contractors or vendors, or Bank's agent's confidential information.

"**Containers**" means tamper-proof, transmittal bags or containers approved by Bank.

"**Delivery Date Deadline**" means the effective date of transactions as prescribed in the Supporting Documents.

"**Deposit Account(s)**" means the deposit Accounts identified in the Supporting Documents.

"**Deposit Sub-Account(s)**" means those subsidiary Deposit Accounts that are tied to the Master Deposit Account.

"**Due Date**" means the due date of Company's bill.

"**Effective Entry Date**" means the date included on any Entry as the date upon or after which such Entry is to be effective.

"**Electronic File**" means an electronic file containing Electronic Images and other information.

"**Electronic Images**" means electronic images of certain Checks.

"**Entry**" shall have the meaning given in the Rules, including, but not limited to, CCD (Corporate Credit or Debit), PPD (Prearranged Payments and Deposits), CTX (Corporate Trade Exchange) entries as well as the data received from Company through which Bank prepares entries.

"**Equipment**" means any computer programs, equipment or Software made available to Company by Bank.

"**Exception**" means a presented item for which a matching Positive Pay File item does not exist in Business Online Bank.

"**Exception Check**" shall have the meaning prescribed in Section 5 of the Remote Deposit Capture Service Description.

"**Filtering Rules**" means those rules established by Company in Business Online Banking that dictate which debit Entries are to be returned or paid and can include criteria such as Originator ID, Standard Entry Class Code, and dollar amount/range.

"**Float**" means funds not yet collected by the Bank.

"**Fee Schedule**" means the Business Banking and Related Services Schedule of Fees and Charges, as may be amended from time to time.

"**Funds Transfer(s)**" means domestic and foreign funds transfer requests.

"**Funds Transfer Service**" shall mean the ability to initiate payments to others and transfer funds between Accounts by wire or internal transfers through Business Online Banking.

"**HIPAA**" means the Health Insurance Portability and Accountability Act.

"**Indemnified Parties**" shall mean Bank, its parent company, affiliates, licensors, processors, third party contractors and vendors and each of their respective directors, officers, employees, and agents.

"**License**" shall have the meaning prescribed in Section 4 of the General Terms.

"**Linked Account(s)**" means those Accounts linked for viewing and transfer purposes through Company's Business Online Banking profile either (i) automatically by function of being owned by Company under Company's taxpayer identification number or (ii) manually after Company executes the appropriate online account linkage form.

"**Loan Account**" means any commercial loan of Company's at Bank.

"**Loan Payment Source Account**" means the deposit account identified to fund any required Company loan payments.

"**Lockbox**" means the United States Post Office address identified in the Supporting Documents.

"**Lockbox Account**" means the Account designated by Company to utilize Lockbox Service.

"**Lockbox Service**" means Bank's remittance processing or Lockbox services.

"**Losses and Liabilities**" means any and all losses, liabilities, damages, claims, obligations, demands, actions, suits, judgments, penalties, charges, costs, or expenses (including reasonable fees and disbursements of legal counsel and accountants) awarded against or incurred or suffered.

"**Master Deposit Account**" means the master concentration Deposit Account designated by Company.

WAB000210

"**NACHA**" means the National Automated Clearing House Association.

"**NOC**" means Notification(s) of Change.

"**Night Deposit**" means any night depository services made available in connection with Cash Vault Services.

"**Night Depository Facilities**" means night depository receptacles identified in the Supporting Documents.

"**ODFI**" means an Originating Depository Financial Institution as defined in the Rules.

"**On-Us Entry**" means an ACH Entry received for credit to an Account.

"**Payees**" means a third party Company has designated in advance to receive Bill Payments.

"**Paying Bank**" shall have the meaning prescribed in the Remote Deposit Capture Service Description.

"**Payment Processing Date**" means the date Company wants a bill payment to be processed.

"**Positive Pay**" means the service offered through Business Online Banking where Company can manage, approve, and return checks presented for payment on the Account by verifying check amount and check number.

"**Positive Pay File**" means the file of checks submitted by Company through Positive Pay for processing.

"**Primary Account**" means the Account designated by Company for settlement of any fees related to the Services.

"**RDC**" means Remote Deposit Capture service offered by Bank.

"**RDC Administrator**" shall have the meaning prescribed in the Remote Deposit Capture Service Description.

"**RDFI**" means Receiving Depository Financial Institution.

"**Remote Checks**" means remotely created checks as defined by Regulation CC.

"**Remittance Materials**" means corresponding remit coupons, correspondence items, and envelope.

"**Requests**" means a request made by Company or Authorized Representative(s) to Bank to initiate a payment order (as defined in the Code) made in the name, or having the unique identifier, of Company (as sender) requesting that funds belonging to, or under the control of, Company be transferred to a specified account or beneficiary.

"**Rules**" means collectively the NACHA Operating Rules and Guidelines and any local ACH Association rules or guidelines.

"**Security Devices**" means those certain procedures and security devices, which may include without limitation, codes, encryption, passwords, and other security devices, systems, Software and any supplemental authentication tools that are used by Company.

"**Security Procedures**" shall have the meaning prescribed in Section 2 of the General Terms.

"**Service Description(s)**" means the service descriptions to the Agreement including any schedules and exhibits to the same.

"**Services**" shall mean the services selected by Company on the Setup Form.

"**Setup Form**" means the Treasury Management Services Setup and Authorization Form completed and signed by Authorized Representatives.

"**Software**" shall have the meaning prescribed in Section 4 of the General Terms.

"**Substitute Checks**" means substitute checks as defined in Regulation CC.

"**Supporting Documents**" means any user guides, user manuals, specification or setup forms and other user materials applicable to the Services contemplated in the Agreement.

"**Sweep**" means the transfers completed as part of the Automated Sweep Service.

"**Target Balance**" means the Account Balance dollar amount established by Company and identified for each Deposit Account in the Supporting Documents.

"**Third Party Items**" means all checks with third-party endorsements and checks that are payable to a different payee (including but not limited to Acceptable Payees) or are payable jointly to Company and a second payee for deposit into Company's Lockbox Account.

"**Unacceptable Checks**" shall have the meaning prescribed in Section 3 of the Lockbox Service Description.

"**Unauthorized Use**" means any unauthorized disclosure, possession, use or knowledge of Confidential Information.

"**User(s)**" means Company, Administrator, any alternate Administrators or other individual users of the Services, as authorized by Company or Administrator.

WAB000211

# EXHIBIT B



## Deposit Account Agreement and Disclosure

### Effective October 2016

In this Deposit Account Agreement and Disclosure, each and all of the deposit account owners and authorized signers are referred to as "you" and "your." Western Alliance Bank is referred to as "Bank," "we," "our," and "us." Bank operates through its divisions, including Alliance Association Bank, Alliance Bank of Arizona, Bank of Nevada, Bridge Bank, First Independent Bank and Torrey Pines Bank. This *Deposit Account Agreement and Disclosure* is the contract that governs your deposit accounts held at Bank (each referred to as an "Account"). Please be sure to read it carefully and keep it for your records. As used in this document, the terms "**Agreement**" and "**Disclosure**" means this document, the signature card, the applicable rate and fee schedule (which includes the Rate Chart, Schedule of Fees and Charges, and Certificate of Deposit Receipt (as applicable), all hereinafter called the "**Schedule**"), and the applicable Truth in Savings Account Disclosure. All owners of and authorized signers on the Account agree to the terms contained in this Agreement, as may be amended from time to time. You agree that we may waive, in our sole discretion, any fee, charge, term, or condition set forth in this Agreement or Schedule at the time the Account is opened or subsequent thereto, on a one-time basis or for any period or duration, without changing the terms of this Agreement or your obligation to be bound by this Agreement, and we are not obligated to provide similar waivers in the future or waive our rights to enforce the terms of this Agreement.

We provide a copy of this Agreement to you when you open your Account. We may change this Agreement at any time, by adding, amending, or deleting existing terms and conditions. We generally send you advance notice of any adverse change, which notice may be included in your statement or in a separate mailing. However, if a change is not adverse to you we may make the change at any time without advanced, or other, notice. If you do not agree with the change, you may close your Account. However, if you continue to use your Account and keep it open, you accept and agree to the change. The current version of this Agreement supersedes all prior versions and contains the terms governing your Account. You may request a copy of this Agreement at any time.

Please note there may be differences in hours of service, fees, products, and limitations within some services between the divisions of Western Alliance Bank. The differences may be driven by local market conditions or risks associated with specific geographic markets.

*Alliance Association Bank, Alliance Bank of Arizona, Bank of Nevada, Bridge Bank, First Independent Bank, and Torrey Pines Bank* are divisions of Western Alliance Bank. *MEMBER FDIC.*

WAB000212

# Deposit Account Agreement and Disclosure
## TABLE OF CONTENTS

**IMPORTANT INFORMATION ABOUT COMMUNICATIONS FROM US** ..........................................................................4

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT** .......................................4

**FDIC INSURANCE** ..................................................................................................................................................................4

**DEPOSIT ACCOUNTS** ..........................................................................................................................................................4

**DATE ACCOUNT OPENED** ..................................................................................................................................................5

**BANK DIVISIONS** ..................................................................................................................................................................5

**INTEREST** ..............................................................................................................................................................................5

**FEES AND CHARGES** ..........................................................................................................................................................5

**BALANCE METHOD** ..............................................................................................................................................................6

**DEPOSIT RULES** ..................................................................................................................................................................6

    Endorsements ....................................................................................................................................................................6

    Final Payment ....................................................................................................................................................................6

    Charge Backs of Deposited or Cashed Checks ................................................................................................................6

    Checks Sent for Collection ................................................................................................................................................6

    Direct Deposits ..................................................................................................................................................................7

    Night Depository Facilities ................................................................................................................................................7

    Crediting of Deposits ........................................................................................................................................................7

    Substitute Checks and Electronic Files Pertaining to Original Checks ............................................................................7

    Deposit of Remotely Created Checks ..............................................................................................................................8

**WITHDRAWAL RULES** ..........................................................................................................................................................8

    Payment Order of Items ....................................................................................................................................................8

    Withdrawal Restrictions and Overdrafts ..........................................................................................................................8

    Notice Requirements ........................................................................................................................................................9

    Stale Dated and Post Dated Items ..................................................................................................................................9

    Power of Attorney ..............................................................................................................................................................9

    Automated Processing of Items ........................................................................................................................................9

    Signatures ........................................................................................................................................................................9

    Preauthorized Drafts ......................................................................................................................................................10

    Electronic Check Conversion ..........................................................................................................................................10

    Re-Presented Checks ....................................................................................................................................................10

    Withdrawal by Remotely Created Checks ......................................................................................................................10

    Check Legends ................................................................................................................................................................10

    Non-Customer Check Cashing Identification..................................................................................................................10

    Checks Payable to a Business Entity or Trust................................................................................................................11

    Limits on Savings and Money Market Transfers and Withdrawals ................................................................................11

    Stop Payment Orders ....................................................................................................................................................11

**TIME DEPOSIT (CERTIFICATES OF DEPOSIT)** ..............................................................................................................11

    Penalty ............................................................................................................................................................................11

    Exceptions ......................................................................................................................................................................12

**ACCOUNT OWNERSHIP** ....................................................................................................................................................12

**CHECKING SUB-ACCOUNTS** ............................................................................................................................................14

**PRECAUTIONS TO REDUCE THE RISK OF UNAUTHORIZED TRANSACTIONS**............................................................14

WAB000213

ASSIGNABILITY ........................................................................................................................................ 14
BANK LIABILITY ...................................................................................................................................... 14
INTERNATIONAL ACH TRANSACTIONS .............................................................................................. 15
RIGHT OF SETOFF .................................................................................................................................. 15
DORMANT ACCOUNTS ........................................................................................................................... 15
ACCOUNT STATEMENTS ........................................................................................................................ 15
CHECK IMAGING ..................................................................................................................................... 16
WHOLESALE WIRE AND ACH TRANSACTIONS .................................................................................. 16
NOTICES ................................................................................................................................................... 16
ACCOUNT TERMINATION ....................................................................................................................... 17
DEATH OR INCOMPETENCE .................................................................................................................. 17
GOVERNING LAW .................................................................................................................................... 17
SYSTEMS AND SOFTWARE .................................................................................................................... 17
CREDIT VERIFICATION ........................................................................................................................... 18
IDENTITY THEFT ...................................................................................................................................... 18
PRIVACY ................................................................................................................................................... 18
UNLAWFUL INTERNET GAMBLING ENFORCEMENT ACT ("UIGEA") OF 2006 ................................ 18
LEGAL ACTIONS AFFECTING YOUR ACCOUNT ................................................................................. 18
RESOLVING DISPUTES ........................................................................................................................... 18
MISCELLANEOUS PROVISIONS ............................................................................................................ 20
SUBSTITUTE CHECKS AND YOUR RIGHTS ......................................................................................... 20
ELECTRONIC FUNDS TRANSFER AGREEMENT ................................................................................. 21
    Currency Conversion Information .......................................................................................................... 22
    Visa® Debit/Check Card, ATM Card and POS Types of Transactions/Transfers ................................. 22
    Fees and Charges for ATM / POS Transactions ................................................................................... 22
    Preauthorized Funds Transfer Types and Preauthorized Transfers ..................................................... 23
    Other EFT Transactions ......................................................................................................................... 23
    Limitations of Liability ............................................................................................................................. 24
    Documentation ....................................................................................................................................... 25
    Other Provisions .................................................................................................................................... 25
    Preauthorized Electronic Funds Transfers ............................................................................................ 26
    In Case of Errors or Questions About Your Electronic Funds Transfers ............................................... 26
IMPORTANT INFORMATION ABOUT YOUR VISA® DEBIT CARD ....................................................... 27
FUNDS AVAILABILITY POLICY DISCLOSURE ..................................................................................... 27
    Your Ability to Withdraw Funds ............................................................................................................. 27
    Longer Delays May Apply ...................................................................................................................... 28
    Hold On Other Funds ............................................................................................................................. 28
    Special Rules for New Accounts ............................................................................................................ 28

## IMPORTANT INFORMATION ABOUT COMMUNICATIONS FROM US

You may receive communications from us, such as statements, notices, letters, interest checks, or other types of correspondence, with the name of Western Alliance Bank or with the trade name of your Bank division (Alliance Association Bank, Alliance Bank of Arizona, Bank of Nevada, Bridge Bank, First Independent Bank or Torrey Pines Bank, noted as a division of or divisions of Western Alliance Bank). Either version of this branding on correspondence is accurate. Western Alliance Bank is a single, FDIC-insured financial institution. The trade names we use promote our regional character. The trade names do not mean that deposits held by different divisions are separately insured.

**Electronic and/or email communications**

You may receive communications about your Account via postal service or you may request statements via our website if you enroll in online banking. Further, you may request to receive disclosures or other types of electronic communication from us via email. To implement this request, Bank must comply with the Electronic Signatures in Global and National Commerce Act ("E-Sign Act")**,** which requires you to affirmatively consent to the use of electronic records in this manner. You may withdraw your consent with appropriate written notice without the imposition of any condition, consequence, or fee for such withdrawal of consent. There may be a fee assessed for paper-based periodic statements, please refer to the applicable Schedule for more information. You agree to notify us immediately of any changes to your email address of record in order for us to comply with your request to electronically communicate with you. You also agree we are not liable, due to your failure to notify us of changes, for any communication not received electronically by you as a result.

## IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or business that opens an Account. What this means for you: When you open an Account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. We may require additional information when or after you open the Account to comply with "Know Your Customer" requirements. We may restrict or close your Account if we are unable to obtain information in order to satisfy our "Know Your Customer" requirements. By opening an Account with us, you confirm that neither you nor any beneficial owner of any Account is covered by any sanctions programs administered or enforced by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC").

Federal tax law requires us to report certain interest payments we make to you to the Internal Revenue Service ("IRS"), and to include your taxpayer identification number ("TIN") on the report. Interest includes dividends, interest and bonus payments for purposes of the applicable rule(s). Therefore, we require you to provide us with your TIN and to certify that it is correct. In some circumstances, federal law requires us to withhold and pay to the IRS a percentage of the interest that is earned on funds in your accounts. This is known as **backup withholding**. We will not have to withhold interest payments when you open your account if you certify your TIN and certify that you are not subject to backup withholding due to underreporting of interest. (There are special rules if you do not have a TIN but have applied for one, if you are a foreign person, or if you are exempt from the reporting requirements.) We may subsequently be required to begin backup withholding if the IRS informs us you supplied an incorrect TIN or that you underreported your interest income.

## FDIC INSURANCE

Per the Federal Deposit Insurance Corporation ("FDIC"), all funds held in an Account of an FDIC-insured institution are insured with coverage up to at least the Standard Maximum Deposit Insurance Amount ("SMDIA") (which is currently $250,000 per Account holder) under the FDIC's general deposit rules. The SMDIA is subject to change from time to time and you agree that it is your responsibility to independently determine the amount of FDIC insurance coverage available for your Accounts. For further information to determine specific insurance amounts for your Accounts, please go to the FDIC Electronic Deposit Insurance Estimator ("EDIE") at this web address: www.fdic.gov/edie.

## DEPOSIT ACCOUNTS

From time to time, we may offer or you may open a variety of Accounts. Each such Account is subject to the general terms and conditions and any specific terms and conditions relating to that type of account as set forth in this Agreement. If you open multiple Accounts, you may receive Schedule information for each Account, but this Agreement will cover all your Accounts. Each Account holder will be jointly and severally (individually) liable to us for debit balances in the Account, including without limitation overdrafts and Account charges. Each Account holder also jointly and severally promises to pay, upon demand, any and all debit balances, all

fees and charges, and our reasonable attorneys' fees and costs and expenses of collection, including but not limited to those incurred at trial and on any appeal.

## DATE ACCOUNT OPENED

If you open an Account after business hours on a business day that we are open, we will consider the transaction made at the opening of the next business day for Account opening, effective date, and issue date purposes.

## BANK DIVISIONS

You may conduct your banking at any division of Western Alliance Bank. The Western Alliance Bank divisions are Alliance Association Bank, Alliance Bank of Arizona, Bank of Nevada, Bridge Bank, First Independent Bank and Torrey Pines Bank. The Bank has the right to accept or decline transactions at the time of presentment.

## INTEREST

When you open an Account that pays interest, we will provide you a Schedule (as defined above). The Schedule is considered part of this Agreement. If your Account earns interest, the following information applies:

**Payment of Interest:** We will pay interest at the annual rate specified on the Schedule, which does not reflect compounding ("Interest Rate"). The applicable Truth in Savings Disclosure sets forth the frequency of interest payments, the frequency of any interest compounding and crediting, the interest accrual basis, the balance on which interest will be calculated, and any minimum balance requirements to earn interest.

**Minimum Balance Requirements:** The applicable Truth in Savings Disclosure may specify a minimum balance you are required to maintain in your Account. If the minimum balance is not maintained during a specified period, we, at our option, may not pay interest on your Account and/or may charge a fee for that period. You should review any minimum balance requirements for your Account.

**Initial Interest Rate:** The initial Interest Rate is the current annual rate of interest we will pay on the specified balance in your Account. We may pay interest at different rates, depending on the amount deposited, the balance in your Account and the type of depositor (e.g., individual, business, or non-profit organization).

**Interest Compounding and Crediting:** The applicable Truth in Savings Disclosure will indicate the interest compounding and crediting frequency, if applicable, for your Account. Compounding generally means interest is being accrued on earned interest. Interest may be compounded more frequently than interest is credited to your Account.

**Interest Accrual:** We may accrue interest on your Account more frequently than we pay or credit interest. The interest that has been calculated, but not paid to the Account, is called accrued unpaid interest.

**Changes:** We have the right to change, at our sole discretion, the rates and fees described on the Schedule or any other term of this Agreement in accordance with the terms of the Agreement.

**Interest Upon Account Closing:** If you close your interest-bearing Account before interest has been credited to your Account on the regular interest payment date for the Account, accrued interest may be forfeited.

## FEES AND CHARGES

Subject to applicable law, you agree to pay us the fees and charges shown in the Schedule as are applicable to your Account or for other services performed by us for you. You agree the fees and charges may be changed by us from time to time and authorize us to charge your Account for their payment whether or not each charge results in an overdraft of your Account. Existing and future charges may be based upon the overall costs of providing Account services and may or may not be based upon the direct cost or expense associated with providing the particular service involved. The charges may be based on consideration of profit, competitive position, deterrence of misuse of Account privileges by customers, and the safety and soundness of Bank. We will notify you of the changes, to the extent required by law.

Each of you also agrees to be jointly and severally (individually) liable for any Account shortage resulting from overdrafts, whether caused by you or another with access to the Account or by the return of a previously credited transaction outside of your control (i.e., chargeback/returned item). This liability is due immediately, and can be deducted directly from the Account balance when sufficient funds

are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

## BALANCE METHOD

On interest-bearing transaction Accounts, we use the daily balance computation method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the Account each day. Interest begins to accrue no later than the business day we receive credit, which may be no sooner than the business day after the day you deposit non-cash items (for example, checks). Refer to the Truth in Savings Disclosure applicable to your Account for details.

## DEPOSIT RULES

### Endorsements

You authorize us to accept transfers, checks, and other items for deposit to your Account if they are made payable to, or to the order of, any one or more of you, whether or not they are endorsed by you. You authorize us to supply missing endorsements, and you warrant all endorsements are genuine. All checks and other items deposited to your Account should be endorsed payable to the order of us for deposit only, followed by your signature and Account number. All endorsements must appear on the back of the check or other item within the first 1-1/2 inches from the left side of the item when looking at it from the front. Endorsements should be in black ink. While we may accept non-conforming endorsements, you will be responsible for any loss incurred by us due to the delay in processing or returning the item for payment. We are not bound by any conditional or restrictive endorsement on a check you cash or deposit, or any endorsement "without recourse."

### Final Payment

All non-cash items (for example, checks) deposited to your Account are posted subject to our receipt of final payment by the payor bank. Upon receipt of final payment, the item becomes a collected item. If final payment is not received or if any item you have deposited or cashed is charged back to us for any reason, you authorize us to charge any of your Accounts, without prior notice and at any time, for the amount of the returned item, our returned item fee, any interest paid on that item, and any other fee we pay or incur. If the returned item is in a currency other than US dollars, the amount returned may be different due to fluctuation of exchange rates. If an item to be charged back is lost in the process of collection or unavailable for return, we may rely upon a photocopy of the item or upon any other generally accepted notification of return of the item, in charging you or any of your Accounts for the amount of the returned item. We reserve the right to refuse any item for deposit into your Account. We may also refuse a deposit after initially accepting it. We will not be liable to you for refusing a deposit, even if it causes outstanding items to be returned.

### Charge Backs of Deposited or Cashed Checks

If you deposit any check or other item to your Account or cash any check, and we are notified that the item will be returned unpaid, or another bank or the customer who wrote the check demands that we repay them for the item for any reason, we may deduct the amount of the item from any of your Accounts, even if doing so creates an overdraft. If a deposited or cashed item is returned, we will charge you a fee, and we may deduct the amount from any of your Accounts. We may deduct the amount from your Account at any time whether the physical item is returned to us or not, and whether we can return the item or a copy to you or not. If an item is returned, we will notify you.

We may place a hold on or charge your Account for any check or other item deposited into your Account if a claim is made or we otherwise have reason to believe that the check or other item: was altered, forged, unauthorized; has a missing signature; a missing or forged endorsement; or should not have been paid, or may not be paid, for any other reason. When the claim is finally resolved, we will either release the hold or deduct from your Account the amount of the item.

### Checks Sent for Collection

We may refuse to accept a check for immediate credit you wish to negotiate either at the time of transaction or before we send it for payment. Reasons for the possible refusal include but are not limited to items that have been previously dishonored, are irregular in any respect, or are drawn in a foreign currency. At our option, we may send the check for collection or return it to you without presenting it to the financial institution on which it is drawn. When sending a check for collection, it means we would not use normal check clearing procedures, and must specially handle the item. If payment is received, we will credit your Account with the amount received once credit is received by us. Payment of the amount received may include the collection fee deducted by the other financial institution. In some instances, the other financial institution may require their collection fee accompany the collection request. These fees are in addition to the standard fee charged by us and will be charged to you accordingly.

WAB000217

## Direct Deposits

If we offer direct deposit services for automatic preauthorized deposits to your Account such as Social Security payments, payroll deposits or automatic transfers from your other Accounts with us, you must notify us at least 30 days prior to the next scheduled direct deposit or preauthorized transfer if you wish to cancel the direct deposit or transfer service. If the bank that sent an electronic deposit notifies us that it was sent by mistake, or was intended for another Account, or if any amount deposited must be returned to the government for any reason, you authorize us to deduct the amount from your Account as provided in the **Final Payment** paragraph above.

## Night Depository Facilities

The night depository service is provided as a convenience to you at certain Bank locations. You agree we will not be required to carry insurance on the night depository or the contents of any night deposit bag or envelope deposited therein. Nor shall we be responsible for any disappearance, theft or loss of any bag or envelope or its contents or any part thereof before we issue a credit for the deposit.

You agree to pay any fees associated with the purchase or replacement of any night deposit bags or keys. You also agree to assume all responsibility for use of the night deposit bag and keys for whomever you authorize use of such. You agree to call for each reusable locked bag deposited in the depository before the end of the first business day following the time of each deposit, and, if not called for within such time, we are hereby authorized to treat such bag as a safekeeping item subject to safekeeping rules. Disposable bags will be destroyed by Bank.

## Crediting of Deposits

If you make a deposit with branch personnel on a business day we are open, we will consider that day to be the day of your deposit. Please check branch locations for specific business hours or refer to your Bank division website.

Deposits not made to branch personnel (such as by ATM, Night Depository, or courier) may be subject to different cut off times, disclosed as follows:

- ATM: If you make a deposit at any of our depository ATMs before the cut off time noted on a business day we are open, we will consider that day to be the day of your deposit. Any deposit made after the cut off time will be considered deposited on the next business day we are open.

| DEPOSITORY ATMs | DEPOSIT CUTOFF TIME (Local Time) |
|---|---|
| Alliance Association Bank Division | No separate ATM's, may use any other Division ATMs |
| Alliance Bank of Arizona Division | 3:00 P.M. |
| Bank of Nevada Division | 3:00 P.M. |
| Bridge Bank Division | No depository ATMs |
| First Independent Bank Division | 3:00 P.M. |
| Torrey Pines Bank Division | 3:00 P.M. |

- Night Depository: If you make a deposit at the night depository before 9 a.m. on a day we are open, we will consider that day to be the day of your deposit. If you make a deposit at the night depository after 9 a.m. on a day we are open or any time on a day we are not open, we will consider the deposit to be made on the next business day we are open.
- Courier/Armored Car: Refer to your courier or armored car agreement you received when contracting for these services, to determine the crediting timeline for your deposit.

All transactions, including those for which we give you a receipt at our teller line, are subject to our verification. Deposit verification does not occur at the teller window, at the ATM, or via mobile banking. Consequently, the receipt or notice you receive when making your deposit does not prove we verified your deposit. We may reverse or adjust any incorrect credit made to your Account without notifying you in advance. When verifying deposits, we endeavor to resolve all discrepancies to the penny.

## Substitute Checks and Electronic Files Pertaining to Original Checks

A "substitute check" is a copy of a check that is the legal equivalent of an original check. If you deposit a substitute check or an electronic

WAB000218

representation of a substitute check into your Account, you agree to reimburse us for losses, costs and expenses we may pay or incur associated with the item not meeting applicable substitute check standards and/or from duplicate payments associated with the item. (See **Substitute Checks and Your Rights** section of this Agreement for further definitions and information regarding substitute checks).

## Deposit of Remotely Created Checks

A remotely created check is created when an Account holder authorizes a payee to draw a check on the Account, but instead of bearing the Account holder's signature, it bears the Account holder's printed or typed name or a statement the Account holder authorized the check.

You must obtain our prior express written consent to deposit remotely created checks into your Account, and regardless, you guarantee the remotely created checks are authorized by the Account holder for payment in the amount it shows.

## WITHDRAWAL RULES

You may make withdrawals from your Account in any manner that is permitted by us for the type of Account you have opened. Withdrawals by mail will be posted to your Account as of the day the transaction is processed by us. We may refuse to accept any check other than standard checks provided by us, or approved by us in advance. Withdrawals and transfers from your Account may be restricted as provided in this Agreement, in the Schedule, or by applicable law.

## Payment Order of Items

When processing checks drawn on your Account, our policy is to pay them in check number order. Lower numbered checks are paid first. Items without check numbers, such as electronic transactions, post first before checks presented are processed. The order in which items are paid is important if there is not enough money in your Account to pay all of the items that are presented. There is no policy that is favorable in every instance. If the smallest items are paid first, you may have fewer NSF or overdraft fees, but the largest, and perhaps more important items (such as rent or mortgage payments) might not be paid. However, if the largest items are paid first, your most important items might be paid but it may increase the overdraft or NSF fees if funds are not available to pay all of the items. We think our policy attains a reasonable balance between minimizing additional cost to you and paying your more important items, given the assumption you desire to have checks paid in the order you wrote them.

If an item is presented without sufficient funds in your Account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for non-sufficient funds ("NSF"). The fees for overdrafts and NSF are disclosed in the Schedule. We encourage you to make careful records and practice good Account management. This will help you to avoid creating items without sufficient funds and incurring the resulting fees.

## Withdrawal Restrictions and Overdrafts

Any signer on the Account, acting alone, has the authority to make withdrawals or transfers of all or any part of the Account balance at any time. Each owner (until we receive notice to the contrary) authorizes each other person who signs or has authority to make withdrawals, as documented on the applicable signature card, to endorse any item payable to you or your order for deposit to the Account or any other transaction with us. Each owner also agrees to be jointly and severally (individually) liable for any Account shortage resulting from charges or overdrafts, whether caused by you or another with access to the Account. This liability is due immediately, and can be deducted directly from the Account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

We do not have to allow you to make a withdrawal from your Account if you do not have sufficient available funds in the Account to cover the full amount of the withdrawal. We will post non-check debits in ascending dollar amount order and then post check withdrawals received on a single business day. We will post checks received on a single business day against your Account in check number order. Checks presented in person at one of Bank's branches will post in ascending check number order prior to checks clearing through nightly processing, which will also be in ascending check number order.

Fees may apply to overdrafts. Fees related to overdrafts will be posted in accordance with the terms outlined in the Schedule.

We may pay other withdrawals or debit items (such as charges) prior to paying any checks and the method of payment for the other withdrawals and debit items may be in any order and at our sole discretion. If there are insufficient available funds to cover some of the withdrawals or debits presented against your Account, such items will be handled in accordance with our overdraft procedures and applicable law. Even if we choose to pay one or more overdrafts, we are not obligated to cover any future overdrafts. We may determine the balance of your Account in connection with determining whether payment of an item will create an overdraft at any time between the time we receive the item and the deadline for us to take action on the item. We are not required to determine your Account balance more

WAB000219

than one (1) time during this period.

A fee may be assessed on any item that will overdraw the available Account balance, regardless of whether we pay or dishonor (return) the item. If we pay the item, we may charge a NSF Item Paid Fee. If we return the item, we may charge a NSF Item Return Fee. You agree, immediately upon notice from us, to deposit funds sufficient to cover any overdraft plus NSF fee, if required. We will not be liable for the dishonor of any item when the dishonor occurs because we set off a debit against your Account. We also may refuse to allow a withdrawal if there is a dispute about the Account (unless a court has ordered us to allow the withdrawal), the Account is garnished or attached, the Account has been pledged as collateral for a debt, the availability of the funds on deposit cannot be verified, any required documentation has not been presented, or you fail to repay an obligation to us on time.

## Notice Requirements

Federal regulations allow us to retain the right to require you to give at least seven (7) days' notice in writing prior to any intended withdrawal from a savings, negotiable order of withdrawal ("NOW"), personal interest-bearing checking or money market account. Although we usually pay withdrawals or checks without notice on these Accounts, by doing so in no way serves as a waiver of this right.

## Stale Dated and Post Dated Items

We reserve the right to pay or dishonor a check more than six (6) months old without prior notice to you. You agree we are not responsible for any loss to you by doing so.

We also reserve the right to pay or dishonor a check dated in the future. You agree we are not responsible for any loss to you in doing so. You agree when you write a check, you will not date the check in the future. If you do, and the check is presented for payment before the date of the check, we may pay it or return it unpaid. You agree if we pay the check, the check will be posted to your Account on the date we pay the check, even though the posting date is prior to the date on the check. We will not honor a postdated check if we receive advance notice from you at such a time and in such a manner as to afford us reasonable opportunity to act. The notice must specify the date, amount, number of the check, and the name of the payee. Notices are effective for the time periods stated in the **Stop Payment Orders** section in this Agreement.

## Power of Attorney

We reserve the right of approval on all powers of attorney. The person executing a Bank-approved power of attorney will be referred to as the "Principal" (Account holder) and the person acting for the Principal as the "Agent." We may refuse to comply with a power of attorney for reasonable cause, or until we receive an affidavit from the Agent stating the power of attorney presented is a true copy of the power of attorney document and, to the best of the Agent's knowledge, the Principal is alive and the relevant powers of the Agent have not been altered or terminated. The attorney-in-fact or Agent has full authority with regard to the Account but does not have an ownership interest in the Account.

## Automated Processing of Items

In accordance with reasonable banking standards, most checks and other items are processed through automated processing and, except in limited circumstances and at our discretion, most items are not individually examined. You agree we act within reasonable banking standards by processing most checks and other items through automated processing systems. We will not honor restrictive or other legends unless we have agreed in writing to do so. Examples of restrictive legends placed on checks we are not required to honor are "must be presented within 90 days" or "not valid for more than $1,000.00." We are not responsible for any losses, claims, damages, or expenses that result from your placement of these or other special instructions on your checks.

## Signatures

You recognize we have adopted automated collection and payment processing, even for items deposited or negotiated in person, so we can process the greatest volume of items at the lowest possible cost to our customers. *We will not enforce multiple signature requirements on personal or business accounts, even if your signature card specifies that multiple signatures are required or you have otherwise instructed us to do so.* Any multiple signature requirements are for your internal control purposes only. In light of this, you agree we do not fail to exercise ordinary care in paying an item solely because our procedures do not provide for the sight examination of items. You authorize us to store and use Signature Card information in any reasonable form we deem necessary, including any digitized signature capture process.

If you use a facsimile signature or other form of mechanically-reproduced signature (such as, but not limited to, desktop publishing, digitized, or computer software generated signature), you agree you shall have the sole responsibility for maintaining security over the facsimile or mechanically reproduced signature, as well as sole responsibility for the device by which the facsimile or mechanically

WAB000220

reproduced signature is affixed, and you shall bear the entire risk for unauthorized use thereof whether or not you are negligent. You agree that no facsimile or mechanically-reproduced signature we have been authorized to honor may be considered a forgery or an unauthorized signature, but such facsimile or mechanically-reproduced signature shall be effective as your signature or endorsement whether or not you have been negligent. You further agree to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or expense (including reasonable attorneys' fees) we or you may suffer or incur as a result of the unlawful use, unauthorized use, or misuse by any person of any such facsimile or mechanically-reproduced signature or the device by which it is affixed. If you use any form of facsimile or mechanically-reproduced signature device, you agree to complete a signed Facsimile Signature Agreement and deliver a sample to us if we request it.

## Preauthorized Drafts

If you voluntarily give information about your Account (such as our routing number and your Account number) to a party who is seeking to sell you goods or services, and you do not physically deliver a check to the party, any debit to your Account initiated by the party to whom you gave the information is deemed authorized by you.

## Electronic Check Conversion

You may authorize a merchant to use your check as a source of account information to initiate an electronic withdrawal from your Account. The merchant uses the check information, along with the transaction amount, to initiate an Automated Clearing House ("ACH") debit transaction. The transaction is electronically transferred through the ACH system and the funds will be debited directly from your Account and deposited automatically into the merchant's Account. After the information is gathered from the check, the merchant should mark it void and return it to you. You should also receive a receipt documenting the transaction. This type of transaction generally results in funds being removed from your Account faster than a normal check transaction. A description of the transaction will appear on your periodic Account statement. Checks used in these types of transactions may not be returned or provided as an image with your periodic Account statement. This type of electronic funds transfer from a consumer Account is governed by the Electronic Fund Transfer Act ("EFTA") and its implementing regulations or Article 4A of the Uniform Commercial Code, as applicable, and subject to the **Electronic Funds Transfer Agreement** section of this Agreement.

## Re-Presented Checks

If a merchant electronically re-presents a check returned due to insufficient or uncollected funds, this transaction is not covered by the EFTA. Checks or images of checks involved in this type of transaction will not be included with your statement. You may authorize a merchant to electronically collect a fee associated with the re-presentment of a check. If a merchant electronically collected a fee associated with the re-presentment of a check, the fee transaction is covered by the EFTA and subject to the **Electronic Funds Transfer Agreement** section of this Agreement if the fee is debited as an electronic funds transfer from a consumer Account. A description of the transaction will appear on your statement.

## Withdrawal by Remotely Created Checks

See **Deposit of Remotely Created Checks** section above for definition of "remotely created checks". If you voluntarily give information about your Account (such as our routing number and your Account number) to a party who is seeking to sell you goods or services, and you do not physically deliver a check to the party, any debit to your Account initiated by the third party to whom you gave the information is deemed authorized. You may not later change your mind and try to revoke your authorization or rescind payment by claiming the remotely created check was unauthorized. We will not be required to re-credit your Account, and may charge against your Account, any remotely created checks for which the third party has proof of your authorization.

## Check Legends

We may disregard information on any check or item other than the signature of the drawer, the identification of the drawee financial institution and payee, the amount, the endorsements, and any other information that appears on the MICR line. In addition, we are not responsible to take action on, or for failure to notify you of restrictive language placed on checks or other items, including but not limited to terms such as "Void after 90 Days," "Paid in Full," "Two Signatures Required," "Void Over $100" or similar statements.

## Non-Customer Check Cashing Identification

If a person who is not an Account holder of ours presents a check drawn against one of your Accounts for payment at the teller line, we may require identification that meets our standards including possibly obtaining a thumbprint or fingerprint from the person. You agree that if the person refuses to comply with our identification standards, we may dishonor the check and we have no liability to you for refusing to negotiate the check. Further, depending on the amount, we reserve the right, in order to protect your Account, to refuse

WAB000221

to honor the check without confirmation from you as to its legitimacy.

## Checks Payable to a Business Entity or Trust

We do not allow checks made payable to any business entity, such as a partnership, corporation, limited liability company, lodge or association, or any other form of ownership other than a natural person such as a trust, to be exchanged for cash or cashed at Bank. Checks payable to the above entities may only be accepted for deposit.

## Limits on Savings and Money Market Transfers and Withdrawals

Federal law requires that an Account holder may make no more than six (6) transfers and/or withdrawals during any one (1) calendar month or statement cycle (or similar period) of at least four (4) weeks, to another of your Accounts with us or to a third party by means of a preauthorized, automatic, or telephone transfer (including data transmission) agreement, by check, draft, debit card, or similar order made by you and payable to third parties. A "preauthorized transfer" includes any arrangement by us to pay a third party from your Account upon written or oral instruction, including an order received through an automated clearing house ("ACH"), or any arrangement by us to pay a third party from your Account at a predetermined time or on a fixed schedule.

You may make unlimited withdrawals (payments directly to you or transfers of funds from your Account to any of your other deposit Accounts or loan Accounts with us), either in person at our locations, by mail, messenger, telephone (via check mailed to you), or use of an ATM card (if applicable).

If you have more than the allowable preauthorized transfers or preauthorized checks or drafts (for money market Accounts) in any one period, your excess transactions may be subject to fees and your Account may be subject to closure by us and the funds placed in another Account you are eligible to maintain, or we may take away the transfer and check capabilities of the Account. Excess transactions are not permitted on savings Accounts.

## Stop Payment Orders

Subject to certain limitations, you may order us to stop payment on any check payable from your Account, whether drawn by you or any other Account holder. The stop payment request will be effective if we receive the order at such time and in such manner as to afford us a reasonable opportunity to act upon the order. The stop payment order is effective for six (6) months. A stop payment order may be renewed for additional six (6) month periods if renewed during a period within which the stop payment order is effective. We will require you to provide the date, the exact amount, and the number of the item, together with the name of the payee.

An ACH stop payment should identify the amount (or range if variable) of the debit, the originating party and Company ID. One time stop payments will expire and are of no further effect after presentment of a single ACH debit against the Account. Generally, ACH stop payments are effective for six (6) months after the date of acceptance and will automatically expire unless renewed.

A confirmation notice will be sent to the address on file confirming the stop payment information provided to us. Should any information be incorrect, you must notify us in writing. If you give us incorrect information, we will not be liable for failing to stop payment on the item. Our acceptance of a stop payment order will not constitute a representation the item has not already been paid or that we have a reasonable opportunity to act upon the order. You may not stop payment on an official, certified, cashier, or teller check issued by us, or request us to stop payment if we have otherwise become accountable for the item. In addition, you may not stop payment on checks governed by separate agreement, such as a check guaranty agreement. Further, you may not stop payment on an item after acceptance of the item by us. Refer to the Schedule of Fees and Charges for new/renewed stop payment order fees.

## TIME DEPOSIT (CERTIFICATES OF DEPOSIT)

If your Account is a time deposit, (also referred to as a "Certificate of Deposit"), you agree to keep the funds on deposit until the maturity of your Account. If your Account has not matured, any withdrawal of all or part of the funds from your Account may result in an early withdrawal penalty as provided in your Certificate of Deposit Disclosures. We will consider requests for early withdrawal and, if granted, the penalty provided in the Certificate of Deposit Disclosures may apply.

## Penalty

In accordance with federal law, if you withdraw any amount within the first six (6) days after deposit to a Certificate of Deposit, we are required to assess an early withdrawal penalty of at least seven (7) days' simple interest on the amount withdrawn. In addition, this penalty and any other early withdrawal penalty are calculated as a forfeiture of part of the accrued interest that has or would be earned on the Account. If your Account has not yet earned enough interest so the penalty can be deducted from earned interest, or if

WAB000222

the interest already has been paid, the difference will be deducted from the principal amount of your Account. We will use the rate in effect for your Account at the time the withdrawal is made to calculate any penalties.

## Exceptions

We may let you withdraw money from your Account before the maturity date without an early withdrawal penalty:

1. Upon the death of any owner of the time deposit; or
2. When any owner of the time deposit is determined legally incompetent by a court or other administrative body of competent jurisdiction; or
3. When the Account is maintained in an Individual Retirement Account (IRA) and the money is paid within seven (7) days after the Account is opened; or
4. When the Account is a Keogh Plan ("Keogh") or 401(k) Plan, if you forfeit an amount equal to at least the simple interest earned on the withdrawn funds; or
5. When the owner of the time deposit that is an IRA or Keogh attains the age 59-1/2 or becomes disabled; or
6. Within an applicable grace period (if any).

## ACCOUNT OWNERSHIP

The type of Account ownership you choose may change how your funds are paid if you die, even if your will states otherwise. You should consult with your estate planning advisor or attorney about your choices.

If you have a personal Account, you agree not to use it for business purposes. Based upon the type of Account ownership you have designated, the following terms and conditions apply:

**Individual Account:** An individual Account is an Account in the name of one Account holder only. Only that person may write checks against the Account or withdraw money.

**Joint Account:** An Account with two or more Account holders is a joint Account. Unless you designate otherwise on the signature card, joint Account holders will be considered joint tenants, with right of survivorship, where funds will immediately pass to the other joint Account holder upon the death of one of the Account holders.

Each joint Account holder, without the consent of any other Account holder, may, and hereby is authorized by every other joint Account holder, to make any transaction permitted under this Agreement, including without limitation:

1. To withdraw all or any part of the Account funds;
2. To pledge the Account funds as collateral to us for any obligation, whether that of one or more Account holders or of a third party;
3. To endorse and deposit checks and other items payable to any joint Account holder;
4. To give stop payment orders on any check or item, whether drawn by that Account holder or not;
5. To add additional owners to the Account; and
6. To close the Account, with the disbursement of Account proceeds as instructed by the joint Account holder.

Each joint Account holder is authorized to act for the other Account holder(s) and we may accept orders and instructions regarding the Account from any joint Account holder. If we believe there to be a dispute between joint Account holders or we receive inconsistent instructions from the Account holders, we may suspend or close the Account, require a court order to act, and/or require all joint Account holders agree in writing to any transaction concerning the Account.

Your obligations under this Agreement are joint and several. This means that each joint Account holder is fully and personally obligated under the terms of this Agreement, including liability for overdrafts and debit balances as set forth previously, irrespective of which joint Account holder benefited from the withdrawal. If you establish a joint Account with the signature of the other joint Account holder(s), you agree to hold us harmless for our reliance upon your designation of the other joint Account holder(s) listed on our documents. Further, the Account is subject to the right of setoff as noted in the **Right of Setoff** section of this Agreement.

**"In Trust For" or Payable on Death ("P.O.D.") Account:** If you establish your Account as "in trust for" ("ITF" or "Totten Trust") or payable on death ("P.O.D."), the Account remains payable to the Account holder(s) during his or her lifetime. The beneficiaries have no right to any funds in the Account during your lifetime. As the owner of the Account, you may withdraw money from the Account

WAB000223

and, by written direction to us, change the beneficiary(ies) on the Account. Once we receive sufficient evidence of the death of the last Account holder, we will pay the balance of the Account to the beneficiary or beneficiaries you designated. If there is more than one surviving beneficiary, the respective interest of each shall be deemed to be in equal shares, unless otherwise stated in Bank's Account records and as allowed by applicable state law. If there is no surviving beneficiary upon the death of the last trustee or Account holder, state law will determine ownership of the funds in the Account.

**Business Accounts:** If the Account is not owned by a natural person (for example, it is owned by a corporation, partnership, limited liability company, sole proprietorship, unincorporated association, etc.), then the Account holder must provide us with evidence, to our satisfaction, of the authority of the individuals who sign the signature card to act on behalf of the Account holder. On any transactions involving the Account, we may act on the instructions of the person(s) authorized in the corporate resolutions, banking agreement, or certificate of authority to act on behalf of the Account holder. You agree to notify us in writing of any changes in the person(s) authorized or the form of ownership. If we receive conflicting instructions or a dispute arises as to authorization with regard to the handling of the Account, you agree we may place a hold on the Account until such conflict or dispute is resolved to our satisfaction and we will not be liable for dishonored items as a result of such hold.

**Trust Account:** A trust Account is an Account held in the name of a trust for the benefit of one or more beneficiaries according to a written trust agreement. The trustee(s) will supply us with a notarized Trust Certification covering the Account. We act only as a depository bank to the trust funds and are under no obligation to act as a trustee or to inquire as to the powers or duties of the trustee(s). The trustee(s) opening the Account, in their individual capacity and jointly and severally (individually), agree to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure, including reasonable attorneys' fees, we may suffer or incur arising out of any action or claim by any beneficiary or other trustee with respect to the authority or actions taken by the trustee(s) in handling or dealing with the Account.

**Uniform Transfers to Minors Act ("UTMA") Account:** If you have established the Account as a custodian for a minor beneficiary under the applicable state's UTMA, your rights and duties are governed by that state's UTMA. For purposes of this section, "applicable state" means the state in which your Account is located as provided in the **Governing Law** section of this Agreement. You will not be allowed to pledge the Account as collateral for any loan to you. Deposits in the Account will be held by us for the exclusive right and benefit of the minor. The custodian and/or any person opening the Account, in their individual capacity, agrees to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure, including reasonable attorneys' fees, we may suffer or incur arising out of any action or claim by any beneficiary or other custodian with respect to the authority or actions taken by the custodian in handling or dealing with the Account.

**Fiduciary or Agent Account:** With respect to all fiduciary or agency Accounts, including but not limited to estate accounts, guardianship accounts, representative payee accounts, conservatorship accounts, trust accounts, UTMA accounts, Coogan accounts, or agent accounts, we reserve the right to require such documents and authorizations as we may deem necessary or appropriate to satisfy that the person(s) requesting or directing the withdrawal of funds held in the Account has the authority to withdraw such funds. This applies at the time of Account opening and at all times thereafter. We have no fiduciary duties to you as a trustee, executor, guardian, or conservator or to the beneficial owners of the Account.

You and any authorized individual on the Account agree to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure, including reasonable attorneys' fees, we may suffer or incur arising out of any action or claim by any beneficiary or third party with respect to the authority, actions, or inaction taken by the trustee(s) or authorized individuals in handling or dealing with the Account.

**Attorney Trust Account:** If you open an attorney trust Account, including an IOLTA or similar account, you authorize us to notify the appropriate state agency if the Account is overdrawn or checks are dishonored, if the applicable state requires notice of those events.

**Government Agency / Municipality / Public Entity Accounts:** This type of Account is owned by a government or public entity. For this type of Account, you agree to provide us with authorization document(s) (in a form acceptable to us) stating that we are designated as a depository for the funds of the government or public entity and such documentation shall state the individual(s) authorized to act on behalf of the government or public entity and the extent of their authority. We may rely upon such documentation until we receive written notice of a change and new authorization documents. We are not responsible for any transaction conducted by a previously authorized individual until we actually receive written notice that the authorized individual's authority has been revoked. Unless specifically stated otherwise in the authorization document(s), we can rely on one authorization for all Accounts owned by the government or public entity. If required by law, you agree to enter into a collateral security agreement regarding this type of Account.

WAB000224

## CHECKING SUB-ACCOUNTS

If you have a checking Account, your Account consists of a transaction sub-account and a savings sub-account. This structure is for internal accounting purposes only and will not affect your available balance, service charges, FDIC insurance, interest earnings, your periodic statement or any other feature of your Account. Funds not routinely needed to pay debits may be periodically transferred to the savings sub-account. A transfer from the savings sub-account back to the transaction sub-account will fund items in excess of the balance in the transaction sub-account. The remainder of your balance will be maintained in the transaction sub-account. If interest is paid on your Account balance, the interest calculation will be the same for both the savings sub-account and the transaction sub-account. If interest is not paid on your account balance, the savings sub-account will be non-interest bearing.

## PRECAUTIONS TO REDUCE THE RISK OF UNAUTHORIZED TRANSACTIONS

Precautions are actions that you can take to protect the security of your Account. These include such measures as protecting the security of passwords, promptly reviewing bank statements for unauthorized activities, and immediately reporting suspicious activity to us. We may also make certain Treasury Management products and/or services available to you that are designed to detect and/or deter check fraud and reduce the likelihood that fraudulent, unauthorized or altered checks or other items will be paid. These products and services will do nothing to prevent fraud unless you implement them. You agree that if you fail to implement any of the products or services, or you fail to follow these and all other precautions reasonable for your particular circumstances, you will be precluded from asserting claims against us for paying unauthorized, altered, counterfeit or other fraudulent items that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your Account or otherwise have any liability to pay such items.

## ASSIGNABILITY

This Agreement will be binding on your personal representative, executors, administrators and successors, and on our successors and assigns. You may not grant a security interest in, transfer, or assign your Account to anyone other than us without our written consent. If ownership is proposed to be transferred, we may require the Account be closed and a new Account opened in the name of the transferee or pledgee.

## BANK LIABILITY

You agree that if we do not properly complete a transaction according to this Agreement, we will not be liable in any event for losses or damages in excess of the amount of the transaction, and we will not be liable if circumstances beyond our control prevent the transaction, or the funds in your Account are or may be subject to legal process or other claim. **WE WILL NOT BE LIABLE FOR INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES REGARDLESS OF THE FORM OF ACTION AND EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF WE FAIL TO STOP PAYMENT ON AN ITEM, OR PAY AN ITEM BEARING AN UNAUTHORZIED SIGNATURE, FORGED SIGNATURE, OR FORGED ENDORSEMENT OR ALTERATION, OUR LIABILITY, IF ANY, WILL BE LIMITED TO THE FACE AMOUNT OF THE ITEM.**

In receiving items from you for withdrawal or deposit, we act only as your agent. You are responsible for the condition of a check or item when you issue it. If a check or item is returned or payment is delayed as a result of any writing or marking you or a prior endorser placed on the front or back of the check or item, you will be responsible for any cost and liabilities associated with such return or delay. We reserve the right to refuse any item for deposit or to reverse credit for any deposited items or to charge your Account for items should they become lost in the collection process.

If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your Account, the transaction, and the circumstances surrounding the loss. You acknowledge we will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you. You agree you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss.

WAB000225

## INTERNATIONAL ACH TRANSACTIONS

Financial institutions are required by law to scrutinize or verify any international ACH transaction ("IAT") that they receive against the Specially Designated Nationals ("SDN") list of the OFAC. This action may, from time to time, cause us to temporarily suspend processing of an IAT and potentially affect the settlement and/or availability of such payments.

## RIGHT OF SETOFF

Subject to applicable law, we may exercise our right of setoff or security interest against any and all of your Accounts (except IRA, Keogh and certain fiduciary Accounts) without notice, for any liability or debt of any of you, whether joint or individual, whether direct or contingent, whether now or hereafter existing, and whether arising from overdrafts, endorsements, guarantees, loans, attachments, garnishments, levies, attorneys' fees, or other obligations. If the Account is a joint or multiple-party Account, each joint or multiple-party Account holder authorizes us to exercise our right of setoff against any and all Accounts of each Account holder. Notwithstanding the foregoing, the right of setoff does not apply to any funds that were received pursuant to the Social Security Act. We do not have to give you any prior notice to apply the funds.

## DORMANT ACCOUNTS

If there has been no customer-initiated deposit or withdrawal activity in your Account for an extended period of time, we may transfer the Account to an inactive or dormant status. A demand deposit account ("DDA") becomes inactive when no customer-initiated activity has occurred on the Account for a period of eleven (11) months and dormant when there has been no customer-initiated activity for a period of twelve (12) months. A savings account ("SAV") or Certificate of Deposit ("COD") becomes inactive when there has been no customer-initiated activity for a period of twenty–three (23) months and dormant when there has been no customer-initiated activity for a period of twenty-four months. We may assess fees in accordance with the Schedule for dormant Accounts.

If the Account remains inactive or dormant for a period of time determined by the laws of the state where the Account is located (see **Governing Law** section of this Agreement), and other requirements of applicable state law are met, we are required to report and remit the balance of the Account to the custody of the applicable state agency and we will thereafter have no liability to you for the balance remitted. To the extent permitted by law and this Agreement with you, we may assess a service charge for maintaining the Account and providing unclaimed Account notices as provided in the Schedule. We reserve the right not to mail statements on Accounts which are dormant or on which previous statements have been returned undelivered. If you have not been receiving statements, disclosures or tax notices on your Account, you should contact us to make sure we have your current address.

## ACCOUNT STATEMENTS

We will send a periodic Account statement for checking and savings Accounts to the current address listed on our records. We will send only one Account statement or other notice for any Account, even if it has more than one owner. You agree that sending the Account statement or other notice to one owner qualifies as sending it to all owners, even if all owners do not have access to the mailing address of record for the Account.

If you have chosen to receive your bank statements via online banking through our website and you have enrolled with us to do so, we will send you an email informing you when your statement is available for review. Please refer to **Important Information About Communications From Us** section in this Agreement for more information regarding electronic bank statements and other electronic communications.

You are responsible for promptly examining your statement each statement period and reporting any irregularities to us. The periodic statement will be considered correct for all purposes and we will not be liable for any payment made and charged to your Account unless you notify us in writing within certain time limits after the statement is made available to you.

We will not be liable for any check that is altered or any signature that is forged unless you notify us within thirty (30) calendar days after your statement is made available to you. Also, we will not be liable for any subsequent items paid, in good faith, containing an unauthorized signature or alteration by the same wrongdoer unless you notify us within thirty (30) calendar days after the statement and first altered or forged items were made available. Except for transactions covered by the EFTA, you must also report any other Account problem within sixty (60) calendar days after the statement is made available or lose your right to assert the problem against us. If the suspected Account problem involves a substitute check you receive, you may (under some circumstances) be entitled to make a claim for an expedited refund. Such a claim may be subject to different notification time frames.

If you have requested us to hold your Account statements, we have the right to mail your statements if you have not claimed them within thirty (30) calendar days. We truncate your checks but may provide you with an image of your checks, pursuant to **Check**

**Imaging** section of this Agreement, on the understanding your original checks will not be returned to you with your statement. You agree our retention of checks does not alter or waive your responsibility to examine your statements or change the time limits for notifying us of any errors.

## CHECK IMAGING

We may provide you with an image of your canceled checks. Check imaging is a process of capturing, indexing, storing and retrieving electronic images of checks. Imaging systems replace the handling, distribution and storage of checks with electronic images.

The images are retained by Bank for a period of seven (7) years from the date of the posting. By opening or using your Account, you agree to this procedure. You agree to allow an imaged document to serve as an original item for any and all purposes, including charging your Account or determining the validity of any signatures or otherwise.

Upon request by you, we will provide you, without charge, with legible copies of up to five (5) checks (front and back) from each Account statement per month. Additional copies of canceled checks are subject to the applicable service charges (see applicable Schedule). You can make a request for these copies by telephoning us at the following numbers:

| | |
|---|---|
| Alliance Association Bank Division | (888) 734-4567 |
| Alliance Bank of Arizona Division | (877) 273-2265 |
| Bank of Nevada Division | (702) 248-4200 |
| Bridge Bank Division | (866) 273-4265 |
| First Independent Bank Division | (775) 828-2000 |
| Torrey Pines Bank Division | (877) 476-2265 |

You agree if you arrange for the printing of your own checks, and the form, encoding or format do not follow our check specification requirements and are not approved by us in advance, we will not be liable to you if the check image is less than legible.

You further agree to use only an ink color that reproduces clearly when imaged, for example dark blue or black, when filling in your checks. You agree we will not be liable to you if an imaged document reproduces improperly due to the fact you have used an ink color that does not reproduce clearly to fill in a check's payee, amount, maker's signature or other information.

## WHOLESALE WIRE AND ACH TRANSACTIONS

With respect to wire transfers or other transfers of funds not governed by the EFTA, you agree to enter into and comply with our wire transfer agreement (if applicable) and to comply with the applicable security procedures and this section. We advise you any receiving financial institution (including us) is entitled to rely on any account or bank number you have provided even though that account or bank number may identify a party different from the person or entity you have described by name in any transfer order.

**Provisional Payment:** Credit given by us to you with respect to an ACH credit or wholesale (wire) funds transfer entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive final settlement, you are hereby notified and agree we are entitled to a refund of the amount credited to your Account in connection with such entry, and the party (the originator of the entry) making payment to you via such entry shall not be deemed to have paid you the amount of such entry.

**Notice of Receipt:** We will notify you of the receipt of payments in the periodic Account statements we provide to you. You acknowledge we will not give next day notice to you of receipt of an ACH or wholesale (wire) funds transfer item.

## NOTICES

The following terms apply to notices relating to your Account:

**Notice of Amendments:** You agree the terms and conditions of this Agreement, including without limitation all fees and charges, may be amended by us from time to time. We will notify you of amendments as required by applicable law. We are not required to send you notice of Interest Rate and Annual Percentage Yield changes for variable rate Accounts. Your continued use of the Account evidences your agreement to any amendment. Notices will be sent to the most recent address shown on our records for your Account. Only one notice will be given in the case of joint Account holders.

**Account Changes:** Any Account holder or person authorized to sign on an Account is required to notify us in writing if any Account holder or other person authorized to sign on an Account dies or is declared incompetent by a court (see **Death or Incompetence** section of the Agreement). It is your responsibility to notify us of any change in your address or name. We are required to honor items drawn only on the listed Account name. Further, we are required to attempt to communicate with you only at the most recent address

WAB000227

provided to us.

## ACCOUNT TERMINATION

You and we agree that either of us may close your Account and terminate this Agreement at any time with or without cause. We will provide written notice to you in advance if we decide to terminate your Account relationship for any reason other than abuse of the Account relationship or to prevent a loss. You agree that advance written notice from us will be reasonable if it is mailed to your statement mailing address immediately upon Account closure. You agree in instances of Account abuse or to prevent a loss, notice is reasonably given by us if mailed immediately upon Account closure. You may close any of your Accounts by notifying us in writing or in person at one of our branch locations.

When an interest bearing Account is closed, there may be accrued interest that has not been credited to the Account. In that case, we will NOT pay you the interest UNLESS we have told you otherwise. Further, for security reasons, we may require you to close your Account and open a new Account if:

1. There is a change in authorized signers;
2. There has been a forgery or fraud reported or committed involving your Account;
3. Any Account checks are lost or stolen;
4. You have too many transfers from your Account; or
5. Any other provision of this Agreement with you is violated.

After the Account is closed, we have no obligation to accept deposits or pay any outstanding checks or charges. You agree to hold us harmless for refusing to honor any check drawn on a closed Account. In the event we close your Account, we may mail you, at your statement mailing address, a Cashier's Check for the applicable remaining Account balance. The termination of this Agreement and closing of an Account will not release you from any fees or other obligations incurred prior to the date upon which this Agreement is terminated and an Account closed, any fees assessed by us in the process of closing an Account, or any fees arising from your responsibility to maintain sufficient funds in an Account to cover any outstanding checks or other debit items.

## DEATH OR INCOMPETENCE

You agree to notify us promptly of the death or court-declared incompetency of any owner or authorized signer on your Account. Until we are given written notice of such death or incompetence by you or a court, we may continue to honor checks, items and instructions by those authorized on the Account. We may also freeze, refuse or reverse deposits and transactions and/or return governmental benefit payments made to the Account holder if we become aware of the death or incompetence of an owner or authorized signer.

## GOVERNING LAW

This Agreement, all Accounts and services provided to you, and any dispute relating to those Accounts and services are governed by federal law and the laws of the State of Arizona, except when the law of the state where your Account is located is not superseded by federal law. Your Account is considered located in the following state:

- If you opened your Account in person, the U.S. state where you opened the Account;
- If you opened your Account by mail, internet, or other remote means and you resided in a U.S. state where we had a branch office at that time, the state where you resided; or
- If you opened your Account by mail, internet, or other remote means and you did not reside in a U.S. state where we had branch offices at that time, Arizona.

In addition, transactions on your Account are also subject to applicable clearinghouse and Federal Reserve Bank rules and regulations. You understand we must comply with these laws, regulations, and rules. You agree if there is any inconsistency between the terms of this Agreement and any applicable law, regulation, or rule, the terms of this Agreement will prevail to the extent any such law, regulation, or rule may be modified by agreement between you and us.

## SYSTEMS AND SOFTWARE

We shall not be responsible to you for any loss or damages suffered by you as a result of the failure of systems and software used by you to interface with our systems or to initiate or process banking transactions whether such transactions are initiated or processed directly with our systems or through a third party service provider. You acknowledge you are solely responsible for the adequacy of

systems and software utilized by you to process banking transactions and the ability of such systems and software to do so accurately.

## CREDIT VERIFICATION

You authorize us to request and obtain one or more credit reports about any owner or authorized signer from one or more credit reporting agencies for the purposes of considering your application for the Account, reviewing or collecting any Account opened for you, or for any other legitimate business purpose. You authorize us to disclose information about your Account to a credit reporting agency if your Account was closed because you have abused it.

## IDENTITY THEFT

Identity theft is on the rise across the United States. It is increasingly important you take steps to reduce the risk of becoming an identity theft victim. There are a number of useful online resources for consumers. For example, the Federal Trade Commission's website, www.ftc.gov/idtheft, is a one-stop national reference tool providing detailed information to help you deter, detect, and defend against identity theft. It will also help you address questions like:

– What are the steps I should take if I am a victim of identity theft?
– What is a fraud alert?
– What is a credit freeze?

To speak to a professional identity theft counselor call 1-877-FTC-HELP (382-4357)

## PRIVACY

We believe your privacy is important. You will be provided a separate **Privacy Disclosure** in addition to this Agreement.

## UNLAWFUL INTERNET GAMBLING ENFORCEMENT ACT ("UIGEA") OF 2006

You agree not to use the Account in any illegal activity, including but not limited to Internet gambling. You are prohibited from processing transactions through your Account that are unlawful under the UIGEA. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling. You agree that if anyone asks us to process a transaction we believe is restricted under the UIGEA, we may block or refuse any transaction we believe that may violate this provision and take other action we deem to be reasonable under the UIGEA and this Agreement.

## LEGAL ACTIONS AFFECTING YOUR ACCOUNT

If you or your Account becomes involved in any legal proceedings, your use of the Account may be restricted. We shall be entitled to act upon any legal action served upon us which we reasonably believe to be binding, with no liability to you for doing so.

If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your Account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the Account and not allow any payments out of the Account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all owners of the Account. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your Account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your Account. The list of fees applicable to your Account(s) in the Schedule may specify additional fees that we may charge for certain legal actions called Legal Processes.

## RESOLVING DISPUTES

For the purposes of this section, a "party" refers to either you or Bank and "parties" refers to both you and Bank. Further, the parties will resolve disputes over the telephone or within the branch office where you opened your Account. The parties agree that upon the election of either party, unresolved disputes will be resolved by binding arbitration, and not through litigation in any court. Claims in arbitration will proceed on an individual basis, on behalf of the named parties only.

You have the right to opt out of this agreement to arbitrate if you tell us within sixty (60) days of opening your Account. If you want to

WAB000229

opt out, contact your relationship officer. Otherwise this agreement to arbitrate will apply without limitation, regardless of whether 1) your Account is closed; 2) you pay us in full any outstanding debt you owe; or 3) you file for bankruptcy.

1. YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED ABOVE. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL.

2. THE PARTIES ALSO WAIVE ANY ABILITY TO ASSERT OR PARTICIPATE ON A CLASS OR REPRESENTATIVE BASIS IN COURT OR IN ARBITRATION.

3. ARBITRATION IS FINAL AND BINDING ON THE PARTIES INVOLVED AND SUBJECT TO ONLY A VERY LIMITED REVIEW BY A COURT.

4. IN ARBITRATION, THE PARTIES ARE WAIVING THEIR RIGHT TO LITIGATE IN COURT, INCLUDING THEIR RIGHT TO A JURY TRIAL.

5. DISCOVERY IN ARBITRATION IS MORE LIMITED THAN DISCOVERY IN COURT.

6. ARBITRATORS ARE NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING IN THEIR AWARDS. THE RIGHT TO APPEAL OR TO SEEK MODIFICATION OF ARBITRATORS' RULINGS IS VERY LIMITED.

7. A PANEL OF ARBITRATORS MIGHT INCLUDE AN ARBITRATOR WHO IS OR WAS AFFILIATED WITH THE BANKING INDUSTRY.

8. ARBITRATION WILL APPLY TO ALL DISPUTES BETWEEN THE PARTIES, NOT JUST THOSE CONCERNING THIS AGREEMENT.

9. IF YOU HAVE ANY QUESTIONS ABOUT ARBITRATION, CONSULT YOUR ATTORNEY OR THE AMERICAN ARBITRATION ASSOCIATION.

You agree that proper jurisdiction and venue for any arbitration or litigation regarding your Account will be in the county of our banking office where your Account is located under the **Governing Law** section of this Agreement. In the event of any controversy, dispute, or claim between you and us (including our employees, agents, or assigns) arising from any agreement, provision, or procedure relating to any Account you have with us under this Agreement, any such controversies or claims will, at the election of either party, be settled by arbitration in accordance with the Federal Arbitration Act.

A. Arbitration proceedings will be administered by the American Arbitration Association and will be subject to its commercial rules of arbitration.

B. For purposes of the application of the statute of limitations, the filing of arbitration pursuant to this paragraph is the equivalent of the filing of a lawsuit, and any claim or controversy which may be arbitrated under this paragraph is subject to any applicable statute of limitations. The arbitrators will have the authority to decide whether any such claim or controversy is barred by the statute of limitations, and if so, to dismiss the arbitration on that basis.

C. If there is a dispute as to whether an issue is subject to arbitration, the arbitrators will have authority to resolve any such dispute.

D. The decision that results from an arbitration proceeding may be submitted to an authorized court of law in an effort to confirm, modify, vacate or enforce an award.

E. This provision does not limit either your right to:
   1. Exercise self-help remedies, such as setoff or
   2. Act in a court of law, before, during or after the arbitration proceeding to obtain: i) a provisional or interim remedy, and/or; ii) additional or supplementary remedies.

F. The pursuit of, or a successful action for provisional, interim, additional or supplementary remedies, or the filing of a court action, does not constitute a waiver of either your right or our right to submit the controversy or claim to arbitration if the other party contests the lawsuit.

Judgment upon an arbitration award may be entered in a court having jurisdiction subject to the following limitation: the arbitration award is binding upon the parties only if the amount does not exceed four million dollars ($4,000,000). If the award exceeds that limit, either party may commence legal action for a court trial de novo. Such legal action must be filed within thirty (30) days following the date of the arbitration award; if such legal action is not filed within that time period, the amount shall be binding. The arbitrator(s), or a court of law, as the case may be, shall award to the prevailing party in recovery of all costs and fees (including reasonable attorneys' fees and costs, arbitration administration or court fees and costs, and arbitrator's fees).

WAB000230

## MISCELLANEOUS PROVISIONS

- You understand that supervisory personnel may randomly monitor customer service telephone conversations to ensure you receive accurate, courteous, and fair treatment.

- If you ask us to follow instructions we believe might expose us to any claim, liability, or damages, we may refuse to follow your instructions or may require a bond or other protection, including your agreement to indemnify us. In the event of any adverse or conflicting claims or demands being made in connection with your Account, or in the event we in good faith are in doubt as to what action we should take regarding your Account, we may (A) place a hold on funds in your Account until such time as we receive an appropriate court order or other assurance reasonably satisfactory to us as to the disposition of funds in the Account, and/or (B) commence an interpleader action in a court of competent jurisdiction to determine the respective rights and obligations of the parties with respect to such funds and your Account. Upon placing such a hold or commencing such an action, we will be relieved of any liability with respect to such funds and your Account.

- You agree to be liable to us, to the extent permitted by law, for any loss, costs, or expenses (including attorneys' fees) that we may incur as a result of any dispute or legal proceeding involving your Account. You authorize us to deduct any such loss, costs, or expenses from your Account without prior notice to you or to bill you separately. This obligation includes disputes between you and us involving your Account and situations where we become involved in disputes between you and an authorized signer, a joint owner, or a third party claiming an interest in your Account. It also includes situations where any action taken on your Account by you, an authorized signer, a joint owner, or a third party causes us to seek the advice of an attorney, whether or not we actually become involved in a dispute.

- Any action by us for reimbursement from you for any losses, costs or expenses may also be made against your estate, heirs and legal representatives, who shall be liable for any claims made against and expenses incurred by us.

- If a court finds any provision of this Agreement to be invalid or unenforceable, such finding shall not make the rest of this Agreement invalid or unenforceable. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

## SUBSTITUTE CHECKS AND YOUR RIGHTS

**What is a Substitute Check?** To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with slightly reduced images of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same as you would use the original check." You may use a substitute check as proof of payment just like the original check. Some or all of the checks that you receive back from us may be substitute checks. This section describes the rights you have when you receive substitute checks from us. The rights in this section do not apply to original checks or to electronic debits to your Account. However, you have rights under other laws with respect to those transactions.

**What are your rights regarding substitute checks?** In certain cases, federal law provides special procedures allowing you to request a refund for losses you suffer if a substitute check is posted to your Account (for example, if you think the wrong amount was withdrawn from your Account or money was withdrawn from your Account more than once for the same check). The losses you may attempt to recover under these procedures may include the amount withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, NSF fees).

The amount of your refund under these procedures is limited to the amount of your loss or the amount of the substitute check, whichever is less. You are also entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law. If you use these procedures, you may receive up to two thousand five hundred dollars ($2,500) of your refund (plus interest if your Account earns interest) within ten (10) business days after we receive your claim, and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we receive your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate the substitute check was correctly posted to your Account.

**How do I make a claim for a refund?** If you believe you have suffered a loss relating to a substitute check you received and that was posted to your Account, please contact us at the applicable Bank division address or telephone number provided below. You must contact us as described below within forty (40) calendar days of the date we mailed or delivered (delivered by a means to which you

WAB000231

agreed) the substitute check in question or the periodic Account statement showing the substitute check was posted to your Account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include:

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: the check number, the name of the person to whom you wrote the check, the date the check was written, and the amount of the check.

**Division Contacts:**

Alliance Association Bank
3033 W. Ray Road, Suite 200
Chandler, AZ 85226
(888) 734-4567

Alliance Bank of Arizona
One East Washington, Suite 100
Phoenix, AZ 85004
(877) 273-2265

Bank of Nevada
2700 West Sahara Avenue
Las Vegas, NV 89102
(702) 248-4200

Bridge Bank
55 Almaden Blvd., Suite 100
San Jose, CA 95113
866-273-4265

First Independent Bank
5335 Kietzke Lane
Reno, NV 89511
(775) 828-2000

Torrey Pines Bank
12220 El Camino Real, Ste.200
San Diego, CA 92130
(877) 476-2265

## ELECTRONIC FUNDS TRANSFER AGREEMENT

This Electronic Funds Transfer Agreement disclosure is made in compliance with federal law regulating electronic funds transfer ("EFT") services. EFTs are electronically-initiated transfers of money involving an Account with us, including but not limited to those EFTs resulting from debit cards, ATM cards, electronic payments, credits and transfers, telephone transfers, and online banking transactions. The following disclosures set forth your and our rights and responsibilities concerning EFTs. In this section, the words "you" and "your" mean those who sign as signers or any authorized user(s). The abbreviation "PIN" or word "code" means a personal identification number.

Privacy of Your Electronic Transactions: Regarding the privacy of your personal information on your Accounts to and/or from which EFTs are permitted, we do not share or disclose your nonpublic personal information to any non-affiliated third parties other than for the permissible exceptions to process your transactions, maintain your Account(s), respond to court orders and legal investigations, or report Account information to the credit bureaus.

Our full **Privacy Policy disclosure** is given to you at the time you open an Account, any time you request a copy by contacting us, or it is available to print from our website by accessing the following web address using any Internet-accessible device: www.westernalliancebancorporation.com/privacy-legal-home/privacy-policy

## Currency Conversion Information

When you use your ATM or Visa®-branded debit card ("Card") at a merchant that settles in a currency other than U.S. dollars, the charge will be converted into the U.S. dollar amount. The currency conversion rate used to determine the transaction amount in U.S. dollars is either:

– A rate selected by Visa® from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa® itself receives; or

– The government-mandated rate in effect for the applicable central processing date.

In each instance, the rate will be plus or minus any adjustment determined by the Visa® issuer. The conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.

## Visa® Debit/Check Card, ATM Card and POS Types of Transactions/Transfers

You may use the Card and PIN issued to you to pay for purchases from merchants who have agreed to accept the card at Point of Sale ("POS") terminals within the networks identified on your Card and such other terminals as the Bank may designate from time to time. POS transactions will be deducted from your Primary Account. "Primary Account" means the Account you select as the main account for all Card transactions. POS transactions involving a refund will be credited to your Primary Account. You may also use the Card to pay for purchases from merchants that accept debit cards with a Visa® symbol. In addition, you may use your Card to pay bills directly by telephone from your Account in the amounts and days you request.

You may use the Card and PIN issued to you to initiate transactions at ATMs of ours, within the networks identified on your Card and such other facilities as we may designate from time to time. Unless you specify a different Account during ATM transactions, your Primary Account will be used for your transactions. Your Primary Account number and information may be obtained from the initial forms you completed when you requested your Card(s). At present, you may use your Card at ATMs (some of these services may not be available at all ATMs) to:

– Deposit funds to your checking and savings Account;
– Withdraw cash from your checking and savings Account;
– Transfer funds between your checking and savings Accounts; and
– Obtain balance information on your deposit Accounts.

## Limitations on Frequency and Amount:

– You may make as many ATM withdrawals per day within the total daily cash withdrawal limits established. (Per transaction fees may apply).
– Deposits to checking or savings Accounts must be made at ATMs owned by us and that accept deposits.
– To protect your Accounts, there are daily dollar limits for withdrawals, even if your available balance is higher than the daily dollar limit. Subject to available funds in your Account, we have established the following limits:

> **ATM and Visa® Debit Card**– You have a daily cash withdrawal limit of one thousand dollars ($1,000) and a daily combined point of sale and debit card purchase limit of one thousand five hundred dollars ($1,500) for a daily combined cash and purchase limit of two thousand five hundred dollars ($2,500).

– The maximum amount you are able to withdraw may also be set by the institution which owns the ATM and may be lower than the limits set by us.
– You may not stop payment on an ATM or Visa® debit card transaction.
– The Card may be revoked without notice to the cardholder or repossessed by us at any time and must be surrendered upon demand.
– The Card transactions described in this section are subject to the limitations described in **Limits on Savings and Money Market Transfers and Withdrawals** section of this Agreement.
– Financial institutions who have agreed to accept debit cards at POS terminals are not required to make available a receipt for small-value transactions of fifteen dollars (**$15.00)** or less.

## Fees and Charges for ATM / POS Transactions

**ATM Fees:** When you use an ATM not owned by us ("Foreign ATM"), you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer). Foreign ATMs for purposes of

the surcharge fees discussed below are ATMs not owned by us or ATM transactions not processed through the MoneyPass ATM system.

– There is no charge for ATM withdrawals at machines owned by us, or when using MoneyPass ATMs. Please visit www.moneypass.com for a list of locations.

– For Alliance Bank of Arizona Division, Bridge Bank Division, First Independent Bank Division, and Torrey Pines Bank Division customers, the surcharge on foreign ATM transactions will be absorbed up to a maximum of $15.00 per Account per month. Any fees exceeding the maximum per month threshold will be passed on to you.

– For Bank of Nevada Division customers only, the surcharge for foreign ATM transactions will be passed on to you, if any are charged.

– For Alliance Association Bank Division customers only, the surcharge on Foreign ATMs will not be passed on to you, if any are charged.

– The Card transactions described in this section are subject to the fees and charges described in **Limits on Savings and Money Market Transfers and Withdrawals** section of this Agreement.

– You are responsible for any Visa International fees for transactions conducted outside the U.S.

**Business Visa® Debit Cards:** A business debit card is an access card issued only to the owner(s) on the business Account or those they have authorized for card access. The cardholder will have access to the business Account via an ATM, POS location or as a Visa® debit card. The funds will be debited directly from the Primary Account. A business debit card is not a consumer product and is not covered under the consumer laws and regulations of the EFTA and is not subject to surcharge fee waivers. A separate application and disclosure must be completed and approved prior to issuance.

## Preauthorized Funds Transfer Types and Preauthorized Transfers

You may arrange for us to complete the following preauthorized transfers to or from your deposit Accounts:

– Pay certain recurring bills from your checking or savings Account; and
– Accept direct deposit to your checking or savings Account.

Limitations on Frequency and Amount:

– There is no limit on the frequency or amount of the direct deposits accepted to your Accounts.
– The transactions described in this section are subject to the limitations described in **Limits on Savings and Money Market Transfers and Withdrawals** section of this Agreement.

Fees and Charges:

– We do not charge for any preauthorized EFTs on consumer Accounts but business Accounts may be charged related transaction fees.
– We will charge a fee for each stop payment order for preauthorized transfers.
– The Card transactions described in this section are subject to the fees and charges described in **Limits on Savings and Money Market Transfers and Withdrawals** section of this Agreement.

## Other EFT Transactions

You may access certain Account(s) you maintain with us by other EFT transaction types as described below:

**Foreign Remittance Transfers:** Foreign remittance transfers are defined broadly as all electronic transfers of funds initiated by a consumer in the U.S., for personal, family or household purposes sent to designated recipients located in foreign countries. Foreign remittance transfers in the amount of fifteen dollars ($15) or less are exempt from the applicable rule. Bank only initiates foreign wire remittance transfer services for existing customers at this time. A foreign wire remittance transfer submitted by a trust or business is excluded from the applicable regulations. At the time you initiate a foreign remittance transfer, you will be provided the required disclosures governing your rights and responsibilities and any fees associated with this service.

**Electronic Check Conversion:** You may authorize a merchant or other payee to make a one-time electronic payment from your checking Account using information from your check to pay for purchases or pay bills. Electronic check conversation is a payment process in which a merchant (after obtaining your authorization) uses your check to gather routing, Account, and check number information to initiate a one-time EFT. This type of EFT transaction involving a consumer account is covered by the EFTA. A description of the transaction will appear on your statement.

**Re-presented Check Transactions and Fees:** You may authorize a merchant to electronically collect a fee associated with the re-

presentment of a check that is returned due to insufficient or unavailable funds. The resulting fee transaction if debited as an EFT from a consumer Account is covered by the EFTA. When a merchant re-presents a check electronically, that transaction is not covered by the EFTA. A description of the transaction will appear on your statement.

## Limitations of Liability

The following limitations may be applicable to your Accounts, except as provided by law:

Visa® is a registered trademark of Visa International.

**Liability for Unauthorized Visa® Point of Sale Debit Card Transactions:** Tell us, AT ONCE, if you believe your Card has been lost or stolen or of any unauthorized transactions. Your liability for unauthorized POS Card transactions that take place on the Visa® system is zero dollars ($0.00). Effective October 17, 2014, zero liability coverage is extended to U.S. ATM transactions sent over the Visa® and Plus networks. We may require you to provide a written statement regarding claims of unauthorized POS Card transactions.

These provisions limiting your liability apply only to cards issued in the United States. With respect to unauthorized transactions, these limits may be exceeded to the extent allowed under applicable law (see **Liability for Unauthorized Transfers** paragraph) only if we determine you were grossly negligent or fraudulent in the handling of your Account or Card. The same consumer liability limits shall apply to Interlink and MoneyPass transactions. To notify you of lost or stolen cards, or of unauthorized transactions, call or write to us at the telephone number or address set forth in the **Liability for Unauthorized Transfers** paragraph below. This will help prevent unauthorized access to your Account and minimize any inconvenience.

**Liability for Unauthorized Transfers-Personal Accounts only:**
Tell us, AT ONCE, if you believe your Card or PIN (code) has been lost or stolen. Telephoning is the best way to keep your possible losses down. You could lose all the money in your Account (plus your maximum overdraft line of credit). If you tell us within two (2) business days, you can lose no more than fifty dollars ($50.00) if someone used your Card or code without your permission. If you do NOT tell us within two (2) business days after you learn of the loss or theft of your Card or code, and we can prove we could have stopped someone from using your Card or code without your permission if you had told us, you could lose as much as five hundred dollars ($500.00). Also, if your statement shows transfers you did not make, tell us at once.

If you are a California resident and you have a debit card that may be used without a PIN for electronic transactions from your consumer Account, then you will be responsible for the lesser of fifty dollars ($50.00) or the amount of unauthorized use prior to your notification to us of the loss or theft of your Card. If you do not notify us of the loss or theft of your Card within sixty (60) days after your Account statement was mailed to you and we can prove that we could have stopped someone from using your Card without your permission if you had told us, then you will be responsible for the amount of unauthorized use of your card up to the lesser of five hundred dollars ($500.00) or the amount of unauthorized use that occurs after the sixty (60) day period mentioned above until the time you notify us of the loss or theft of your card.

If you do not tell us within sixty (60) days after the statement was mailed to you, you may not get back any money lost after the sixty (60) days if we can prove we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

**Contact for Unauthorized Transfers:** If you believe your Card or code has been lost or stolen or that someone has transferred or may transfer money from your Account without your permission, contact us immediately:

**Alliance Association Bank Division**: Call **(888) 734-4567** or write us at Alliance Association Bank, 3033 W. Ray Road, Suite 200, Chandler, AZ 85226.

**Alliance Bank of Arizona Division**: Call **(877) 273-2265**, or write us at Alliance Bank of Arizona, One East Washington, Suite 100, Phoenix, AZ 85004. After business hours, call **(800) 528-2273**.

**Bank of Nevada Division:** Call **(702) 248-4200** or write us at Bank of Nevada, 2700 West Sahara Avenue, Las Vegas, NV 89102. After business hours, call **(800) 528-2273.**

**Bridge Bank Division:** Call **(866) 273-4265**, or write us at Bridge Bank, 55 Almaden Blvd., Suite 100, San Jose, CA 95113

**First Independent Bank Division**: Call **(775) 828-2000**, or write us at First Independent Bank, 5335 Kietzke Lane, Reno, NV 89511. After business hours, call **(800) 528-2273.**

WAB000235

**Torrey Pines Bank Division**: Call **(877) 476-2265,** or write us at Torrey Pines Bank, 12220 El Camino Real, Ste. 200, San Diego, CA 92130. After business hours, call **(800) 528-2273.**

You should also call the number or write to the address listed above if you believe a transaction has been made using information from your checks without your permission.

**Business Days:** For purposes of these EFT disclosures, our business days are Monday through Friday. Holidays are not included.

**Our Liability for Failure to Make Transfers**: If we do not complete a transfer to or from your Account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will NOT be liable for instance:

– If, through no fault of ours, you do not have enough money in your Account to make the transfer.
– If the money in your Account is subject to legal process or other claim restricting such transfer.
– If the transfer would go over the credit limit on your overdraft line.
– If the ATM where you are making the transfer does not have enough cash.
– If the terminal was not working properly and you knew about the breakdown when you started the transfer.
– If circumstances beyond our control (such as fire or flood) prevent the transaction, despite reasonable precautions that we have taken.
– There may be other exceptions stated in our agreement with you.

## Documentation

**Periodic Statement:** For all Accounts to or from which EFTs can be made, we will send a periodic statement for each monthly statement cycle in which an EFT has occurred and at least quarterly if no EFT has occurred, such as the case on savings Accounts.

**Terminal Receipt:** You can get a receipt at the time you make any transfer to or from your Account using one of our ATMs or a POS terminal unless the POS transaction is for fifteen dollars ($15.00) or less.

**Direct Deposits:** If you have arranged to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call us at the number below to find out whether or not the deposit has been made.

| | |
|---|---|
| Alliance Association Bank Division | (888) 734-4567 |
| Alliance Bank of Arizona Division | (877) 273-2265 |
| Bank of Nevada Division | (702) 248-4200 |
| Bridge Bank Division | (866) 273-4265 |
| First Independent Bank Division | (755) 828-2000 |
| Torrey Pines Bank Division | (877) 476-2265 |

## Other Provisions

**Stop Payments on ATM, POS, or Debit Card Transactions:**
You may not place a stop payment order on any ATM, POS, or debit card transaction.

**Personal Identification Number (PIN):** The PIN issued to you is for your security purposes. The numbers are confidential and should not be disclosed to third parties or recorded on the Card. You are responsible for safekeeping your PIN(s). You agree not to disclose or otherwise make your PIN available to anyone not authorized to sign on your Account(s).

**Notices:** All notices to you will be effective when we have mailed them to your last known address on our records unless a different effective date is stated in the notice. Notices from you will be effective when received by us at the telephone number or the address specified in this Agreement. We reserve the right to change the terms and conditions upon which EFT service is offered. We will mail notice to you at least twenty one (21) days before the effective date of any change, or as required by law. Use of this service is subject to existing regulations governing your Account and any future changes to those regulations.

**Enforcement:** In the event either party brings a legal action to enforce this Agreement or collect amounts owing as a result of any Account transaction, the prevailing party shall be entitled to reasonable attorneys' fees and costs, including fees on any appeal, subject to any limits under applicable law.

WAB000236

**Termination of ATM or POS:** You agree that we may terminate this Agreement and your use of the Card or POS services, if:

1) You or any authorized user of your Card or PIN, breach this or any other agreement with us;

2) We have reason to believe there has been an unauthorized use of your Card or PIN; or

3) We notify you or any other party to your Account we have canceled or will cancel this Agreement.

4) You or any other party to your Account can terminate this Agreement by notifying us in writing.

Termination of service will be effective the first business day following receipt of your written notice. Termination of this Agreement will not affect the rights and responsibilities of the parties under this Agreement for transactions initiated before termination.

## Preauthorized Electronic Funds Transfers

**Stop Payment Rights:** If you have told us in advance to make regular electronic fund transfers from your Account(s), you can stop any of these payments. Here's how: Call us or write to us at the telephone number or address set forth in the **In Case of Errors or Questions About Your Electronic Fund Transfers** section of the Agreement in time for us to receive your request three (3) business days or more before the payment is scheduled to be made. We may charge you a fee (as described in the Schedule) for each stop payment order you give.

**Notice of Varying Amounts:** If these regular payments may vary in amount, the person you are going to pay will tell you, ten (10) days before each payment, when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

**Liability for Failure to Stop Payment of Preauthorized Transfers:** If you order us to stop one of these payments three (3) business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

**Other Provisions:** There may be a delay between the time a deposit is made and when it will be available for withdrawal. We reserve the right to refuse any transaction which would draw upon insufficient funds, exceed a credit limit, lower an Account below a required balance, or otherwise require us to increase our required reserve on the Account.

## In Case of Errors or Questions About Your Electronic Funds Transfers

Telephone, write or email us as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on your statement or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

**Alliance Association Bank Division**
**3033 W. Ray Road, Suite 200**
**Chandler, AZ 85226**
**(888) 734-4567**
**inquiries@allianceassociationbank.com**

**Alliance Bank of Arizona Division**
**One East Washington Street, Suite 100**
**Phoenix, AZ 85004**
**(877) 273-2265**
inquiries@alliancebankofarizona.com

**Bank of Nevada Division**
**2700 West Sahara Avenue**
**Las Vegas NV 89102**
**(702) 248-4200**
inquiries@bankofnevada.com

**Bridge Bank Division**
**55 Almaden Blvd., Suite 100**
**San Jose, CA 95113**
**866-273-4265 (call this number, no email address)**

**First Independent Bank Division**
**5335 Kietzke Lane**

WAB000237

**Reno, NV 89511**
**(775) 828-2000**
inquiries@alliancebankofarizona.com

**Torrey Pines Bank Division**
**12220 El Camino Real, Suite 200**
**San Diego, CA 92130**
**(877) 476-2265**
inquiries@torreypinesbank.com

When you contact us, please provide the following information:

- Your name and Account number (if any),
- Describe the error or the transfer you are unsure about, why you believe it is an error, or why you need more information, and
- The dollar amount of the suspected error.

If you tell us orally, we may require that you send us information about the suspected error or your question in writing within ten (10) business days.

We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty five (45) days to investigate your concern or questions. If we decide to do this, we will credit your Account within ten (10) business days for the amount you think is in error, so you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your concern or question in writing and we do not receive it within ten (10) business days, we may not credit your Account.

For errors involving new Accounts, POS Card transactions, or foreign-initiated transactions, we may take up to ninety (90) days to investigate your concern or question. For new Accounts, we may take up to twenty (20) business days to credit your Account for the amount you think is in error.

We will tell you the results within three (3) business days after completing our investigation. If we decide there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

If a notice of error involves unauthorized use of your Card with the Visa® logo when it is used for a POS debit transaction, we will provide provisional credit within five (5) business days after you notify us instead of within ten (10) or twenty (20) business days. We may withhold providing this accelerated provisional credit, to the extent allowed under applicable law, if the circumstances or Account history warrants the delay.

## IMPORTANT INFORMATION ABOUT YOUR VISA® DEBIT CARD

Because there are different networks you may encounter when conducting debit transactions, Visa® has requested we inform you of potential liability on these transactions. You can use your Card for non-Visa® debit transactions which are defined as debit transactions without a PIN with merchants who participate in the STAR and Visa® networks. All other networks listed on the back of your card will require the use of a PIN. For personal Accounts, your liability when using the STAR network for PIN-less Card transactions is limited to either fifty dollars ($50.00) or five hundred dollars ($500.00), depending on the timing of your notification to us. Merchants who participate in the STAR network are required to provide you with a clear way of choosing to make a PIN-less Card transaction if they support this option.

When you conduct a PIN-less Card transaction using the Visa® network, you are covered by Visa®'s zero liability policy; however, you must still notify Bank of unauthorized transactions as outlined in this **Electronic Funds Transfer Agreement** section of the Agreement.

## FUNDS AVAILABILITY POLICY DISCLOSURE

### Your Ability to Withdraw Funds

Our policy is to make funds from your cash and check deposits available to you on the first business day after the day we receive your deposit. However, funds from electronic direct deposits will be available on the day we receive the deposit. Once the funds are available, you can withdraw them in cash and/or we will use them to pay checks you have written. For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If you make a deposit on a business day we are open, we will consider that day to be the day of your deposit. Please check branch locations for specific business hours or refer to your bank division website.

WAB000238

Deposits not made to branch personnel (such as by ATM, Night Depository, or courier) may be subject to different cut off times, disclosed as follows:

| DEPOSITORY ATMs | DEPOSIT CUTOFF TIME |
|---|---|
| Alliance Association Bank Division | No separate branches, may use any other Division branches |
| Alliance Bank of Arizona Division | 3:00 P.M. |
| Bank of Nevada Division | 3:00 P.M. |
| Bridge Bank Division | 3:00 P.M. |
| First Independent Bank Division | 3:00 P.M. |
| Torrey Pines Bank Division | 3:00 P.M. |

- <u>Night Depository:</u> If you make a deposit at the night depository before 9 a.m. on a day we are open, we will consider that day to be the day of your deposit. If you make a deposit at the night depository after 9 a.m. on a day we are open or any time on a day we are not open, we will consider the deposit to be made on the next business day we are open.
- <u>Courier/Armored Car:</u> Refer to your courier or armored car agreement you received when contracting for these services, to determine the crediting timeline for your deposit.

## Longer Delays May Apply

In some cases, we will not make all of the funds you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposit, however, may be available on the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available on the first business day after the day or your deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or is made at one of our ATMs, or if we decide to take this action after you have left the premises, we will mail you the notice by the next business day after we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

- You deposit checks totaling more than $5,000 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your Account repeatedly in the last six months.
- We believe a check you deposit will not be paid.
- There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

## Hold On Other Funds

**Check Cashing.** If we cash a check for you drawn on another bank, we may withhold the availability of a corresponding amount of funds already in your Account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

**Other Account.** If we accept for deposit a check drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds you have on deposit in another Account with us. In this case, the funds in the other Account would not be available for withdrawal until the time periods that are described elsewhere in this Agreement for the type of check you deposited.

## Special Rules for New Accounts

If you are a new customer, the following special rules will apply during the first thirty (30) days your Account is open:

WAB000239

– Funds from electronic direct deposits to your Account will be available on the day we receive the deposit.

– Funds from deposits of cash, wire transfer, and the first five thousand dollars ($5,000) of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you.

– The excess of five thousand dollars ($5,000) will be available on the ninth business day after the day of deposit.

– If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first five thousand dollars ($5,000) will not be available until the second business day after the day of your deposit.

– Funds from deposits of checks drawn on Bank will be available on the first business day after the day of your deposit.

– Funds from all other check deposits will be available no later than the ninth business day after the day of deposit.

**WAB000240**